# FILED

SEP − 9 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REVEREND PATRICK MAHONEY, *et al.,*)
)
     Plaintiffs, )
)
     -vs- )
)    Civil Action No. _____ 05 1786
THE UNITED STATES MARSHALS )
SERVICE, *et al.,* )
)
     Defendants. )

## PLAINTIFFS' STATEMENT OF POINTS AND AUTHORITIES SUPPORTING THE MOTION FOR PRELIMINARY INJUNCTION

Mahoney, Newman, and Christian Defense Coalition offer the following statement of points

and authorities in support of their motion for a preliminary injunction.

### STATEMENT OF FACTS[1]

Briefly, the facts are as follows:

The Roman Catholic Archdiocese of Washington hosts, every year just prior to the opening

of a new Term of Court, a Red Mass. This mass takes places at St. Matthew's Cathedral. St.

Matthew's Cathedral is located at 1725 Rhode Island Avenue, NW, in Washington, the District of

Columbia.[2] In the past, attendees at the Red Mass have included Justices of the Supreme Court, and

other federal and local government officials.[3]

---

1.    Mahoney, Newman, and the CDC incorporate, as though fully set out herein, the facts stated in their Verified Complaint, and in their Exhibits 1 through 4, supporting the motion.

2.    See http://www.stmatthewscathedral.org/main.html (Last visited August 29, 2005).

3.    In 2002, for example, when the Red Mass had to be held elsewhere due to renovation work at St. Matthew's, "Chief Justice William H. Rehnquist and Associate Justices Antonin Scalia and Anthony A.

On October 5, 2003, Reverend Mahoney, Troy Newman, the Christian Defense Coalition and others joined together to conduct a demonstration supporting the public display of the Ten Commandments. This demonstration took place on the southern sidewalk along Rhode Island Avenue NW, in Washington, DC, directly across from St. Matthew's Cathedral. Arriving on the scene, they discovered that United States Marshals had established a security zone in front of the Cathedral, closing the street to vehicular traffic. They also saw that yellow police tape had been draped in various locations, although it was not immediately apparent what that tape was meant to indicate.

Reverend Mahoney spoke with a Marshal and learned that his demonstration would be permitted on the sidewalk across from St. Matthew's (immediately adjacent to a press pool), but that neither he nor his associates would be permitted to carry or display their signs containing the text of the Ten Commandments. Mahoney, then others, tested the restriction, first by entering the zone where their demonstration was to occur, and discovering that they were not molested in any way,

Kennedy attended, as did Attorney General John Ashcroft, D.C. Mayor Anthony A. Williams, Secretary of Housing and Urban Development Mel Martinez and Secretary of Agriculture Ann M. Veneman." <u>See</u> The Washington Times, Oct. 7, 2002, Monday, Final Edition, p. A2.

In 2003, when Reverend Mahoney, Mr. Newman, and others were being arrested for their display of plaques of the Ten Commandments, the congregation at the Red Mass "included U.S. Chief Justice William Rehnquist, Associate Justice Antonin Scalia, U.S. Secretary of Housing and Urban Development Mel Martinez, District of Columbia Mayor Anthony Williams and Maryland Lt. Gov. Michael Steele." <u>See</u> http://www.georgiabulletin.org/world/2003/10/06/US-4 (Last visited August 29, 2005).

And, in 2004, while Reverend Mahoney and the Christian Defense Coalition were being harassed and interfered with by the United States Marshals Service, those attending the Red Mass included, "Justices Clarence Thomas, Anthony M. Kennedy and Antonin Scalia, White House Chief of Staff Andrew H. Card Jr., White House Counsel Alberto Gonzalez, D.C. Mayor Anthony A. Williams and Maryland Lt. Gov. Michael S. Steele." <u>See</u> The Washington Times, Oct. 4, 2004 Monday, p. B1.

then returning to the zone with a sign, and being immediately accosted, then ultimately arrested. On this occasion, Newman did not display a sign. Nor was he within the prohibited zone. Instead, he was carrying a camera and taking photographs of the incident (as were members of the media standing in the same location). When the Marshals discovered that Newman was "with" Mahoney, he was arrested too.

As a consequence of that process, on October 3, 2004, Mahoney and the Christian Defense Coalition returned to the vicinity of St. Matthew's Cathedral to conduct a further demonstration related to the public display of the Ten Commandments. When he arrived at the scene, he discovered a scene virtually identical to the previous October. This time, the only difference was that, rather than actually arresting him, United States Marshals continuously disrupted his efforts to conduct his prayer vigil and demonstration. The disruptions consisted of repeated threats to arrest, warnings that arrests could occur at any moment without notice, and similar threats. Ultimately, Mahoney and the CDC concluded its activities, but only did so despite the disruptions and interference of the United States Marshals Service.

