# EXHIBIT 4

## DECLARATION OF
## FATHER DANIEL SPARKS

I, Father Daniel Sparks, hereby declare under the penalties of perjury of the law of State

of Alabama that the following statement of facts is true and correct:

1.    I am a resident of the State of Alabama, and a citizen of the United States.

2.    I live at 606 Forest Way, Leeds, Alabama, 35094.

3.    I make this Declaration freely and without reservation, based on my personal knowledge

and recollection of the facts stated herein.

4.    I am an Anglican priest.

5.    I participated in events surrounding the 2003 confrontation in Montgomery, Alabama,

between supporters of public displays of the Ten Commandments and opponents.

6.    As a consequence of that involvement, I participated in a 2003 tour of the southeastern

United States to support such displays.

7.    Ultimately, I was present in front of the St. Matthew's Cathedral in Washington, DC, on

the first Sunday in October, 2003, to participate in a vigil and demonstration supporting Ten

Commandment displays.

8.    I was arrested on that Sunday and charged with crossing a police line.

9.    Attached to this Declaration is a print-out of a web page designed and maintained by me,

which is hosted on the internet at http://www.thesparksreport.com/node/51&print; the print-out

consists of seven (7) pages.

10.    The content of the attached pages includes the narrative of the events of that day that I

wrote.

05 1786

Declaration of Father Daniel Sparks Page 1

**FILED**

SEP - 9 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

11.     I have reviewed that narrative and it is a true and correct statement of the incidents that occurred that day.

12.     There is, on page four (4) of that print-out a photograph of a man in the custody of U.S. Marshals, walking from right to left across the field of view of the picture.

13.     Based on my personal observation of the vicinity depicted in that photograph, that picture is a true and accurate depiction of the scene at the date and time of my arrest.

14.     My knowledge of the conditions at the date and time is evidenced by the fact that I am the man under arrest in the picture.

15.     I adopt as fully set out in this Declaration that narrative.

FURTHER YOUR DECLARANT SAYETH NOT.

I, Father Daniel Sparks, hereby declare, under the penalty of perjury of the State of Alabama, that the foregoing Declaration is true and correct.  Executed this 29th day of August, 2005.


Fr. Daniel Sparks

Welcome to The Sparks Report

---

# Six arrested for the rule of law

Submitted by Fr. Daniel Sparks on Fri, 10/10/2003 - 12:00am.

On Sunday, October 5, 2003, I walked a block from my hotel in Washington, DC to St. Matthew's Cathedral on Rhode Island Avenue. A 10 a.m. service was scheduled at the church, where the Red Mass would be celebrated—a service held prior to the beginning of a new session of the US Supreme Court and which the Supreme Court justices normally attend.

I was walking with two ladies with whom I had been travelling on the Spirit of Montgomery Save the Commandments caravan from Montgomery, Alabama to Washington, DC When we approached the block where St. Matthew's is located, we crossed the street behind police barricades that had been set up to block vehicle traffic on the street immediately in front of the church. Police officers told us to walk up the sidewalk nearest the church, which we did. There was a police line on the edge of the sidewalk on the far side of the street from the church.

We arrived in front of the church within a few seconds and I greeted a pastor who had been travelling with us. He stated that he was going in the church for the service but that others of our group were down at the far end of the sidewalk, outside of the police line, and that the police would not let them come inside the line if they were carrying signs with the Ten Commandments printed on them.

I spoke with others who were entering the church or passing by on the sidewalk. There was, in my estimation, in excess of a thousand people who were standing on the steps of the church or on the sidewalk in front of the church, all who were apparently waiting to enter the church for the service. There were also numerous others who were freely walking the sidewalks, whether they were simply passing down the sidewalk, coming to join the throng entering the church, or observing the crowd. Across the street, on the sidewalk opposite the church, were three or four television cameras and crews, as well as a couple of wandering news photographers.

After speaking with various people in front of the church, I crossed the street. There, I

approached the police line, from inside the line, and spoke to a man standing outside of the line. He informed me that the police had instructed him not to come inside the line because he was holding a pole with a U.S. flag and a cross on it. There were several law enforcement officers who saw me inside the police line and who saw me speaking with this man outside of the line. These officers were located at various places: on the steps of the church, on the sidewalk in front of the church, on the street in front of the church, on the sidewalk across the street from the church, and standing at the far end of the block next to the police tape. One or more of these officers in each of these areas observed my free movement within the police line. At no point was I asked to leave the area.

After speaking to the man with the flag, I walked a few steps down the sidewalk to where the media personnel were located. I stood a few feet from them, observing the crowd. Two of my fellow Alabama citizens, Matt and Alicia Carden, who had been travelling with the caravan, walked up and stood beside me and we began talking. At that time, the Rev. Patrick Mahoney, one of the caravan organizers, walked up and stood immediately beside the television crews. He was holding a sign with the Ten Commandments printed on it. The Cardens and I walked over and stood beside the Rev. Mahoney.

Within a few seconds, federal marshals wearing business attire approached the Rev. Mahoney. The marshals told the Rev. Mahoney that he could not stand there with the sign. The Rev. Mahoney replied that he was going to stand there and that the marshals could arrest him if they had to. The marshals took the Rev. Mahoney by the arms and began leading him toward the far end of the block, where the other people with signs were standing. When the Rev. Mahoney tried to go down on his knees, the marshals dragged him outside of the police line—which had, by that time, been extended across the entire end of the street—and released him.

