UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

|  |  |
|---|---|
| REVEREND PATRICK MAHONEY, et al., | ) |
|  | ) |
| Plaintiffs, | ) |
|  | ) |
| v. | )    Civil Action No. 05-1786 |
|  | )    (RCL) |
| U.S. MARSHALS SERVICE, et. al., | ) |
|  | ) |
| Defendants. | ) |

_____

## DEFENDANT U.S. MARSHALS SERVICE'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Defendant United States Marshals Service ("Defendant" or "Marshals Service") respectfully submits this memorandum of points and authorities in opposition to Plaintiffs' Motion for a Preliminary Injunction ("PI Mot.").

## I.  INTRODUCTION

Plaintiffs bring this action under First and Fifth Amendments to the United States Constitution, and under the Religious Freedom Restoration Act, challenging the security measures the Marshals Service plans to implement at this year's Red Mass.  See Complaint at 11-15.  Specifically, Plaintiffs challenge the decision of the Marshals Service to exclude the general, non-attending public from the immediate vicinity of St. Matthew's Cathedral starting an hour before the mass and continuing until an hour after the mass has ended.  Plaintiffs claim that this decision infringes what they deem to be their right to hold a prayer vigil and demonstration at a specific location of their choosing, i.e. on the Rhode Island Avenue sidewalk "across the street from the main entrance to St. Matthew's Cathedral."  See PI Mot. at 1.

Plaintiffs have utterly failed to meet the strict requirements for obtaining emergency injunctive relief. First, they have failed to show a substantial likelihood of prevailing on the merits. The decision of the Marshals Service to create a controlled-access area in the immediate vicinity of the Cathedral is a reasonable, content-neutral restriction that is narrowly tailored to achieve a significant governmental interest: ensuring the personal safety of the U.S. Supreme Court Justices and other dignitaries who likely will attend the mass. At the same time, the protective measures the Marshals Service has chosen leave open ample alternative channels of communication. Plaintiffs will be permitted to demonstrate anywhere outside the controlled-access area, including a specially-designated area that is only 20 yards from arriving and departing dignitaries and has an unobstructed view of the entrance to the Cathedral. Thus, Plaintiffs cannot show a substantial likelihood of prevailing on the merits.

Second, Plaintiffs cannot show that they would be irreparably harmed absent an injunction. Plaintiffs have made clear that the persons with whom they wish to communicate are the Supreme Court Justices. As Plaintiffs state in their memorandum: "In the [most recent] term of the Supreme Court, the Court decided two cases involving public displays of the Ten Commandments . . . . The Plaintiffs want to demonstrate in support of their views on this issue." See Plaintiffs' Statement of Points and Authorities Supporting The Motion for Preliminary Injunction ("PI Memo.") at 3. Plaintiffs' demonstration will include "displaying signs containing the text of the Ten Commandments, as well as prayer and public speaking addressing the role of the Ten Commandments in American law, government and society." Id. at 6. The Marshals Service's plan allows Plaintiffs (and any other demonstrators) to demonstrate within 20 yards of the spot the Supreme Court Justices will be arriving and departing. This proximity, and the

unobstructed view the demonstrators will have of the front entrance of the Cathedral, will make their signs readily visible to the attendees, and will allow the demonstrators to make themselves heard by the attendees without voice amplification. Plaintiffs have no need for an injunction to fully exercise their First Amendment rights.

Third, the balancing of potential harms militates strongly against granting Plaintiffs injunctive relief. Plaintiffs have shown no need for an injunction, while the Supreme Court Justices and other top officials attending the mass would be deprived of adequate security if the Marshals Service were forced to open the Rhode Island Avenue sidewalk in question. The public's interest, too, would be harmed by granting Plaintiffs an injunction, as the Nation obviously has a strong interest in ensuring the safety of its top government officials.

## II. BACKGROUND

### A.    The Red Mass

Since 1952, the Red Mass has been celebrated annually in Washington, D.C., on the Sunday before the first Monday in October, to coincide with the new term of the Supreme Court of the United States. Government officials, diplomats, and people of all faiths attend the mass to invoke God's blessing and guidance in the administration of justice. See Declaration of Susan Gibbs ("Gibbs Decl."), attached hereto as Exhibit A, ¶ 2.

The Red Mass enjoys a rich history. Originating centuries ago in Rome, Paris, and London, its name derives from the traditional color of the vestments worn by celebrants of the Mass. Over the centuries, the Red Mass marked the official opening of the judicial year of the Sacred Roman Rota, the Tribunal of the Holy See. During the reign of Louis IX, Saint Louis of France, La Sainte Chapelle in Paris was designated as the chapel for the mass; the chapel now is

used only once during the year, solely for the Red Mass. Since the Middle Ages, and continuing even during World War II, English judges and lawyers have attended the Red Mass annually at Westminster Cathedral. In 1928, old St. Andrew's Church in New York City inaugurated the tradition in the United States. Since then, the Red Mass has been celebrated annually there and in many cities across the United States. Id. at ¶ 3.