This year, on October 2, 2005, Mahoney and the CDC will return to this same location once again. In the Term of the Supreme Court that is drawing to a close, the Court decided two cases involving public displays of the Ten Commandments, Van Orden v. Perry, 545 U.S. — (2005) (Docket No. 03-1500), and, McCreary County v. ACLU of Kentucky, 545 U.S. — (2005) (Docket No. 04-480). The Plaintiffs want to demonstrate in support of their views on this issue in a time and place chosen because of those likely to be in attendance. But the Plaintiffs are painfully aware of the pattern and practice of the Marshals Service to disrupt and interfere with lawful demonstrations

in these circumstances. The Plaintiffs reasonably fear that they will either be arrested, or harangued and harassed with threats of arrest. As a matter of fact, their past experience has taught them that either instance – arrest or interferences that are less than arrest – have the potent capability to suppress the Plaintiffs' First Amendment rights.

## ARGUMENT

To obtain injunctive relief, the well-settled law of this Circuit requires the Plaintiffs to demonstrate (1) that they are likely to prevail on the merits, (2) that they will suffer irreparable injury if injunctive relief is denied, (3) that the granting of injunctive relief will not cause substantial harm to the other parties and finally, (4) that the granting of injunctive relief is in the public interest, or at least, not adverse to the public interest. Wisconsin Gas Co. v. FERC, 758 F.2d 669, 673-674 (1985); Washington Metropolitan Area Transit Authority v. Holiday Tours, Inc, 559 F.2d 841, 843 (1977); Virginia Petroleum Jobbers v. FPC, 259 F.2d 921, 925 (1958).

Plaintiffs are likely to prevail on their claims, see Arguments I, infra. Further, they satisfy the requirement of showing irreparable injury, see Argument II, infra. The Defendants will not suffer any substantial harm if enjoined from arresting, threatening to arrest, harassing or intimidating the Plaintiffs for their demonstration and prayer vigil on October 2, 2005, in the vicinity of St. Matthew's Cathedral, nor will they be harmed by an injunction barring such conduct violative of the First Amendment rights of the Plaintiffs, see Argument III, infra. Finally, the interest of the public is with the preservation of constitutional rights, not their suppression; therefore the requested injunctive advances the public interest, see Argument IV, infra.

I.    PLAINTIFFS ARE LIKELY TO PREVAIL ON THEIR CLAIMS.

The Plaintiffs have asserted four causes of action in their Verified Complaint: Violation of

Rights Guaranteed by the First Amendment to the United States Constitution; Violation of Rights

Guaranteed by Title 42 U.S.C. § 2000bb, the Religious Freedom Restoration Act; Violation of Due

Process Rights Guaranteed by the Fifth Amendment to the United States Constitution; and, Violation

of Equal Protection Rights Guaranteed by the Fifth Amendment to the United States Constitution.

See generally Verified Complaint.

In their Verified Complaint, the Plaintiffs charge that the closure of the Rhode Island Avenue

sidewalk, only to the demonstration activity that they planned to conduct on Sunday, October 5,

2003, and the harassment and disruption of the same activities on Sunday, October 3, 2004, violated

their constitutional rights. They likewise allege that recurrence of either arrests or harassment on

Sunday, October 2, 2005, will again violate their rights. Plaintiffs are likely to prevail on their

claims, as a review of the governing legal principles shows:

A.    ARRESTS, THREATS OF ARREST, HARASSMENT AND INTIMIDATION
DIRECTED AT THE PRAYER VIGIL AND DEMONSTRATION OF THE
PLAINTIFFS VIOLATE CONSTITUTIONAL PRINCIPLES EMBODIED IN THE
PUBLIC FORUM DOCTRINE

The Supreme Court employs "forum" analysis to resolve claims of access to public property

for purposes of free speech. Cf., e.g., Perry Education Association v. Perry Local Educators'

Association, 460 U.S. 37 (1983) (internal mail system of public school not a traditional or designated

public forum); United States v. Grace, 461 U.S. 171 (1983) (public sidewalk surrounding U.S.

Supreme Court is a traditional public forum); Cornelius v. N.A.A.C.P. Legal Defense and Education

Fund, Inc., 473 U.S. 788, 797 (1985) (Combined Federal Campaign is not a traditional or designated

public forum).[4]  When forum analysis is applied in the instant case, Plaintiffs' claims for injunctive and declaratory relief are demonstrably well-founded and justified.

         1.     Plaintiffs' Peaceful, Public Advocacy on a Sidewalk in Downtown Washington Is Protected Speech

As explained in the Statement of Facts, the Plaintiffs plan to conduct a demonstration and prayer vigil on the south side public sidewalk adjacent to Rhode Island Avenue NW, directly across the street from the entrance to St. Matthew's Cathedral, on the morning of October 2, 2005, during the time period when the Cathedral hosts the annual Red Mass. Their prayer vigil and demonstration will consist of the displaying of signs containing the text of the Ten Commandments, as well as prayer and public speaking addressing the role of the Ten Commandments in American law, government and society.