The Rev. Mahoney immediately turned around, ducked under the police tape, and walked down the same sidewalk toward the area where he had previously been standing. He stopped about twenty feet away from the previous point and stood with the Ten Commandments sign. Mr. Carden then went over to the police line and took a Ten Commandments sign from one of the people there. He then came over and stood beside the Rev. Mahoney. The federal marshals grasped the Rev. Mahoney's hand and handcuffed him, causing him to drop his sign. They also seized Mr. Carden, causing him to drop his sign near one of the police cars. Mrs. Carden picked up the sign that

the Rev. Mahoney had dropped. The marshals seized Mrs. Carden, causing her to drop the sign. The Rev. Mahoney called to Troy Newman, another member of our group, to take pictures of the arrests.

Seeing that the Ten Commandments sign was lying on the street, being trampled by the boots of federal marshals wearing tactical equipment and carrying machine guns, I reached down and picked up the sign. I held the sign above my head. During this time, the marshals were handcuffing the Cardens. One of the marshals pointed toward me and said three or four times, "We need to get this one." After the Rev. Mahoney and the Cardens had been handcuffed and lined up against the rear of one of the police cars, one of the marshals approached me. The marshal said, "Sir, put down the sign." I replied, "No, sir." He then grasped my left arm and twisted it behind my back, then grasped my right arm, doing the same, which caused me to drop the sign. He then handcuffed me and pushed me against the side of police car, next to the others who had been arrested.



Fr. Daniel Sparks is arrested by federal marshals for holding a Ten Commandments sign.

The marshals then had us sit down on the curb, with our feet in the street. Mr.
Newman, who was standing approximately ten feet or more away from the officers
and us, was approached by one of the officers, who seized him. Another officer took
Mr. Newman's camera and handcuffed him. The marshals had Mr. Newman sit on
the curb beside us.

The Rev. Donald Ely, another of our group, came from inside the church, where he
had been sitting, waiting for the service to begin. He walked over to us and stood,
asking what was going on. The marshals told the Rev. Ely to go outside of the police
line. He stated that he wanted to stand there with us. The marshals again told him to
go outside of the line, that they did not want to arrest him because he had done
nothing wrong. The Rev. Ely affirmed that he had done nothing wrong and insisted
that the others of us had done nothing wrong, either. He asked the marshals what we
had done wrong. They refused to answer him and, when he refused to walk away,
they handcuffed him and had him sit on the curb beside us.

The Washington, D.C. Metropolitan Police were present but were not involved in the
arrests. The marshals had us placed in police cars belonging to the Metro Police. We
were eventually taken to the Second District Headquarters station of the Metro
Police. We were required to remove our belts, shoelaces, watches, rings, necklaces,
and everything from our pockets. The five men were placed in a large holding cell and
Mrs. Carden was placed in a small female holding cell. After approximately one hour,
a marshal dressed in business attire came to speak to us. He stated that he had been
called out of his church service to come process us. He collected our names and other
information. A few minutes later, the same marshal came back to verify some
additional information. This time, two other marshals who were in uniform
accompanied him.

After we furnished the information to the marshals, we continued to wait in the cell.
After several hours, the first marshal returned. He told us that we could each pay
$300 each and we would be released. We would have to return the next morning for a
hearing to set a trial date. Based on previous experience, the Rev. Mahoney and Mr.
Newman stated that this was not appropriate. They insisted that the Washington, DC
"post and forfeit" arrangement should apply in this incident. The marshal left us. He
returned a few minutes later and stated that we could each pay $100 as a post and
forfeit and we would be free to leave. The Rev. Mahoney insisted that this was not the
usual fine. He also requested that he be released on his own recognizance and have

his day in court. The marshal again left and returned a few minutes later. This time, the marshal stated that were being charged with crossing a police line and that we could each pay $25 post and forfeit and we would be released. We agreed to this, with the exception of the Rev. Mahoney. The Rev. Mahoney and Mr. Newman informed the rest of us that the usual post and forfeit amount is $50.

We were each photographed and fingerprinted. The Rev. Mahoney was allowed to speak to someone over the telephone in order to provide the information necessary for his release. The rest of us were then required to pay our $25 fine. Then, each of us was required to give our thumbprints on paperwork. Shortly thereafter, we were each let out of the cell, given our belongings, and released. We walked around the building and entered the front of the police station, where we called for someone to pick us up.

It is important to note that, although we were charged with crossing a police line, some of us did not cross the line. It is also important to note that hundreds of other people were indiscriminately allowed to come inside the police line. Only those who were holding Ten Commandments signs were forbidden to enter. It is again important to note that I was not arrested until I refused to put down the Ten Commandments sign; at no point was I ever told not to enter the police line, nor was I told to go outside of the police line. Regardless of the actual charges by the police, the arrests resulted from the fact that four of us held Ten Commandments signs—and two of us didn't do anything more than stand on the sidewalk.

It is also important to note that the executive branch of our federal government has the power to enforce laws; in other words, these federal marshals who arrested us are under the direct jurisdiction of the president. On Monday, October 6, I spoke in person about this abuse of power with Mr. H. Goodloe Sutton, Jr., a staff member of U.S. Senator Richard Shelby, and Ms. Jenny Bottegal DiJames, a staff member of U.S. Representative Bud Cramer. Both seemed concerned about this issue, but gave no indication as to how the congressmen might respond.

The above information is a true and correct representation of the events described.

Sincerely,
The Rev. Daniel J. Sparks

**See more photographs of the arrests.**

## Read another account of this event.

Content © 2005 by The Sparks Report. All rights reserved.

This page was viewed on 2005-08-26 09:44 -0600 and can be found at    **Return to web view**

http://www.thesparksreport.com/node/51.