In Washington, the John Carroll Society sponsors the Red Mass. Founded in 1951, the John Carroll Society assists the Archbishop of Washington in his works of charity and other community projects. The Society draws its approximately 1,000 members from all areas of metropolitan Washington's professional and business life, and considers as its primary purpose the enhancement of its members' spiritual, intellectual and social fellowship. Id. at ¶ 4.

Washington's Red Mass traditionally has been celebrated at the Cathedral of St. Matthew the Apostle, located at 1725 Rhode Island Avenue, N.W. The mass is attended each year by hundreds of people—the Cathedral seats 1000 people—including Supreme Court Justices, White House officials, Cabinet members, high-level clergy, state and local government officials, foreign dignitaries, judges from the federal, state, and local judiciary, and members of the press. Id. at ¶ 5. While this year's list of attendees has not yet been finalized, Supreme Court Justices, United States District Court Judges, and D.C. Superior Court Judges will attend; in addition, the Marshals Service expects top officials from other branches of federal, state, and local government to attend, as well as foreign dignitaries and high-ranking members of the Catholic Church. See Declaration of Robert Brandt ("Brandt Decl."), attached hereto as Exhibit B, ¶ 7.

**B.    Protective Measures**

By virtue of its role in protecting members of the judiciary, <u>see</u> 28 U.S.C. § 566(e)(1)(A), the Marshals Service traditionally has assumed principle responsibility for providing security at the Red Mass.  <u>See</u> Exhibit A (Gibbs Decl.) ¶ 6; <u>see also</u> Exhibit B (Brandt Decl.) ¶ 2.  The Marshals Service will provide security at this year's event[1] as well.  <u>See</u> Exhibit B (Brandt Decl.) ¶ 1.  In addition to the Marshals Service's overall security operation, the Supreme Court police and other law enforcement entities will be providing personal security for their respective protectees.  <u>Id.</u> at ¶ 3.  Should the President of the United States decide to attend the mass, all security operations would be assumed by the United States Secret Service.  <u>See</u> 18 U.S.C. § 3056.

Defendant has submitted herewith a declaration by Robert Brandt, who is the Supervisory Deputy Marshal in charge of the Marshals Service's security operation for this year's Red Mass. <u>See</u> Exhibit B.  Mr. Brandt has been involved in the development of this year's security plan.  <u>Id.</u> at ¶ 5.  As explained in Mr. Brandt's declaration, to protect the Supreme Court justices and other dignitaries expected to attend the mass, the Marshals Service will establish a controlled-access area on the street and sidewalks of Rhode Island Avenue that run in front of the Cathedral.  <u>Id.</u> at ¶¶ 9, 11.  The controlled-access area will be in effect starting one hour before the mass begins and continuing until one hour after the mass has ended.  Establishing a controlled-access area

---

[1] Plaintiffs' brief focuses entirely on the security measures the Marshals Service employed in 2004 and 2003.  The subject of Plaintiffs' injunction request, however, is the Marshals Service's security plan for 2005.  Thus, and because the reasonableness of any security plan depends on current conditions, Defendant will address only the 2005 security plan.  Defendant has attached hereto as Exhibits C and D declarations from the supervisors who were in charge of the 2004 and 2003 events, but only to provide context and to show that Plaintiffs' allegations regarding those years are largely incorrect.

will allow the Marshals Service to ensure that only persons attending the mass and credentialed press gain access to the immediate vicinity of the Cathedral. All other persons attempting to enter the controlled-access area, whether by vehicle or on foot, will be re-routed. The Marshals Service wishes to prevent the general, non-attending public from loitering in the controlled-access area so as to reduce the possibility of an individual positioning himself or herself near the Cathedral and waiting for a target of opportunity. Id. at ¶ 9.

To create the controlled-access area, the Marshals Service will use barricades to close Rhode Island Avenue between 17th Street and Connecticut Avenue, and will use police tape to limit access to the sidewalks on both sides of Rhode Island Avenue. Attached to Mr. Brandt's declaration is a diagram showing the location of the controlled-access area. Because the street and sidewalks in question are District of Columbia, as opposed to federal, property, the Marshals Service has obtained the concurrence of the responsible city officials to create the controlled-access area. Id. at ¶ 11.

The only vehicles permitted in the controlled-access area will be the vehicles of specified dignitaries, which will enter through the 17th Street barricade and drop off the dignitaries (as well as pick them up after the mass) directly in front of the Cathedral's center door. This area, which will be the length of two sedans and two sedans wide, will be designated the dignitary drop-off/pick-up area. The dignitary drop-off/pick-up area will be closed to all members of the public except the arriving/departing dignitaries. Id. at ¶ 12.

All pedestrians permitted within the controlled-access area will be routed through a single entry point on the west end of the sidewalk that runs in front of the Cathedral. Deputy Marshals will be stationed at the pedestrian entry point—as well as at other points around, outside, and

within the controlled-access area—to ensure that only authorized persons enter the controlled-access area and that, once inside, they do not endanger the arriving and departing dignitaries. Outside the controlled-access area, the Marshal Service will not impose any restrictions. The Marshals Service considers everything outside the controlled-access area to be a public area. Id. at ¶ 13.