It is an axiom of the Constitution that religious speech and discussion "are forms of speech protected by the Constitution." Widmar v. Vincent, 454 U.S. 263, 269 (1981); Heffron v. ISKCON, Inc., 452 U.S. 640 (1981). So the signs containing the Decalogue's text, and the prayers and speaking on the topics planned to be addressed, all "far from being a First Amendment orphan, [are] as fully protected under the Free Speech Clause as secular private expression." Capital Square Review and Advisory Board v. Pinette, 515 U.S. 753, 760 (1995) (citing cases). Further, the use of

---

4.     As exemplified in Cornelius, the analysis proceeds in three steps.  First, the activity threatened or affected by government action must be identified, and it must be determined whether it is speech protected under the First Amendment. Cornelius, 473 U.S. at 797. (Obviously, in cases not involving expression or expressive activities, the analysis concludes here.) Second, it is essential to "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." Id. Third, where constitutionally protected speech is at stake, the government action must be analyzed according to the standards applicable to the relevant forum. Id.

signs to draw public attention to what the Plaintiffs perceive as pervasive judicial hostility to the public display of the Ten Commandments is protected expression. Displaying signs and placards addressing public issues is a form of free speech resting "at the core of the First Amendment," Boos v. Barry, 485 U.S. 312, 318 (1988) (and cases cited). Accord United States v. Grace, 461 U.S. 171, 176-77 (1983) (and cases cited); cf. Grayned v. City of Rockford, 408 U.S. 104, 119 (1972) ("classic expressive gesture of the solitary picket").

2.      The Rhode Island Avenue Sidewalk Is a Traditional Public Forum Property

The location in dispute  – the sidewalk adjacent to and on the south side of Rhode Island Avenue NW –  is a downtown city sidewalk in the District of Columbia. It runs alongside Rhode Island Avenue, and the specific location at issue is directly across the street from St. Matthew's Cathedral.

This sidewalk is a traditional public forum property.

It is open. It is continuous through that area of the District of Columbia. It is used for all manner of normal pedestrian and commercial activities. Access to these sidewalks is, usually, unrestricted. There are no gates nor guards. There are no requirements for identification cards or passes. The layout of this sidewalk encourages the public to sightsee, to patronize nearby businesses and amenities, and to enjoy the vistas along this avenue. Nothing sets these sidewalks apart from any other sidewalk in the City of Washington.

Under the First Amendment, "streets, sidewalks, and parks, are considered, without more, to be public forums [sic]." United States v. Grace, 461 U.S. 171, 177 (1983) (and cases cited). It is well settled that:

[w]herever the title of streets and parks may rest, they have immemorially been held
in trust for the use of the public and, time out of mind, have been used for purposes
of assembly, communicating thoughts between citizens, and discussing public
questions. Such use of the streets and public places has, from ancient times, been a
part of the privileges, immunities, rights, and liberties of citizens.

Hague v. C.I.O., 307 U.S. 496, 515 (1939) (plurality opinion).

Not only are streets, sidewalks, and parks traditional public forum properties, they represent

"quintessential public forums." Perry Education Association v. Perry Local Educators' Association,

460 U.S. 37, 45 (1983). On the range of properties open in varying degrees to expressive activities,

the Rhode Island Avenue sidewalk here lies at the very "end of the spectrum." Id.

> 3.    Arrests, Threats of Arrest, Harassment and Intimidation of the Plaintiffs
>        Violates Their Constitutional Rights

The United States Marshals Service cannot sustain its burden of demonstrating that the

closure of a public sidewalk to the display of hand-held signs is justified, and that the pattern of

arrests and harassments where narrowly drawn to serve an important public purpose.

In a traditional public fora, "the government's ability to permissibly restrict expressive

conduct is very limited." United States v. Grace, 461 U.S. at 177 (quoting Perry, 460 U.S. at 45)

(additional citations omitted). This conclusion results from the fact that "[o]ne who is rightfully on

a street [or a sidewalk] open to the public 'carries with him there as elsewhere the constitutional right

to express his views in an orderly fashion.'" Members of City Council of Los Angeles v. Taxpayers

for Vincent, 466 U.S. 789, 810 (1984) (quoting Jamison v. Texas, 318 U.S. 413, 416 (1943))

(additional citation omitted). In fact, "[r]egulation of speech activity on governmental property that

has been traditionally open to the public for expressive activity, such as public streets and parks, is

examined under strict scrutiny." United States v. Kokinda, 497 U.S. 720, 726 (1990).

In <u>Capital Square Review and Advisory Board v. Pinette</u>, 515 U.S. 753, 761 (1995), the Court explained that in a traditional public forum property, "the right to limit protected expressive activity is sharply circumscribed: it may impose reasonable, content-neutral time, place and manner restrictions ... but it may regulate expressive <u>content</u> only if such a restriction is necessary, and narrowly drawn, to serve a compelling state interest."

Two government actions have either already injured, or presently threaten to injure, the Plaintiffs in the exercise of their First Amendment rights: arrests for sign displays in a traditional public forum property; and, hectoring and harassment in the form of constant threats to arrest and prosecute for displaying signs. Both of these actions fail the relevant standards of scrutiny.