In deciding the appropriate size and location of the controlled-access area, the Marshals Service took into account a number of factors, including the large number of high-level public officials who attend the event with little or no notice, and the recent national media focus on the Supreme Court and its prospective new members. Id. at ¶ 6. The Marshals Service considers this year's event a reasonably likely target for individuals who might seek a public forum for an attack or disruption of the event. Id. The Marshals Service also took into account a variety of logistical factors, such as the need for emergency vehicle access, the potential for emergency evacuation of the attendees and other building occupants, and the set-off distances necessary to mitigate the effectiveness of a variety of weapons. Id. at ¶ 10.

In addition to security concerns, the Marshals Service took into careful consideration the public's First Amendment interests. To ensure that the above-described protective measures have a no more substantial impact on free speech than reasonably necessary, the Marshals Service will establish a designated area within the controlled-access area for credentialed members of the press. This area will have direct access by sight and sound to the front entrance of the Cathedral. The Marshals Service believes that placing the press in close proximity to the event will promote the general public's First Amendment interests. Id. at ¶ 15.

The media area will be located on the sidewalk directly across Rhode Island Avenue from

the center door of the Cathedral. The area will be 30 feet long by 6 feet deep, and will be clearly marked. Attached to Mr. Brandt's declaration is a photograph showing the area of the sidewalk where the media will be placed. Use of the media area will be restricted to members of the press who have coordinated their presence with, and been cleared by, the Archdiocese of Washington. All equipment used in the media area will be cleared by Deputy Marshals before it is set up. With these safeguards, the Marshals Service considers that the media will pose no threat to arriving and departing dignitaries. Id. at ¶ 16.

In addition, the Marshals Service will establish a designated demonstrator area outside the controlled-access area on the M Street sidewalk closest to the Cathedral, roughly 20 yards from the dignitary drop-off/pick-up area. The demonstrator area will be clearly marked with police tape or small barriers, such as bicycle stands. Use of the demonstrator area will be restricted to persons professing to be demonstrators. Demonstrators also will be free to demonstrate anywhere else outside the controlled-access area. Id. at ¶ 17.

The demonstrator area will be a roughly 250 square-foot area immediately to the left of the BB&T building as you face the Cathedral. It will have an unobstructed view of the front of the Cathedral (the press area being slightly to the right as you face the Cathedral), and it will be close enough to arriving and departing dignitaries for the demonstrators to make themselves heard without voice amplification. Attached to Mr. Brandt's declaration are a satellite photograph showing the location of the demonstrator area; and two photographs showing the view of the Cathedral from the demonstrator area and the location of the press area in relation to the demonstrator area. Id. at ¶¶ 18-19.

The Marshals Service anticipates that the demonstrator area will provide adequate space for at least 50 people holding signs, which should be sufficient to accommodate everyone who wishes to demonstrate. <u>Id.</u> at ¶ 20. Indeed, in 2003, there were roughly 30 demonstrators. <u>See</u> Declaration of James Brooks, attached hereto as Exhibit D, ¶ 4. In 2004, the only demonstrators were Reverend Mahoney and his wife. <u>See</u> Exhibit B (Brandt Decl.) ¶ 20. If there are more demonstrators than the area can accommodate, or if they do not wish to be in the demonstrator area, they will be free to demonstrate anywhere else outside the controlled-access area, i.e. anywhere in the public area. <u>Id.</u>

Demonstrators will be permitted to engage in speech making, to hold prayer vigils or religious services, to display signs or placards, and to engage in any other expressive activity they wish. No person, however, will be permitted to disrupt the Red Mass activities, violate the law, or endanger the attendees of the Red Mass or the officials providing security at the mass. <u>Id.</u> at ¶ 21.

The Marshals Service's reasons for placing the demonstrator area on the M Street sidewalk are two-fold. First, because the demonstrators, unlike the media, will not have been vetted before the event, there is a much greater concern about their posing a threat to attending dignitaries. Having the demonstrator area roughly 20 yards from the dignitary drop-off/pick-up area will provide a buffer zone between the demonstrators and the arriving and departing dignitaries. The buffer zone will ensure that dignitaries are not within accurate range of any projectiles, and that, should one of the demonstrators enter the controlled-access area, the security personnel will be able to intercept the demonstrator before he or she reaches the dignitaries. <u>Id.</u> at ¶ 22.

Second, the portion of the M Street sidewalk in question provides the best view of the Cathedral from anywhere outside the controlled-access area; the demonstrator area is the location that is closest to the front of the Cathedral. Thus, the location will maximize the demonstrators' ability to communicate their message. Id. at ¶ 23.

In summary, the Marshals Service has carefully balanced both the security needs of the event and the First Amendment rights of the press and public in developing the protective measures described above. As long as the demonstrators behave lawfully, the only limitation they will encounter will be the requirement that they demonstrate outside the controlled-access area. In the Marshals Service's judgment, this requirement imposes the least possible burden on the demonstrators consistent with ensuring the security of the Supreme Court Justices and other high-level officials who will be attending the event. At the same time, the area reserved for the demonstrators will allow them both to be seen and to be heard by the persons with whom they wish to communicate; thus, the demonstrators will not be prevented from communicating their message. Id. at ¶ 25.