Undoubtedly, the United States Marshals Service will argue its statutory duty to insure the safety of protected persons (judges, justices, etc.) constitutes that compelling government interest that justifies its actions in 2003, in 2004, and that will justify whatever actions it needs must take in 2005. The argument proves too much. The interest in protecting statutorily designated persons did not justify the Supreme Court sidewalk closure at stake in <u>United States v. Grace</u>, 461 U.S. 171 (1983) or the ban on sign displays that bring certain foreign dignitaries into public opprobrium at stake in <u>Boos v. Barry</u>, 485 U.S. 312 (1988).[5]

Under strict scrutiny, the Marshals Service's actions can be "upheld only if narrowly drawn to achieve a compelling interest." <u>Grace</u>, 461 U.S. at 177. "In order to qualify as narrowly tailored, a content neutral ordinance must avoid vesting ... officials with discretion to grant or deny licenses."

---

5.    <u>Boos</u> is particularly pertinent since there were clearly vital national interests at stake in the protection of foreign dignitaries, because such protection is an aspect of the duties of the federal government under international law. <u>See Boos</u>, 485 U.S. at 323-24 (discussing this "vital national interest").

Miami Herald Pub. Co. v. City of Hallandale, 734 F.2d 666, 673 (1984), aff'd 742 F.2d 590 (11th Cir. 1984).  See Forsyth County. v. Nationalist Movement, 505 U.S. 123, 132-33 (1992).  But, as shown on the facts here, the Marshals Service exercised unbridled discretion to arrest, threaten to arrest, harass and disrupt demonstrations and similar activities in the traditional public forum.

Unlike cases in which a particular regulation purports to grant discretion to an administrative decision-maker but omits important, confining details that would limit discretion, the present controversy does not arise on a flawed regulation or statute.  There is, on information and belief, no regulation granting that directs the closure of public sidewalks to demonstrations or prayer vigils, or that endows the Service with the authority to flatly prohibit the display of hand-held signs.  All there is in this regard is naked power.

In the absence of any regulation or statute, no restriction on discretion of the Marshals exists.  Thus, the unbridled discretion, as exercised by the United States Marshals Service during the 2003 and 2004 Red Mass demonstrations in Washington, DC, clearly violates the Miami Herald standard.

There are no objective standards to guide the Service when, why, and who is to be arrested, stopped, limited in the exercise of their constitutional rights on public streets and sidewalks.  The absence of articulated standards renders the Service's decisions discretionary.  This is unconstitutional.  Id.

No compelling government interests can exist for a wholly discretionary system affecting and regulating free speech on a traditional public forum.  The Service's arrogation of power in these circumstances gives Marshals the type of unbridled discretion uniformly declared unconstitutional by the Supreme Court.  See Forsyth County, 505 U.S. 123, 131 (1992) (striking a speech regulatory

scheme because it "involve[d] appraisal of facts, the exercise of judgment, and the formation of an

opinion [cit.] by the licensing authority," and consequently created "the danger of censorship and of

abridgement of our precious First Amendment freedoms") (citations and quotation marks omitted);

see also Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51 (1969); Freedman v. Maryland,

380 U.S. 51 (1965).

### B.    THE UNITED STATES MARSHALS SERVICE EXERCISES UNBRIDLED DISCRETION.

The exercise of raw federal police powers by the United States Marshals Service to close

public sidewalks to demonstrators is an instance of unbridled discretion that restrains speech in

advance. It creates uncertainty, fear of reprisals, arrests, and intimidations. It does not punish speech

after the fact but seeks to silence it in advance. It is a prior restraint on expression.

It restrains and inhibits expression before it takes place, and gives the Service the right to

deny expression altogether. While such schemes generally may be treated as time, place, and manner

restrictions on expression and can pass constitutional muster if they are free from reliance upon the

content of communications for their operation, see Thomas v. Chicago Park District, 534 U.S. 316,

322-23 (2002), by omitting any standards to confine the exercise of discretion to legitimate,

constitutionally appropriate standards, the exercise of raw power to suppress expression is an

unconstitutional restraint on expression.

As the United States Supreme Court has stated, "[a]ny system of prior restraints of expression

comes to this Court bearing a heavy presumption against its constitutional validity." New York

Times Co. v. U.S., 403 U.S. 713, 714 (1971) (quoting Bantam Books, Inc. v. Sullivan, 372 U.S. 58,

70 (1963)). The Service "'thus carries a heavy burden of showing justification for the imposition

of such a restrain.'" New York Times, 403 U.S. at 714 (quoting Organization for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971)). In this case, the Service simply cannot sustain the burden of justifying the systematic restraint of speech it has imposed.

In reviewing its prior restraint cases, the Supreme Court noted, "the regulations we have found invalid as prior restraints have `had this in common: they gave public officials the power to deny use of a forum in advance of actual expression.'" Ward v. Rock Against Racism, 109 S.Ct. 2746, 2756, n.5 (1989) (quoting Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 553 (1975)). Here, this is precisely what occurred in 2003 with the arrest of the Plaintiffs and virtually what occurred in 2004 when Marshals frustrated and disrupted the Plaintiffs' activities.

The Supreme Court has said, "a law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." Shuttlesworth v. City of Birmingham, 394 U.S. 147, 150-51 (1969). Such a restraint is worse than a badly drawn law, it is no law at all: the Court has made "clear that a person faced with such an unconstitutional licensing law may ignore it and engage with impunity in the exercise of the right of free expression for which the law purports to require a license." Id. at 151.