### III.  STANDARD OF REVIEW

The decision whether to grant preliminary injunctive relief under Federal Rule of Civil Procedure 65 is reserved to the sound discretion of the Court. Fed. R. Civ. P. 65(a). The Court's exercise of this discretion is subject to the admonition of the Supreme Court that an injunction should issue only when the intervention of a court of equity "is essential in order effectually to protect property rights against injuries otherwise irremediable." Weinberger v. Romero-Barcelo, 455 U.S. 305 (1982). It is well settled that injunctive relief is an extraordinary remedy, and that the party seeking it has a substantial burden of proof. Mazurek v. Armstrong, 520 U.S. 968, 972

(1997); <u>Yakus v. U.S.</u>, 321 U.S. 414 (1944) (preliminary injunction is extraordinary relief of a drastic nature).  <u>See also</u>, <u>e.g.</u>, <u>Cobell v. Norton</u>, 391 F.3d 251, 258 (D.C. Cir. 2004); <u>Virginia Petroleum Jobbers Ass'n v. Federal Power Comm'n</u>, 259 F.2d 921, 925 (D.C. Cir. 1958).  The burden of proof is solely on the applicant for the injunction; a defendant bears no burden to defeat the application.  <u>Granny Goose Foods, Inc. v. Teamsters</u>, 415 U.S. 423, 442-43 (1974).[2]

To be entitled to the extraordinary remedy of injunctive relief, a plaintiff must carry a heavy burden by making "a clear showing" that:  (1) there is a substantial likelihood of prevailing on the merits of its claim; (2) a preliminary injunction is necessary to prevent it from suffering irreparable injury; (3) the threatened injury to the plaintiff outweighs the possible harm to others; and (4) the public interest favors issuance of the injunction.  <u>Mazurek</u>, 520 U.S. at 972; <u>Cobell</u>, 391 F.3d at 258; <u>Washington Metropolitan Area Transit Comm'n v. Holiday Tours, Inc.</u>, 559 F.2d 841, 843 (D.C. Cir. 1977).  These factors "interrelate on a sliding scale and must be balanced against each other.  'If the arguments for one factor are particularly strong, an injunction may issue even if the arguments in the other areas are rather weak.'"  <u>Serono Laboratories, Inc. v. Shalala</u>, 158 F.3d 1313, 1318 (D.C. Cir. 1999), (<u>quoting</u> <u>CifiFed Fin. Corp. v. Office of Thrift Supervision</u>, 58 F.3d 738, 746 (D.C. Cir. 1995)).  By the same token, if the plaintiff makes a weak showing on one factor, the other factors may not be enough to compensate.  <u>Barton v. District of Columbia</u>, 2002 U.S. Dist. LEXIS 15494, at *18 (D.D.C. 2002) (<u>citing</u> <u>Taylor v. RTC</u>, 56 F.3d 1497, 1506 (D.C. Cir.), <u>amended</u> <u>on other grounds</u> <u>on reh'g</u>, 66 F.3d 1226 (D.C. Cir. 1995)).

---

[2] Plaintiffs assert that it is *the Marshals Service's* burden to demonstrate that its security measures are "justified" and "narrowly drawn to serve an important public purpose."  <u>See</u> PI Memo. at 8.  <u>Granny Foods</u> makes clear that it is Plaintiffs who bear the burden of proof.

Finally, "[t]he basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." Wisconsin Gas Co. v. Fed. Regulatory Comm'n, 758 F.2d 669, 674 (D.C. Cir. 1985). To constitute irreparable harm, "the injury must be both certain and great; it must be actual and not theoretical." Id.

## IV.  ARGUMENT

**A.     Plaintiffs Cannot Show a Substantial Likelihood of Success on Their First Amendment Claim**

### 1.     Applicable First Amendment Principles

The right to use public streets and sidewalks for assembly and communicating views is fundamental to the First Amendment. See Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983). It also is beyond cavil, however, that "[t]he privilege of a citizen of the United States to use the streets . . . for communication on views on national questions may be regulated in the interest of all." Hague v. CIO, 307 U.S. 496, 516 (1939); see City Council of City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 804 (1984) ("It has been clear since the Court's earliest decisions concerning the freedom of speech that the state may sometimes curtail speech when necessary to advance a significant and legitimate state interest"); United for Peace & Justice v. City of New York, 323 F.3d 175, 176 (2nd Cir. 2003) (per curiam) ("[T]he right to use public forums such as streets for speech and assembly is not absolute."); see also Metromedia. Jnc. v. City of San Diego, 453 U.S. 490, 501 (1981) ("[A]t times First Amendment values must yield to other societal interests.").

Where, as here, the Government imposes a content-neutral restriction on speech in a public forum, courts apply the traditional "time, place, or manner" test for constitutionality.

"[E]ven in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant government interest, and that they leave open ample alternative channels for communication of the information.'" Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark v. Cmty. For Creative Non Violence, 468 U.S. 288, 293 (1984)); accord Virginia Pharm. Bd. v. Virginia Consumer Council, 425 U.S. 748, 771 (1976). The security restrictions implemented by the Marshals Service for the Red Mass event easily meet this standard.