Such a system of prior restraint must be accompanied by adequate procedural safeguards: denials of speech rights must be of brief duration for purposes only of maintaining the status quo; the scheme must require quick judicial review of the decision; and, where grave dangers of censorship are present as here, the government must bear the burden to initiate court action and prove its grounds for denial of the right to engage in expressive activity. FW/PBS, Inc. v. City of

Dallas, 493 U.S. 215, 227 (1990). The Service's standardless, unbridled discretion provides none of the procedural safeguards that are necessary prerequisites to constitutionality.

C.  ARRESTS AND THREATS OF ARREST FOR DISPLAYING SIGNS CONTAINING THE TEXT OF THE BIBLICAL TEN COMMANDMENTS VIOLATE RIGHTS OF RELIGIOUS FREEDOM PROTECTED UNDER THE RELIGIOUS FREEDOM RESTORATION ACT.

The demonstrations and prayer vigils of the Plaintiffs are the product of their deeply held religious convictions regarding their obligation to speak the truth, to proclaim the standard of God's law. See generally Plaintiffs' Exhibit 1, Declaration of Reverend Patrick Mahoney. Compelled by their faith to engage in what is, at its essence, a prophetic witness, the Plaintiffs are, nonetheless, not consigned to the fate of so many Biblical prophets.[6] Instead, these Plaintiffs can and do invoke the jurisdiction of this Court to aid the defense of their religious liberties, and do so thanks to, among other things, the remarkably sensitive reaction of James Madison to the imprisonment of Baptist preachers in Virginia.[7]

---

6.      "Others were tortured and refused to be released, so that they might gain a better resurrection. Some faced jeers and flogging, while still others were chained and put in prison. They were stoned; they were sawed in two; they were put to death by the sword. They went about in sheepskins and goatskins, destitute, persecuted and mistreated-- the world was not worthy of them. They wandered in deserts and mountains, and in caves and holes in the ground."

The Epistle to the Hebrews, ch. 11:35-38 (New International Version).

7.      "James Madison informed a Philadelphia friend in 1774, 'That diabolical Hell conceived principle of persecution rages among some and to their eternal Infamy the Clergy can furnish their Quota of Imps for such business. This vexes me the most of any thing whatever. There are at this [time] in the adjacent county not less than 5 or 6 well meaning men in close Gaol [jail] for publishing their religious Sentiments which in the main are very orthodox.'" LEONARD LEVY, THE ESTABLISHMENT CLAUSE: RELIGION AND THE FIRST AMENDMENT, at 3-4 (UNC Press 1994) (citing WILLIAM T. HUTCHINSON ET AL., EDS., 1 THE PAPERS OF JAMES MADISON 106 (Chicago, 1962).

Page -13-

Two separate sources of rights are at stake here, with respect to the religious liberties of the

Plaintiffs: one is statutory, the Religious Freedom Restoration Act, Title 42 U.S.C. § 2000bb; the

other one is a constitutional confluence of the Freedom of Speech and Free Exercise of Religion

Clauses.[8]  To succeed on a claim under RFRA,[9] the Plaintiffs must show that a substantial burden

has been imposed on their religious exercise, and that the Government's action is not the least

restrictive means of accomplishing a compelling government interest. See Title 42 U.S.C. § 2000bb-

1.[10]

---

Perhaps, by comparison, the hours rather than days spent incarcerated, and the instances of official hectoring and harassment, are not to be compared with the gravity of the plight of the Virginia Baptists. Still, it was the close confinement of men of conscience expressing orthodox sentiments and suffering that moved Madison and that propelled his lifelong quest for religious liberty as the normative order for Virginia and the Nation. For the Plaintiffs, however, the hours of incarceration, the public humiliation of arrest, and the targeted abuse and hectoring do make them yearn for the religious liberty that Madison prized.

8.    The Supreme Court has adopted a linguistic turn of phrase, "hybrid rights," to describe the category of cases in which religious exercise together with the exercise of some other constitutional right compels the Judiciary to apply strict scrutiny. See Employment Div. v. Smith, 494 U.S. 872, 882 (1990).

9.    The analysis applicable to the claims is identical, so that likelihood of success on the one claim indicates likelihood of success on the other. For this reason, Plaintiffs set out their argument on likelihood of success on their RFRA claim in full and adopt, by reference, that argument with respect to their hybrid rights claim under the First Amendment.

10.    The relevant portion of RFRA states:

(a) In General.--Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

(b) Exception.--Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

1.    Arrests, Hectoring, and Harassment by Marshals Substantially Burdens the
Religious Exercises of the Plaintiffs

The essential question presented by the Plaintiffs' RFRA claim is this:

Do arrests, hectoring and harassment of persons displaying signs depicting the Ten
Commandments, when those hand held sign displays are carried out in fulfillment of
religious duty, constitute substantial burdens on religious exercises?

In the view of the Plaintiffs, the answer to this threshold question is, "Yes."

Imprisoned preachers stoked the fire of religious liberty that burned within James Madison.