### 2.    The Marshal Service's Plan Is Content-Neutral

The threshold inquiry as to the validity of a "time, place, or manner" restriction is whether the restriction is "'based upon either the content or subject matter of speech.'" Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 648 (1981) (quoting Consol. Edison Co. v. Public Serv, Comm'n, 447 U.S. 530, 536 (1980)). The content-neutrality analysis asks "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." Ward, 491 U.S. at 791.

In the case at bar, Plaintiffs do not argue that the Marshals Service's security measures are content-based, see PI Memo. at 9, and Mr. Brandt's declaration establishes conclusively that the requirement that any demonstrations take place outside the controlled-access area is applicable equally to all demonstrators, regardless of their message. See Exhibit B (Brandt Decl.) ¶ 17. Compare McGuire v. Reilly, 260 F.3d 36, 4 (1st Cir. 2001) (holding that Massachusetts Reproductive Health Care Facilities Act, which established floating buffer zones between reproductive health care facility and protesters, was content-neutral). "As long as a

regulation serves a legitimate purpose unrelated to expressive content, it is deemed content-neutral even if it has an incidental effect on some speakers and not others." Id., citing Ward, 491 U.S. at 791, and Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 740 (1st Cir. 1995). Here, the obvious purpose of the challenged security measures is to ensure the personal safety of the Supreme Court Justices and other dignitaries attending the Red Mass. This purpose is, by definition, content-neutral.

### 3.    The Government's Interest Is Significant

At the outset, Defendant would note that Plaintiffs have employed the wrong test for determining the validity of content-neutral time, place, or manner restrictions. Plaintiffs suggest that, "[u]nder *strict* scrutiny, the Marshals Service's actions can be 'upheld only if narrowly drawn to achieve a *compelling* interest.'" See PI Memo. at 9 (quoting U.S. v. Grace, 461 U.S. 171, 177 (1983) (emphases added). In fact, it is settled law that content-neutral restrictions are subject only to an intermediate level of scrutiny: specifically, they need only be "narrowly tailored to serve a *significant* government interest, and leave open ample alternative channels of communication." Ward, 491 U.S. at 791 (1989) (quoting Clark, 468 U.S. at 293) (emphasis added). As the Court explained in Turner Broadcasting System, Inc. v. FCC, 512 U.S. 622, 642 (1994), "regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny . . . because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue." Compare Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 736 (1st Cir. 1995) (intermediate scrutiny is "less exacting in both the 'ends' and 'means' segments of the equation.").

Accordingly, Plaintiffs' entire analysis is flawed.  Plaintiffs proceed on the assumption that the Marshals Service's restriction must serve a compelling interest, placing their primary emphasis on Grace and Boos v. Barry.  As Plaintiffs argue:  "The interest in protecting statutorily designated persons did not justify the Supreme Court sidewalk closure at stake in [Grace] or the ban on sign displays that bring certain foreign dignitaries into public opprobrium at stake in [Boos]."  See PI Memo. at 9 and n. 5 ("Boos is particularly pertinent").  Grace, however, specifically recognized that the "compelling interest" standard applies only to content-based restrictions.  461 U.S. at 177 (distinguishing content-neutral restrictions from "restrictions such as an absolute prohibition on a particular type of expression").[3]  Boos involved an explicitly content-based restriction, to which the "compelling interest" standard applied.  485 U.S. 312, 318-19 (1988) ("[The statute] is content based.  Whether individuals may picket in front of a

---

[3] Grace involved a federal statute that banned a "specified [type] of communicative activity"— the "display [of] any [political] flag, banner, or device"—on the public sidewalks surrounding the Supreme Court building.  461 U.S. at 175, 181.  The Court considered this restriction to be "facially content-neutral."  Id. at 181, n. 10.  Grace, however, did not turn on whether the interest in providing for the protection of Supreme Court Justices was important enough to justify the ban on signs.  Indeed, the Court specifically opined that "we do not denigrate the necessity to protect persons and property . . . . within the Supreme Court grounds."  Id. at 182.  Instead, the Court rejected the ban on the ground that it "did not sufficiently serve that purpose."  Id.  As the Court reasoned, "there is no suggestion . . . [that the banned activities] in any way obstructed the sidewalks . . ., threatened injury to any person or property, or in any way interfered with the orderly administration of the building."  Id.  The case at bar is clearly distinguishable.  Mr. Brandt has testified that allowing the non-attending general public inside the controlled-access area would put the Justices at risk in a variety of ways, such as:  by allowing an individual to loiter near the Cathedral and "wait for a target of opportunity"; by interfering with emergency-vehicle access to the site; by impeding emergency evacuation of the attendees; by putting the Justices within accurate range of certain types of weapons and projectiles; and by reducing the time available for security personnel to intercept an individual who might seek to make physical contact with the Justices.  See Exhibit B (Brandt Decl.) ¶¶ 9, 10, and 22.  Thus, unlike the activity-specific ban in Grace, the sidewalk closure at issue in the case at bar specifically serves the asserted purpose of ensuring the physical safety of the Justices and other dignitaries.

foreign embassy depends entirely upon whether their picket signs are critical of the foreign government or not."). Thus, neither case supports the proposition—suggested by Plaintiffs—that the personal security of Supreme Court Justices cannot be deemed significant enough to justify a content-neutral restriction.