See supra n.7. Given that historic antecedent, it ought to be beyond cavil that seizing a man, taking

him into police custody, placing him behind bars, and conditioning his release on a promise to appear

at his own future prosecution, all because he displayed a sign bearing the text of the Ten

Commandment, adequately proves up the substantiality of the burden on the Plaintiffs' religious

exercise.[11]  The religious nature of the duty that brought the Plaintiffs to the Rhode Island Avenue

sidewalk across the street from the Catholic Cathedral of St. Matthew is set forth in Plaintiffs'

---

Title 42 U.S.C. § 2000bb-1.

11.    The question of whether arrests and threats of arrest constitute a substantial burden on religious
exercise was assumed to be answered in the affirmative by the Fourth Circuit, in American Life League v.
Reno, 47 F.3d 642, 654-55 (4th Cir. 1995):

> The threshold inquiry under RFRA concerns burden. If a statute does not substantially
> burden a religious practice, then the statute does not implicate RFRA.
>
> Plaintiffs' complaint alleges that they do not 'condone . . . nonpeaceable or violent conduct.'
> Accordingly, a proscription on violence and force cannot substantially burden their religious
> exercise. However, plaintiffs' complaint also alleges that their opposition to abortion (on
> religious grounds) requires them to obstruct physically, through peaceful picketing, access
> to clinics offering abortion services. We will assume that this allegation, coupled with
> plaintiffs' assertion that the Access Act violates their RFRA rights, satisfies their obligation
> to plead a substantial burden on their religious exercise.

American Life League v. Reno, 47 F.3d 642 (4th Cir. 1995).

Page -15-

Exhibits 1, and in the Verified Complaint. See Plaintiffs' Exhibit 1, ¶¶ 5-11; Verified Complaint ¶¶ 19-25. Even short of arrest, the focused hectoring and harassment of the Plaintiffs while they engaged in religious exercises, carried out by federal government officers, seems unquestionably to present the instance of a clearly substantial burden on religious exercise. And, the willingness of the Marshals to forebear with arrests and threats of arrests, if the Plaintiffs surrendered the right to display their signs depicting the text of the Ten Commandments, also evinces the coercive burdening that the Marshals effected. See Plaintiffs' Exhibit 1, ¶¶ 19-34; Verified Complaint ¶¶ 30-44.

2.    No Compelling Government Interest Justifies The Marshals Use of Arrests, Hectoring and Harassment

Undoubtedly the Marshals will assert security interests as the justification for its decision to arrest the Plaintiffs in 2003, and to harass and hector them during their vigil in 2004. The Marshals Service is charged by federal law with protecting, among others, federal judges. As noted supra n.3, Supreme Court justices and other officials often attend the annual Red Mass. But the fact that protected persons are present in one location or another does not provide a bootstrap mechanism to justify otherwise invalid restrictions. Otherwise, in United States v. Grace the Court would have concluded that the near location of the Court, with its cadre of protected persons, justified removing placard carriers from the sidewalk on the perimeter of the Supreme Court block. For that matter, the interest in securing the safety of protected persons would have justified an entirely different outcome for the restriction on sign displays in Boos v. Barry.

The argument for security proves too much. And in doing so, it omits any explanation of why the streets and sidewalks can be maintained open, not just to others seeking to attend the Red Mass, but to passersby, to walkers of dogs, to riders of bicycles, to members of the press and media.

By choosing to leave open the sidewalks near St. Matthews to all manner of persons conducting all manner of ordinary activities of human existence, while selecting out for special restriction only those who display signs with messages on them, the Marshals Service belies the imperative nature of any claimed interest.  Of particular relation in this case is the willingness of the Marshals Service to allow members of the press and media, with their microphones, video cameras, notebooks, and other reporting paraphernalia to stand in exactly the location where the Plaintiffs were arrested, hectored and harassed.  That choice alone puts the lie to the nature of the interest at stake here.

> 3.    Any Compelling Government Interest Could Have Been Served by Less Restrictive Means

Assuming that some relevant government interest of a sufficiently compelling nature justifies restrictions on pristine religious speech on a public sidewalk, it is certain that arrests, hectoring and harassment were not the least restrictive means to accomplish those purposes.

Apparently, the Marshals Service is concerned that sign displays interfere with line of sight for security personnel.  It is beyond consideration that the Marshals would claim that these Plaintiffs are the source of any direct threat of harm to any protected person within the purview of the Marshals duties.  So it seems predictable that if the Marshals Service presents a defense it will be the problem of the hidden weapon, the one that is held by a person unrelated to the Plaintiffs, who uses the Plaintiffs and their signs to provide sheltering cover.

If this is the Government's argument, less restrictive approaches abound:

- Put Marshals or other police personnel within and near the location where the Plaintiffs engage in their demonstration and prayer vigil

- Put Marshals behind the Plaintiffs and those with them, so that anyone attempting to shield their wrongful conduct from view cannot do so, or,

- Deploy metal detectors to the location and limit access to the area of concern to those willing to undergo and pass screening.[12]

* * * * * *

Because the Marshals Service overstepped by employing the heavy hand of arrest, hectoring, and harassment, when less restrictive means were available, because no conceivable interest not already adequately served by other means justifies the Marshals, the substantial burden inflicted and threatened to be inflicted on the Plaintiffs' religious exercise cannot pass scrutiny under RFRA. Consequently, the Plaintiffs are substantially likely to prevail on their claim of violation of the Act.