To the contrary, it is apparent that such an interest is amply sufficient to satisfy the "significant governmental interest" standard. In <u>Ward</u>, the Supreme Court held that the City of New York, in requiring music bands to follow certain guidelines in using a band shell in Central Park, had a significant interest in protecting its residents from "unwelcome noise." 491 U.S. at 796-797. In <u>Globe Newspaper Co. v. Beacon Hill Architectural Comm.</u>, 100 F.3d 175, 187 (1st Cir. 1996), the First Circuit held that a government commission's interest in preserving a district's aesthetic character was a "significant government interest." If protecting residents from unwelcome noise and aesthetic insult are "significant" governmental interests, surely protecting the safety of Supreme Court Justices must be considered a "significant" governmental interest. <u>Compare</u> <u>Watts v.</u> <u>United States,</u> 394 U.S. 705, 707 (1969) ("The Nation undoubtedly has a valid, even an overwhelming interest in protecting the safety of its Chief Executive and allowing him to perform his duties without interference from threats of physical violence."); <u>Stigile v.</u> <u>Clinton,</u> 110 F.3d 801, 804 (D.C. Cir. 1997) ("[I]n addition to *actually* protecting the President, the government also has an interest in assuring the public that it is taking every possible precaution to ensure that he is safe.") (emphasis in original).

### 4.    The Security Plan Is Narrowly Tailored

In <u>Ward</u>, the Supreme Court clarified the "narrowly tailored" prong of First Amendment jurisprudence:

> Lest any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so. Rather the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. . . . To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals . . . . So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative.

Id. at 799-800 (internal citations and quotations omitted).

Thus, a reviewing court should not second-guess the reasonable determination of the responsible government official by means of a de novo assessment of whether there is some other, less intrusive means of achieving the government's objective. Ward, 491 U.S. at 797 ("The Court of Appeals erred in sifting through all the available or imagined alternative means of regulating sound volume in order to determine whether the city's solution was 'the least intrusive means' of achieving the desired end."); and id. at 800 ("The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted."). Accord Clark v. Cmty. For Creative Non-Violence, 468 U.S. 288, 299 (1984); Carew-Reid v. Metro. Transp. Auth., 903 F.2d 914, 917 (2d Cir. 1990) ("[I]f the scope of the regulation is not substantially broader than required to secure the governmental interest, the regulation is not invalid simply because a court, second guessing the decisions of the governmental body, discerns some less-restrictive alternative to the regulation.").

-17-

The Marshals Service's security measures easily satisfy the "narrowly tailored" test. The measures are temporally limited to a period of time from one hour before the mass begins until one hour after the mass has ended, and spatially limited to the Rhode Island Avenue street and sidewalks between 17th Street and Connecticut Avenue. See Exhibit B (Brandt Decl.) ¶¶ 9, 11. Indeed, in the demonstrator area, demonstrators will be able to approach within 20 yards of the spot where the Supreme Court Justices and other dignitaries will be arriving and departing. Id. at ¶ 17. As made clear by Mr. Brandt's declaration, in determining the size and scope of the controlled-access area, the Marshals Service carefully weighed both the security needs of the event—taking into account such matters as the need for emergency-vehicle access to the site, the possibility of an emergency evacuation of the attendees, the need to ensure that the attendees are not within accurate range of certain types of weapons and projectiles, and the need to ensure that security personnel will have enough time to intercept an individual who crosses into the controlled-access area and seeks to make physical contact with the Justices—and the First Amendment interests of the public. Id. at ¶¶ 9, 10, and 15-23. The solution the Marshals Service reached clearly promotes a substantial government interest that would be achieved less effectively absent the restriction. This is all that is required to satisfy the "narrowly tailored" test. The Court should decline Plaintiffs' invitation to attempt to second-guess the Marshals Service's determination. Compare Ward, 491 U.S. at 797, 800; United For Peace & Justice v. City of New York, 243 F. Supp. 2d 19, 24 (S.D.N.Y) (concluding that City's ban on march in front of United Nations was narrowly tailored to City's legitimate security concerns because "this march is simply too large for the BPD to adequately secure the safety of the United Nations Headquarters"), aff'd per curiam, 323 F.3d 175 (2d Cir. 2003).

Finally, to the extent Plaintiffs seek to argue that they themselves are peaceful and do not pose a threat, and therefore that the controlled-access area is unnecessary, see Pl. Memo. at 6, this argument ignores the well-settled principle that "the validity of [a] regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case." Ward, 491 U.S. at 781; accord Clark v. Community for Creative Non-Violence, 468 U.S. 288, 296-97 (1983); Heffron, 452 U.S. 652; White House Vigil for ERA Committee v. Clark, 746 F.2d 1518, 1534 n.106 (D.C. Cir. 1984) ("There is no suggestion, of course, that appellees or intervenors themselves would engage in activity that threatens the White House or its occupants . . . .  We are concerned instead with persons who harbor less beneficent intentions").