D.    THE PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THEIR EQUAL PROTECTION CLAIM

The essence of the Equal Protection claim brought by the Plaintiffs is that substantially similarly situated individuals were treated differently, and in the process, the fundamental rights of the Plaintiffs were violated.

A large crowd was present on the date of the 2003 Red Mass. See Exhibit 3 (Declaration of Brenna Sullenger (photos attached thereto); see also n.3 supra (reporting on attendance at previous Red Masses). Those present included attendees, onlookers, passersby, the press, and the Plaintiffs. Persons walking their dog, reading a paper, passing by on the sidewalk were left entirely unmolested by the Marshals. See Exhibit 1, ¶¶ 56-57; see also "Six Arrested for the Rule of Law," attached to Plaintiffs' Exhibit 4, Declaration of Father Daniel Sparks ("There were also numerous others who were freely walking the sidewalks, whether they were simply passing down the sidewalk, coming

---

12.    This proposal presents its own set of possible constitutional difficulties. But there is no indication that the Government ever considered such less restrictive mechanisms of insuring judicial security.

to join the throng entering the church, or observing the crowd"). Even the Plaintiffs, until they displayed their Ten Commandments sign, were not differentially burdened.

Once Reverend Mahoney and then others attempted to communicate to the public on an issue of paramount – to them – importance by displaying the Ten Commandments sign, a different standard was applied by the Marshals Service. As explained in Mahoney's Declaration, immediate seizure, followed by immediate arrest, resulted from his sign display. Exhibit 1, ¶¶ 20-34. So far as undersigned counsel has been able to determine through due diligence, no member of the press carrying cameras or microphones, no passersby carrying newspapers, and no other individuals simply passing through the vicinity (other than these Plaintiffs and those with them) were subjected to arrest, hectoring or harassment.

This conduct of the Marshals violates the Equal Protection rights of the Plaintiffs and they are likely to prevail on their claim.

### D.    THE PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THEIR DUE PROCESS CLAIM

The irreducible minimum of due process is adequate notice of expected conduct. For the person who would confine their behavior within the bounds of the law, notice of the requirements of the law is a necessity. For a Constitution that would confine the law enforcement behaviors of police, marshals, judges, juries and others, specificity of terms is a necessity. Here, there is not some statute or regulation by which the Marshals are given authority over permitted uses of the public sidewalks near the Cathedral of St. Matthew in Washington, the District of Columbia. Hence, there is no notice to the Plaintiffs or others that their conduct in the vicinity of the Cathedral may appropriately be made subject to the direction and control of Marshals. Equally troubling, there is

no constraint on the administrative judgments, the ad hoc decisionmaking of Marshals on the scene.

The Due Process violation here is the Defendants' enforcement of a fictional, nonexistent, rule. The Supreme Court has explained, "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).

There is no statute or code section embodying the prohibition on hand-held signs imposed by the Defendants on the Plaintiffs.

The Marshals are not constitutionally endowed with the power they arrogate in the performance of their protective function, the power to make laws. This omission is for good reason: the right to freedom of speech is too supremely precious to subject it to the kind of chimerical beast that changes, shifts, mystifies the eyes, and defies those who would, if they could, be obedient.

The sign ban is unconstitutional because, being imagined and fictional, its terms are so "vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Constr. Co., 269 U.S. 385, 391 (1926). The Supreme Court explained the problem of vague enactments in Grayned:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute "abut[s]

upon sensitive areas of basic First Amendment freedoms," it "operates to inhibit the exercise of [those] freedoms." Uncertain meanings inevitably lead citizens to "'steer far wider of the unlawful zone' . . . than if the boundaries of the forbidden areas were clearly marked."

Grayned, 408 U.S. at 108-09.

The ban on hand-held signs fails the test: it does not "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." Grayned, 408 U.S. at 108. While all laws must be reasonably clear, laws which regulate or restrict free speech, such as the twenty foot zone, must satisfy "a more stringent vagueness test," Village of Hoffman Estates v. Flipside, Hoffman-Estates, 455 U.S. 489, 499 (1982) (footnote omitted).

Moreover, this imagined rule suffers from ambiguous breadth and that raises the genuine concern that its requirements will be defined by the subjective, varying, ad hoc judgment of police officers who have arrogated to themselves the power to create statute law. Grayned, 408 U.S. at 108-09. A law must have greater certainty than that before it can be used to restrict free speech. "Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." Riley v. Nat'l Federation of the Blind, 487 U.S. 781, 801 (1988) (internal quotation marks and citations omitted).

When a law imposes such vague criminal prohibitions, speakers are forced to proceed at their own peril -- or to censor their speech out of fear of prosecution. The Due Process Clause forbids such government-imposed guessing games. Grayned, 408 U.S. at 108-09.