In sum, the security measures at issue herein "directly furthers . . . legitimate governmental interests . . . and . . . those interests would [be] less well served in the absence of the [restriction]." Ward, 491 U.S. at 801.  Thus, the security measures must be deemed to be narrowly tailored.[4]

---

[4] Plaintiffs rely on several prior-restraint cases to argue that the controlled-access area cannot be deemed narrowly tailored because it purportedly "vests officials with discretion to grant or deny licenses." See PI Memo. at 9-13.  The case at bar obviously does not involve the granting or denial of licenses.  Further, the restriction at issue here is not a prior restraint; the Marshals Service seeks not to prevent speech, but only to regulate the place of its expression.  As noted in Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 12 (1st Cir. 2004), "[t]he Supreme Court has explicitly rejected attempts to analyze security-based time-place-manner restrictions as prior restraints.") (citing Hill v. Colorado, 530 U.S. 703, 733-34 (2000); Schenck v. Pro-Choice Network, 519 357, 374 n. 6 (1997); and Madsen v. Women's Health Ctr., Inc., 512 U.S. 753, 763 n.2 (1994) ("petitioners are not prevented from expressing their message in any one of several ways; they are simply prohibited from expressing their message within the 36-foot buffer zone")).  Thus, Plaintiffs' prior-restraint analysis is inapposite.

5.    **The Security Plan Leaves Open Ample Alternative Avenues of Communication**

The final element of the "time, place, or manner" test is whether the restriction in question leaves open ample alternative channels for communication.  An "ample" alternative channel need not be an equivalent one.  Plaintiffs need not have "access to every or even the best channels or locations for their expression."  Carew-Reid v. Metropolitan Transp. Authority, 903 F.2d 914, 919 (2nd Cir. 1990).  Nor does the ample-alternative inquiry turn on whether the plaintiffs find the alternative to be as satisfying as the channel being proscribed; rather, an alternative channel will be upheld if the plaintiffs receive sufficient opportunity to convey their views.  See Housing Works. Inc, v, Kerik, 283 F.3d 471, 481-82 (2d Cir. 2002) ("That [plaintiff] considers no other City location as beneficial for its purposes as City Hall Plaza does not negate the fact that significant alternate channels are open for the messages it wishes to convey."); Globe Newspaper Come. v. Beacon Hill Architectural Commission,100 F.3d 175, 188 (1st Cir. 1996) (access to the intended audience need only be sufficient, not the best nor most ideal, to convey plaintiff's message).  See also United for Peace and Justice v. City of NewYork, 323 F.3d 175 (2d Cir. 2003) (per curiam) ("ample alternative channel" criterion met where group was allowed to hold a stationary rally at a location near the site where group wished to march).

In the case at bar, Plaintiffs have ample alternative channels of communicating their message.  They will be permitted to engage in any expressive conduct they desire within 20 yards of, and within the direct line of sight of, the audience they wish to reach.  See Exhibit B (Brandt Decl.) ¶¶ 17-18, and photographs attached thereto.  Thus, they clearly will have a sufficient opportunity to convey their message.

6.      **Conclusion**

The controlled-access area the Marshals Service plans to implement is a reasonable "place" restriction which is content-neutral, is narrowly tailored to serve a significant government interest, and leaves open ample alternative channels for communication of the information.  Thus, it is perfectly constitutional.  Compare Hill, 530 U.S. at 707-08, 724, 730 (upholding as reasonable "place" restriction statute prohibiting persons from knowingly approaching within eight feet of individual who was within 100 feet of health care facility entrance for purposes of displaying sign, engaging in oral protest, education, counseling, or passing leaflets or handbills); Madsen, 512 U.S. at 768-70 (state's interests, *inter alia*, in protecting woman's freedom to seek lawful medical services in connection with her pregnancy, in ensuring public safety and order, and in promoting free flow of traffic on public streets and sidewalks, sufficient to justify state court injunction creating 36-foot buffer zone around abortion clinic entrances and driveways, from which antiabortion protesters were excluded); Frisby v. Schultz, 487 U.S. 474 (1988) (upholding total ban on picketing on sidewalk outside a residence); Heffron, 452 U.S. 640 (upholding restriction of leafletting at a fairground to a booth).  Plaintiffs cannot establish a substantial likelihood of prevailing on their merits of their First Amendment claim.

B.      **Plaintiffs Cannot Show a Substantial Likelihood of Success on Their Alternative Claims**

Plaintiffs' alternative claims—those brought under the Religious Freedom Restoration Act ("RFRA") and the 5th Amendment —deserve little comment.  All three of these alternative claims fail as a matter of law.

### 1.     Plaintiff Cannot Make Out a RFRA Violation

RFRA provides that government officials "shall not substantially burden a person's exercise of religion."  42 U.S.C. § 2000bb-1(a) (2002).  To establish a *prima facie* case of a RFRA violation, the plaintiff bears the burden of proving the following three elements:  "(1) a substantial burden imposed by the federal government on a (2) sincere (3) exercise of religion." Kikumura v. Hurley, 242 F.3d 950, 960 (10th Cir. 2001); Werner v. McCotter, 49 F.3d 1476, 1479 n. 1 (10th Cir. 1995).  Even assuming, *arguendo*, that Plaintiffs' proposed demonstration constitutes an "exercise of religion," Plaintiffs cannot show that the Marshals Service will impose a substantial burden on that exercise.  As set forth in detail above, Plaintiffs will be permitted to engage in whatever expressive conduct they desire, including holding a prayer vigil and religious service, so long as they do so outside the controlled-access area.  See Exhibit B (Brandt Decl.) ¶ 21.  It simply is beyond cavil that requiring Plaintiffs to hold their prayer vigil 20 yards from the spot they ideally would like to hold it can be considered a substantial burden on their religious activity.