Under the vagueness doctrine, "stricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser." Smith v California,

361 U.S. 147, 149 (1959). The Supreme Court has reiterated this more stringent scrutiny of vague

laws that impinge on first amendment rights. Hynes v. Mayor of Oradell, 425 U.S. 610, 620 (1976)

("[t]he general test of vagueness applies with particular force in review of laws dealing with

speech"). Stringent scrutiny, together with specificity in legislation, preclude the chill on free speech

that results from vague laws: "[u]ncertain meanings inevitably lead citizens to 'steer far wider of the

unlawful zone... than if the boundaries of the forbidden areas were clearly marked.'" Grayned, 408

U.S. at 109 (quoting Baggett v. Bullitt, 377 U.S. 360, 372 (1964)). The need for specificity is clear:

> [t]hese freedoms are delicate and vulnerable, as well as supremely precious in our
> society. The threat of sanctions may deter their exercise almost as potently as the
> actual application of sanctions. Because First Amendment freedoms need breathing
> space to survive, government may regulate in the area only with narrow specificity.

NAACP v. Button, 371 U.S. 415, 433 (1963) (citations omitted). The fictional ban on displaying

hand-held signs imposed by the defendants fails to establish a definite standard of conduct, because

it is fictional; thus, it violates due process because "everyone is entitled to know what a statute

requires or forbids." Hynes, 425 U.S. at 620 (striking an ordinance permitting solicitation only for

"recognized charitable causes" as unconstitutionally vague). The Due Process Clause of the Fifth

Amendment is offended by the enforcement of, or the threat of enforcement of, an imaginary law

restricting rights of freedom of speech.

II.    IRREPARABLE HARM WILL RESULT TO THE PLAINTIFFS ABSENT AN ORDER
       FROM THIS COURT

The Plaintiffs seek to engage in a protected form of expression on a traditional public forum

property, and are prevented from doing so by the action of federal government agencies and their

employees. Their injuries, the ones already sustained when they were arrested in 2003, and when

they were harassed and disrupted in 2004, the ones threatened in the form of future hectoring, harassment, and arrests, are classic deprivations of First Amendment rights.

Even the momentary loss of these freedoms is irreparable. Loss of a First Amendment right is irreparable because it is an injury that cannot be fully compensated by later damages. See, e.g., Elrod v. Burns, 427 U.S. 347, 373 (1976); New York Times Co. v. United States, 403 U.S. 713 (1971); White House Vigil for the ERA Comm. v. Watt, 717 F.2d 568 (D.C.Cir.1983); A Quaker Action Group v. Hickel, 421 F.2d 1111, 1116 (D.C.Cir.1969); Waters v. Barry, 711 F. Supp. 1121, 1123 (D.D.C. 1989); Community for Creative Non-Violence v. Carvino , 648 F. Supp. 476, 479 (D.D.C.), rev'd on other grounds sub nom. Community for Creative Nonviolence v. Kerrigan, 865 F.2d 382 (D.C.Cir.1989). The Plaintiffs satisfy this element of the test for the issuance of preliminary injunctive relief.

III.     THE DEFENDANTS WILL NOT BE HARMED BY THE ISSUANCE OF INJUNCTIVE RELIEF

There is no harm to the Defendants in the issuance of the requested injunction.

The Defendants suffer no injury in being ordered by the Court, pending the disposition of this litigation, not to arrest, threaten to arrest, harass, or disrupt the Plaintiffs in the conduct of their planned demonstration. The risk of any injury to the Defendant is particularly minimized because the Plaintiffs propose a form of Order under which any real police emergency justifying the closure of public sidewalks and ways would not prevent the Defendants from ordering the Plaintiffs to comply with such closures. This factor favors the Plaintiffs' motion for a preliminary injunction.

IV.  THE PUBLIC INTEREST WILL BE ADVANCED, NOT HARMED, BY THE ISSUANCE
OF INJUNCTIVE RELIEF IN THIS CASE

The public interest lies with the vindication of the rights of the Plaintiffs in this case.

Certainly the religiously-animated political speech of the Plaintiffs is at stake, and the
Plaintiffs are distressed about the possible loss of those rights. But there are larger issues at stake.

Unsurprisingly, citizens expect that the supremely precious and delicate rights afforded by
the First Amendment will be guarded and protected by government officials, not trammeled on in
the naked rush for easiest methods of policing the public ways. So, while the government may assert
that the interest of the public is in the vindication of its practice of sweeping public sidewalks clear
of demonstrators whenever important government officials step out of government offices and make
use of the same public streets and sidewalks. Plainly, granting the injunction here serves to advance
the public interest.

CONCLUSION

For the foregoing reasons, the Court should grant the Preliminary Injunction in the form
submitted herewith and without bond.

Dated:  September 9, 2005.

Respectfully submitted,

James Matthew Henderson Sr. # 452639
*Counsel of Record*
The American Center for Law and Justice
201 Maryland Avenue NE
Washington, DC  20002
Telephone:      (202) 546-8890
Facsimile:      (202) 337-3167

*Attorneys for the Plaintiffs*