### 2.     Plaintiffs Cannot Make Out Their Fifth Amendment Claims

Plaintiffs argue that the Marshals Service's security plan violates both their equal protection and their due process rights under the 5th Amendment.  See Pl. Memo. at 18-22. These claims fail because Plaintiffs cannot show that they will be treated differently than similarly situated persons, and because Plaintiffs lack a property or liberty interest in holding their demonstration at the specific location of their choosing.

The Equal Protection component of the Fifth Amendment's Due Process Clause places the same limits on the exercise of federal power that the Equal Protection Clause of the

-22-

Fourteenth Amendment places on the exercise of state power. <u>Bolling v. Sharpe</u>, 347 U.S. 497 (1954). In essence, the equal protection guarantee requires that similarly situated persons be treated similarly. <u>City of Cleburne v. Cleburne Living Center, Inc.</u>, 473 U.S. 432 (1985). The Equal Protection Clause protects from "disparity in treatment . . . between classes of individuals whose situations are arguably indistinguishable." <u>Ross v. Moffitt</u>, 417 U.S. 606, 600 (1979).

To bring an action under the Equal Protection Clause, a plaintiff must show that the government has failed to "afford similar treatment to similarly situated persons." <u>News America Pub., Inc. v. FCC</u>, 844 F.2d 800, 809 (D.C. Cir. 1988). To the extent that there are meaningful differences between individuals, they are not similarly situated for equal protection purposes. <u>City of Cleburne</u>, 473 U.S. at 441. Thus, "[t]he threshold inquiry in evaluating an equal protection claim is . . . 'whether a person is similarly situated to those persons who allegedly received favorable treatment.'" <u>Women Prisoners of the District of Columbia Department of Corrections v. District of Columbia</u>, 93 F.3d 910, 924 (D.C. Cir. 1996) (quoting <u>United States v. Whiton</u>, 48 F.3d 356, 358 (8th Cir. 1995)).

Plaintiffs cannot meet this threshold requirement. Specifically, under the Marshals Service's plan, Plaintiffs will be treated identically to all other demonstrators and all other members of the public not attending the mass. <u>See</u> Exhibit B (Brandt Decl.) ¶¶ 13, 17. To the extent Plaintiffs argue that they will be treated differently from the credentialed press—who will be placed within the controlled-access area—Plaintiffs clearly are not similarly situated to the press members. As Mr. Brandt explains in his declaration, "because the demonstrators, unlike the media, will not have been vetted before the event, there is a much greater concern about their posing a threat to attending dignitaries." <u>See</u> Exhibit B (Brandt Decl.) ¶ 22.

As to Plaintiffs due process claim, an essential element of any such claim is that the government have deprived the plaintiff of a recognized liberty or property interest.  See, e.g., Cleveland Bd. of Educ. v. Loudermill, 105 S. Ct. 1487, 1491 (1985).  Plaintiffs' entire due process claim is premised on the assumption that they will be deprived of the opportunity to display hand-held signs.  See PI. Memo. at 20.  As shown in Mr. Brandt's declaration, however, the Marshals Service will impose no such restriction.  See Exhibit B (Brandt Decl.) ¶ 21.  Thus, Plaintiffs cannot establish that they will be deprived of any liberty or property interest whatsoever.  Compare Grace, 461 U.S. at 177-78 ("We have regularly rejected the assertion that people who wish to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please.") (internal quotation omitted).  Nor can there be any legitimate concern about vagueness, as Plaintiffs will be permitted to engage in whatever expressive conduct they wish as long as they remain outside the controlled-access area.

**C.**     **Plaintiffs Cannot Meet the Remaining Criteria for Obtaining Injunctive Relief**

While Plaintiffs cannot come close to showing a substantial likelihood of success of the merits, they also cannot show irreparable harm absent an injunction.  As shown above, they have ample alternative channels of communication by which they can convey their message.  Accordingly, no harm whatsoever will result from the denial of relief.

In addition, the balance of equities and public interest weigh against granting preliminary injunctive relief.  The Nation has a strong interest in ensuring the safety of Supreme Court Justices and other high-level government officials.  This important public interest weighs heavily against a grant of injunctive relief.

## V.  CONCLUSION

Based upon the foregoing, Defendant respectfully requests that Plaintiff's motion for a preliminary injunction be denied.

Respectfully submitted,

_____/s/_____
KENNETH L. WAINSTEIN, D.C. Bar #451058
United States Attorney

_____/s/_____
R. CRAIG LAWRENCE, D.C. Bar #171538
Assistant United States Attorney

_____/s/_____
STRATTON C. STRAND, D.C. Bar #464992
Assistant United States Attorney