UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REVEREND PATRICK MAHONEY, *et al.*,)
                            )
     Plaintiffs,          )
                            )
     -vs-                )     Civil Action No. 05-1786-RCL
                            )
U. S. MARSHALS SERVICE, *et al.*,   )
                            )
     Defendants.       )

## PLAINTIFFS' REPLY STATEMENT
## OF POINTS AND AUTHORITIES

Come now the Plaintiffs – Reverend Patrick Mahoney, Troy Newman, and the Christian

Defense Coalition – and tender their Reply Statement of Points and Authorities Defendant U.S.

Marshals Service's ("USMS") Opposition to Plaintiffs' Motion for Preliminary Injunction.

### REPLY TO STATEMENT OF FACTS

Despite Deputy Marshal Brooks' statements to the contrary, there were absolutely no access

restrictions or controls in place on October 5, 2003, when Reverend Mahoney arrived on the scene

and when he first stood, adjacent to members of the media, on the sidewalk across from St.

Matthew's Cathedral. Mahoney Supplemental Declaration ¶ 3 ("Mahoney Supp. Decl.") (Plaintiffs'

Exhibit F). There were no police lines at that time, or police tape marking off controlled areas.

Mahoney Supp. Decl. at ¶ 4. Moreover, there were people moving up and down the sidewalk, and

standing around near that location, some had cups of coffee, some were chatting with the media

representatives, others were onlookers. Mahoney Supp. Decl. at ¶ 5.

In his declaration, Deputy Marshal Roberts mentions a controlled access area, but there were

absolutely no demarcations, police tape, saw bucks or other indications on the sidewalk on the south side of Rhode Island Avenue that morning; in addition, as the previous year, this time there were, again, people walking up and down along the sidewalk, standing about, a few that asked question of Reverend and Mrs. Mahoney, and otherwise making customary use of the sidewalk.  Mahoney Supp. Decl. at ¶ 7.  Nor did Roberts accurately portray the facts of that morning related to the Marshals Service's interaction with, and interference with, Reverend and Mrs. Mahoney.  Mahoney Supp. Decl. at ¶ 8.  During the time that Reverend and Mrs. Mahoney were present on that morning and displaying the sign with the Ten Commandments on it, about 45 minutes to an hour, virtually constantly Reverend Mahoney was either being engaged by various Marshals in confrontations about his right to be present, or being told that arrest was imminent.  Mahoney Supp. Decl. at ¶ 9.  In fact, arrest seemed so likely to occur immediately that Reverend Mahoney asked his wife to step down the sidewalk some distance in order to avoid her being arrested with him.  Mahoney Supp. Decl. at ¶ 10.

Kathleen Mahoney was present with her husband, on October 3, 2004, on the public sidewalk adjacent to Rhode Island Avenue across the street from the Cathedral of St. Matthew, in the District of Columbia.  Kathleen Mahoney Declaration ¶ 2 ("K. Mahoney Decl.") (Plaintiffs' Exhibit E).  Her presence on that Sunday was in keeping with a long-standing family practice; her husband, she, and at times their children, have been present for the Red Mass seven or eight times in the last thirteen years.  K. Mahoney Decl. ¶ 3.  She joined with her husband to be a visible presence and witness, to pray, and to express their views regarding the public display of the Ten Commandments.  K. Mahoney Decl. ¶ 4.  She sought to do these things in a public place, not inside the Cathedral, and

to do them at that time because the Supreme Court then had pending before it cases on the constitutionality of such displays.  K. Mahoney Decl. ¶ 5.

From past experience she knew that justices of the Supreme Court attended the Red Mass at the Cathedral.  K. Mahoney Decl. ¶ 6.  Displaying the Ten Commandments on the sidewalk that day was intended to show that such displays in public places are appropriate and certainly are not less appropriate where the display is outside a place of worship.  K. Mahoney Decl. ¶ 7.  Displaying the Ten Commandments on the sidewalk that day was also intended to remind all who witnessed their display that the Ten Commandments are foundational principles upon which American law is based.   K. Mahoney Decl. ¶ 8.

The Mahoneys arrived at the location well in advance of the start of the 10:00 a.m. Red Mass. K. Mahoney Decl. ¶ 9.  Deputy Marshal Roberts claims that neither he nor others harassed Reverend Mahoney, but, in fact, for a period of thirty or more minutes, they continuously spoke with and to him about our vigil and display of the Ten Commandments.   K. Mahoney Decl. ¶ 11.  While it is true that the Marshals did not take her husband's sign from them, they did everything they could to intimidate him about the display of the sign and their presence on the sidewalk.  K. Mahoney Decl. ¶ 12.   Moreover, one or more of the security detail repeatedly threatened to arrest Reverend Mahoney husband if he did not leave that location.   K. Mahoney Decl. ¶ 13.   Her husband was sufficiently concerned that these threats of arrest were real and that arrest was imminent that he asked Kathleen Mahoney to move down the sidewalk away from him so that they would not both be arrested.  K. Mahoney Decl. ¶ 14.  Also from the time they arrived, Kathleen Mahoney noticed that there was a continuous flow of people on the sidewalk, using that sidewalk for passage up and

down Rhode Island Avenue.  K. Mahoney Decl. ¶ 16.

Kathleen Mahoney was shocked when she read paragraph six of Deputy Marshal Roberts' Declaration, "the sergeant posted two uniformed MPD officers close to Reverend Mahoney to ensure that he did not attempt to harm the arriving dignitaries. . . ."  K. Mahoney Decl. ¶ 17.  Her shock resulted from her awareness of her husband's lifelong commitment to pacifism, and from her knowledge that government officials know my husbands, including federal government officials and Washington MPD officials, have continuously worked with him for sixteen years, and have no basis in facts or past behavior to fear that he would attempt to harm anyone.   K. Mahoney Decl. ¶ 18.

Roberts' assertion that Reverend Mahoney's conduct caused an unanticipated need to reshuffle manpower and strained the entire operation is not credible because, well in advance of that day, Reverend Mahoney had spoken with Metropolitan Police Officials to advise them of his planned activity for that day.  Mahoney Supp. Decl. at ¶ 11.  In that conversation with MPD officials, Reverend Mahoney told them where he would stand, what time he would be present, how many participants would be there, and what they would have in the way of signs.  Mahoney Supp. Decl. at ¶ 12.  That advance notice is Reverend Mahoney's regular custom and practice, dating to his very first event in Washington, DC, in November 1989.  Mahoney Supp. Decl. at ¶ 13.

Moreover, Reverend Mahoney is appalled by Deputy Marshal Roberts' assertion that he had to ensure that Mahoney did not attempt to harm arriving dignitaries or interfere with the procession.  Mahoney Supp. Decl. at ¶ 14.  That assertion was appalling for at least several reasons.  First, as a practicing Christian, Reverend Mahoney is committed to peaceful and nonviolent expression in the public square and his twenty eight year public record across the Nation of participating in,

organizing, and leading such vigils and demonstrations proves that he has kept his commitment. Second, Reverend Mahoney has never blocked a public procession. Third, as previously indicated, Reverend Mahoney took affirmative steps to inform Washington MPD officials well in advance of his plans, and the Washington MPD knows his sixteen year track record of keeping his commitments with respect to events in the District. Fourth, these facts are specially significant where, as here, Reverend Mahoney has led numerous demonstrations in previous years of the Red Mass and has never had any instance of violent conduct or interference with processions. Mahoney Supp. Decl. at ¶ 15.

Based on his personal knowledge of the location, Reverend Mahoney has concluded that he will not be able to communicate effectively to arriving dignitaries, including justices of the Supreme Court and other federal, state and local government officials, from the "pen" set aside for demonstrators. Mahoney Supp. Decl. at ¶ 17. That "pen" is too remote from the arriving dignitaries. That "pen" is screened from view by a commercial building. That "pen" will be screened from view by the media and their equipment. Mahoney Supp. Decl. at ¶ 18-20.

Kathleen Mahoney is appalled that Deputy Marshal Brandt thinks that her First Amendment interests will be secured by allowing the media to stand along Rhode Island Avenue, if they are approved by a church official. K. Mahoney Decl. ¶ 20. Her First Amendment interests are to pray, to display the Ten Commandments, and to speak their message that such displays are important and appropriate, and that the Ten Commandments are foundational to American law. K. Mahoney Decl. ¶ 21. Her First Amendment interests also include doing these things in a place and time when her intended audience – justices of the Supreme Court – can reasonably be expected to be in a position

to see and hear her.  K. Mahoney Decl. ¶ 22.  Relegating the Mahoneys to a "pen" far back from Rhode Island Avenue, in a location screened from view by their intended audience by a large commercial building and the "media pen" hardly "promotes" their First Amendment interests.  K. Mahoney Decl. ¶ 23.

In sixteen years of frequent prayer vigils and demonstrations, including outside the Red Mass, Reverend Mahoney had never had his right of access to a public sidewalk limited depending on whether he was approved by a church official or possessed press credentials.  Mahoney Supp. Decl. at ¶ 21.  Deputy Marshal Brandt's assertion that placing Reverend Mahoney in a demonstration "pen" maximizes Mahoney's ability to communicate his message is not credible for all the reasons listed above.  Mahoney Supp. Decl. at ¶ 22.

The media does not represent Kathleen Mahoney.  K. Mahoney Decl. ¶ 24.  The media's exercise of constitutional rights is not her exercise of constitutional rights.  K. Mahoney Decl. ¶ 25.  The media's exercise of constitutional rights will not promote her First Amendment rights.  K. Mahoney Decl. ¶ 26.  The media will not be present for the same purposes as Kathleen Mahoney; the Mahoneys are seeking to pray and to communicate; the media will report the events of the day and will do so from their own particular, edited viewpoints.  K. Mahoney Decl. ¶ 27.

The Marshals Service's actions in this case are perplexing because Reverend Mahoney has a spotless record of peaceful and nonviolent vigils and demonstrations at the Red Mass.  Mahoney Supp. Decl. at ¶ 23.

Kathleen Mahoney finds it absurd that Deputy Marshal Brandt states that she and her husband will not be permitted to endanger Red Mass attendees, which seems to suggest that the

Mahoneys pose or intend to pose a threat or to violate the law. K. Mahoney Decl. ¶ 28. She is seeking to exercise constitutional rights of speech, free exercise of religion and peaceable assembly, not to violate the law. K. Mahoney Decl. ¶ 29. She has never endangered anyone, in twenty-five years of public protest activity, and has no intention of doing so at this Red Mass. K. Mahoney Decl. ¶ 30. Moreover, Deputy Marshal Brandt preposterously asserts that his demonstration zone will maximize the Mahoneys' ability to communicate their message; that planned zone, far from Rhode Island Avenue, screened from the view of approaching dignitaries by a commercial building, and occluded by the media pen, could not be more poorly constructed to serve the purpose of maximizing her ability to communicate. K. Mahoney Decl. ¶ 31.

Because of the prior arrests at the Red Mass in 2003, and the constant harassment and threats of arrest at the Red Mass in 2004, and because of the uncertainty that these government actions create, only Reverend Mahoney and his wife plan to be present to pray and to display their sign. Mahoney Supp. Decl. at ¶ 24.

## REPLY ARGUMENT

1. <u>Deputy Marshal Brandt is not a legislature authorized to enact his ad hoc judgments into law</u>. To say that the Defendant's defense is astounding is not to overstate the case. The essence of their defense of past and future conduct restricting the exercise of rights protected by the federal Constitution and statute law is that police judgments – judgments unfettered by any statutory or constitutional limitations – warrant judicial approbation of their security scheme.

Defendant screens the nature of this case, which is not about the enforcement of a possibly unconstitutional statute or regulation because there is no statutory scheme of regulations of the

Rhode Island Avenue sidewalk.  There is no ordinance section to that effect, nor is there even a regulation of a municipal or federal administrative body that imposes the scheme that Defendant defends here.

All there is here is the ad hoc, subjective judgment of a Deputy Marshal.  Undoubtedly, to insure effective law enforcement, policing officials must have the authority to act within their assigned sphere or operations, and in this case that means the sphere of protecting judicial and certain other government officials.  But to survive scrutiny, the judgments and actions of such police officials must occur within the bounds of carefully crafted legislation.

In opposition, the Marshals Service has offered the Declaration of Robert Brandt ("Brandt Decl.") (Defendant's Exhibit B) to justify its interference with the usual and customary uses of the public sidewalk along Rhode Island Avenue NW.  Brandt's declaration fails to offer any compelling reason to justify the sweeping closure of the Rhode Island Avenue sidewalk opposite from the Cathedral of St. Matthew.  To be sure, the statutory duty to provide protection to judicial and other officers is a valid interest.  But Brandt's declaration fails to show how that interest justifies his ad hoc judgment to close a public sidewalk.

Particularly troubling here is the absence of any statutory or regulatory scheme purporting to impose time, place and manner restrictions on the use of the sidewalk.  The Supreme Court explained the problem this way:

> "Where First Amendment interests are affected, a precise statute 'evincing a legislative judgment that certain specific conduct be . . . proscribed,' <u>Edwards v. South Carolina</u>, 372 U.S. 229, 236 (1963), assures us that the legislature has focused on the First Amendment interests and determined that other governmental policies compel regulation. See Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup. Ct. Rev. 1, 32; <u>Garner v. Louisiana</u>, 368 U.S. 157, 200, 202 (1961)

(Harlan, J., concurring in judgment)."

Grayned v. City of Rockford, 408 U.S. 104, 109 (1972).  Here, however, there cannot be a "precise statute 'evincing a legislative judgment'" because there is **no statute** evincing any legislative judgment.  Instead, all that there is is Deputy Marshal Brandt's subjective judgments about what factors may, or may not, enhance the security activities of the Marshals Service.  Moreover, Deputy Marshal Brandt omits any evidence to support a conclusion that there is any basis in fact to believe that a real and credible threat of harm exists at the Red Mass on Sunday, October 2, 2005.

All that Deputy Marshal Brandt does offer, then, is an undifferentiated fear or apprehension about what might happen.  But, despite his fears and apprehensions, the Supreme Court has explained that "undifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression," Tinker v. Des Moines Ind. School Dist., 393 U.S. 503, 508 (1969).[1]

2.     The Defendant, by means of the Brandt security plan, has chosen to target only expression clearly protected by the First Amendment, including spoken communication and sign displays.  See Brandt Decl. ¶¶ 17-22 .  These restrictions will affect the Plaintiffs because verbal communications and sign displays are their chosen means of expression.  These methods of communication are used to further Plaintiffs' goal, encouraging support for the public display of the Ten Commandments through peaceful, lawful expression.  Each means that Plaintiffs would employ to communicate with the public is squarely jeopardized by the Brandt security plan.

---

1.     Of course, Tinker relates to special considerations of the public school classroom environment. Unlike the Des Moines schools at issue there, here we are treating the public sidewalk along Rhode Island Avenue in Washington, DC.  Certainly in this case the deference owed to such undifferentiated fears and apprehensions is even less than in Tinker.

Defendant does not dispute that the prayer vigil and sign display by the Plaintiffs constitutes protected expression. Defendants' Opposition Memo at 12. Instead, the Defendant seeks to justify the Brand security plan as content neutral, reasonable regulation of time, place or manner of expression, that leaves open ample alternative channels of communication. Defendant's Opposition Memo at 12-20. Defendant offers no case authority for the proposition that the subjective, ad hoc decisions of police officials are due the deference of the intermediate level of scrutiny applicable to statutes and ordinances.

Contrary to the Defendant's argument, as explained above, the Supreme Court has identified as particularly troubling, and of greater risk to First Amendment values, those vague systems of restriction of expression that allow for such ad hoc judgments. Moreover, the Defendant has ignored the teaching of the Supreme Court regarding absolute prohibitions on expression, explained in United States v. Grace, 461 U.S. 171, 183 (1983). There, the Court, after describing the reasonable time, place and manner framework, stated that the absolute restrictions on expression were subject to the highest level of scrutiny:

> Additional restrictions such as an absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling governmental interest.

Grace, 461 U.S. at 177 (citations omitted). Deputy Marshal Brandt has explained his plan in some detail, and in doing so, has stated that the controlled access area will, in fact, effect an absolute prohibition on demonstrating. See Brandt Decl. ¶¶ 17-25.

In the face of the naked concession that the Brandt security plan imposes an absolute prohibition on demonstrations, the Marshals Service's arguments directed to an intermediate level

of scrutiny are, simply, inapposite.

3.    <u>Narrowly drawn alternatives to the absolute ban inside the controlled access area and the demonstration pen exist</u>.  "Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms."  <u>Riley v. National Fed'n of the Blind of North Carolina. Inc.</u>, 487 U.S. 781, 801 (1988) (internal quotation marks and citation omitted).  A law is "narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy."  <u>Frisby v. Schulz</u>, 487 U.S. 474, 485 (1988) (citation omitted).  By contrast, a law is not narrowly tailored when "there is no core of easily identifiable and constitutionally proscribable conduct that the [law] prohibits."  <u>Secretary of State v. Joseph H. Munson Co.. Inc.</u>, 467 U.S. 947, 965-66 (1984).

Here, the troubling fact is the Marshals Service has concluded that the exercise of the First Amendment rights of speech and assembly constitutes some kind of threat of harm to government officials that the Service is charged to secure.  This conclusion is the only one possible because the Marshals Service has deliberately and candidly targeted demonstrations and prayer vigils and other communicative exercises for restriction.  Under the applicable standards, <u>Riley</u> and <u>Secretary of State</u>, the Defendant's assertion that the Brandt security plan is narrowly tailored means that the Defendant contends that these fundamental constitutional rights are the exact source of the evil that the Brandt security plan seeks to remedy.

The Marshals Service concludes that its security plan is narrowly tailored, but it can be shown not to be by examination of the Service's actions in 2004.

Narrow tailoring was exhibited by the deployment of a few extra officers in the vicinity of Reverend Mahoney and his wife during the October 2004 Red Mass.  The 2004 incident

demonstrates that a more narrowly drawn solution is available. The Marshals Service can assign an appropriate number of officers to insure that security interests do not compel the unnecessary restriction of First Amendment rights.

Deputy Marshal Roberts states that two officers on foot were detailed to watch Reverend Mahoney and his wife after Reverend Mahoney refused to move down the sidewalk across from the Cathedral of St. Matthew during the Red Mass in October 2004. Roberts Decl. ¶ 6. In addition, he states that about 10 motorcycle officers of the MPD that were already on scene were directed to park their vehicles between Reverend Mahoney and the locations from which dignitaries were disembarking from their vehicles. Roberts Decl. ¶ 6. Taking these two steps, admittedly <u>described</u> as burdensome, the Defendant apparently concluded that statutory obligations to provide for physical security of protected persons were satisfied, for no other additional measures were taken, and the only other possible conclusion to draw than that one is that there was neglect of duty.

In addition to 2004 approach, as an alternative to simply assigning extra officers to the scene to police any demonstrations that occur, the Marshals Service could place the demonstration pen in another location that would insure the visibility that has been compromised by their ad hoc judgment to cancel the public forum status of the Rhode Island sidewalk. While the Plaintiffs do not agree that a speech pen is appropriately adopted here at all, or in the absence of statutory authorization to create one, if the Court concludes that the use of the speech restrictive pen approach is justified, then the Plaintiff respectfully suggests that either of two other locations would adequately secure the Government interests asserted and better serve the First Amendment interests of the Plaintiffs and of others.

The pen could be placed along Rhode Island Avenue to the east of the media pen, at a distance sufficient to provide a buffer from the designated location for disembarkation of dignitaries, perhaps even as much 20 yards to the east along Rhode Island Avenue from that point. See Brandt Decl. ¶¶ 17, 22. By placing the pen at a distance from the disembarkation point, the Defendant's desire to provide a buffering space to allow for any necessary preventive measure in an exigent circumstance is fully satisfied. And, by placing the pen along Rhode Island Avenue, the screening of the Plaintiffs' message, which will occur if the Brandt plan is given effect, is avoided. Dignitaries arriving by vehicle will be afforded the opportunity to view the Plaintiffs' message and sign from the safety of their vehicles, without having to be able to see through a building or past the obstructive equipment and bodies of the media.[2]

These options, while perhaps suffering from their own separate constitutional defects, certainly secure any relevant government interest while better respecting the precious, extremely delicate, and vulnerable rights of expression guaranteed by the First Amendment. Thus they demonstrate that the absolute prohibition of demonstrations in the controlled access area is not narrowly drawn or narrowly tailored.

4.     The Defendant studiously avoids the decision of the D.C. Circuit in Mahoney v. Babbitt. The Marshals Service invoke decisions of the First and Second Circuit Courts of Appeal. See

---

2.     Although it would be less desirable to the Plaintiffs, as an alternative, the pen could be placed on the sidewalk adjacent to Rhode Island Avenue to the west of the media pen. By doing so, some of the same obstruction of view problems remain, but the opportunity to be viewed by dignitaries approaching in vehicles will be less affected.

Defendant's Opposition Memo at 16-20.[3]  The authorities cited by the Defendant, however are

inconsistent with the decision of the D.C. Circuit in <u>Mahoney v. Babbitt</u>, 105 F.3d 1452 (D.C. Cir.

1997), and with the earlier decision in <u>Henderson v. Lujan</u>, 964 F.2d 1179 (D.C. Cir. 1992).

Defendant's reticence to discuss <u>Mahoney</u> may be best understood by looking at that decision

through the lens of commentary about the <u>Mahoney</u> decision:

> <u>Mahoney</u> is not a drastic change from First Amendment jurisprudence; yet, it demonstrates the judicial reluctance to allow the government to circumvent the rigorous First Amendment protection by transforming the public-forum character of property. Courts prohibit the government from converting public forums into nonpublic forums for the purpose of regulating otherwise protected activity.

> In <u>Grace</u> and <u>Henderson</u>, the government unsuccessfully restricted First Amendment expression by legislatively converting particular public sidewalks into restricted areas where the government already limited expression.  In <u>Mahoney</u>, the government did not attempt to transform the sidewalks into a nonpublic forum. Instead, the government tried to restrict expression on the sidewalks by granting itself a permit for the entire area.  Although the form of the governmental action was different in <u>Mahoney</u>, the unconstitutional result was the same as in <u>Grace</u> and <u>Henderson</u>. As a result, the D.C. Circuit did not allow the government to evade the public-forum analysis and held that the government's actions were unconstitutional.

> Although the D.C. Circuit's refusal to allow the government to convert public forums into nonpublic forums may demonstrate the great degree of protection that courts give to First Amendment rights, it is possible that the entire public/nonpublic forum distinction is irrelevant. In <u>Henderson</u>, Judge Stephen Williams noted that the public/nonpublic forum distinctions "artificially complicate the judicial assessment of time, place or manner restrictions."  He claimed that whether courts employ the time, place, or manner test for public forums or the reasonableness test for nonpublic forums, the critical factor is the same: "the compatibility of the forbidden speech with the purposes to which the site is dedicated."  As a result, the only practical result of the distinction is to expand the legal arguments of the parties, needlessly burdening

---

3.      Reliance on <u>Hill v. Colorado</u>, 530 U.S. 703 (2000) is inapposite.  There, the Colorado Bubble Zone statute allowed speech within the affected zone and simply imposed a manner of speech requirement, namely that one who would display a sign or engage in oral protest, counseling or education stand still rather than approaching those to whom they would communicate there message.

courts. Therefore, it is possible that even if the D.C. Circuit had allowed the government to transform the sidewalks into a nonpublic area, the restrictions might still have failed the reasonableness test.

The D.C. Circuit Review -- August 1996 - July 1997: Chapter: Constitutional Law, 66 GEO. WASH. L. REV. 857, 862-863 (April 1998).

An examination of the facts and circumstances of the 1997 Mahoney case reveals why the Marshals Service does not look to that case for guidance.  There, the National Park Service decided to deny Reverend Mahoney's application for a demonstration site along the Inaugural Parade route, offering him instead the nearby alternative of John Marshall Park adjacent to the federal courthouse in the District of Columbia:

> We note briefly one other defense of the government, that is that appellants were granted permits for two other areas on Inauguration Day, areas not on Pennsylvania Avenue and not along the parade route. Appellees have offered us no authority for the proposition that the government may choose for a First Amendment actor what public forums it will use. Indeed, it cannot rightly be said that all such forums are equal. The very fact that the government here struggles to bar the speech it fears or dislikes from one forum while offering, whether freely or grudgingly, access to another belies the proposition of equality. Once before, in Henderson v. Lujan, the government argued that leafletters banned from a sidewalk needed no remedy because they had access to other channels of communication, such as other stretches of sidewalk. We declined to discuss that rationale in Henderson, as "the ban fails the narrow tailoring requirement in any case." 964 F.2d at 1184. As in Henderson, so here, and again we will not belabor the government's alternative site theory.

Mahoney v. Babbitt, 105 F.3d 1452, 1459 (D.C. Cir. 1997).[4]  Consequently, there, the D.C. Circuit

---

4.      It is true that viewpoint based discrimination threatened by the National Park Service was a key feature of Mahoney.  Here, the Plaintiffs are not asserting that the problem is viewpoint bias.  But as the Court noted in Mahoney v. Babbitt, the D.C. Circuit's earlier decision in Henderson v. Lujan, declined to give any consideration to the Government's claim that alternative sites satisfied the ample alternative channels of communication requirement because the ban failed the narrow tailoring requirement.  So too here, the complete prohibition of demonstrations on the public sidewalk cannot be justified on the theory of an ample alternative channel of communication being offered because the ban is not narrowly tailored.

refused to tolerate a regulatory ipse dixit withdrawing a portion of the Pennsylvania Avenue sidewalk from the traditional public forum.

Similarly, in Henderson v. Lujan, 964 F.2d 1179, 1181 (D.C. 1992), the Court rebuffed the Government's decision to retract from the public forum a segment of sidewalk along Constitution Avenue in the District.  As the Court there explained:

> In one sense, tradition operates at a very high level of generality, establishing a working presumption that sidewalks, streets and parks are normally to be considered public forums. . . . Traditions specific to a particular area work differently. Common sense and the cases make clear that when government has dedicated property to a use inconsistent with conventional public assembly and debate . . . then the inconsistency precludes classification as a public forum.  But government cannot establish the inconsistency simply by declaring it and by enforcing restrictions on speech. It is quite true that in Greer the Court distinguished its earlier decision in Flower v. United States, 407 U.S. 197, 32 L. Ed. 2d 653, 92 S. Ct. 1842 (1972), on the ground that in Flower the base authorities "had 'abandoned any claim [of] special interests in who walks, talks, or distributes leaflets on the avenue,' ", 424 U.S. at 837 (quoting Flower), whereas in Greer there had been no such abandonment. But the Greer Court also dismissed Flower as a case where the Court had understood that the disputed avenue "was a public thoroughfare in San Antonio no different from all the other public thoroughfares in that city." Id. at 835. And later cases confirm that Flower and Greer do not establish that time, place, or manner restrictions can bootstrap themselves into validity by their mere existence, even if prolonged.  See United States Postal Service v. Greenburgh Civic Ass'ns, 453 U.S. 114, 133, 69 L. Ed. 2d 517, 101 S. Ct. 2676 (1981) (government "may not by its own ipse dixit destroy the 'public forum' status of streets and parks which have historically been public forums"); Grace, 461 U.S. at 180 ("Nor may the government transform the character of the property by the expedient of including it within the statutory definition of what might be considered a nonpublic forum parcel of property.").

Based on that analysis, the D.C. Circuit rejected the retraction of the Constitution Avenue sidewalk from the traditional public forum.  Likewise, this Court should resist the Defendant's invitation to walk the primrose path.

5.    The Defendant's security argument proves too much.  The Marshals Service asserts an

interest in the protection of statutorily designated officials as the government interest justifying the

Brandt security detail.  Without disputing that providing for physical security of protected persons

is an important government interest, the analysis applicable here calls for something more than the

existence of an interest and the creation of just any remedy.  In <u>Henderson</u>, for example, the interest

in maintaining an atmosphere appropriate to the particular nature of the Vietnam Veterans Memorial

did not suffice to sustain the prohibition on handbilling on the Constitution Avenue sidewalk.  Nor

did, in <u>United States v. Grace</u>, the interests in preserving the appearance of judicial independence

and in securing the safety of the Court and its personnel justify the prohibition of sign displays on

the sidewalks around the Supreme Court (even though one could have stepped across the street and

displayed the signs under the statutory scheme struck down in <u>Grace</u>).

In fact, from the Government's argument, that "the government also has an interest in

assuring the public that it is taking every possible precaution to ensure" the safety of protected

persons, Defendant's Opp. Memo at 16, it seems likely that the government would justify requiring

citizens to stay off the streets when protected persons were abroad, to remove themselves from

public places when protected persons want to go for a stroll, to scatter instantly when protected

persons leave their government offices and facilities and venture forth in the traditional public forum.

Such an ad hoc evaluation of government interests and of the most thoroughly effective ways

of securing them would render the First Amendment nugatory.

6.    <u>Only by ignoring the precedents of the D.C. Circuit can the Marshals Service justify its claim</u>

<u>that the demonstration pen satisfies the ample alternative channels of communication test</u>.  Mahoney

and <u>Henderson</u>, and the other cases discussed in reply argument 4, <u>supra</u>, dispose of the Marshals

Service's "ample alternatives" argument, Defendant's Opp. Memo at 20. The public forum properties at stake just cannot, under precedent binding upon this Court, be treated as so many fungible goods.

7.    <u>Saying that Plaintiffs can engage in prayer to whatever extent they desire – so long as they do so in a location other than the controlled access area – is a linguistic dodge for Defendant's conclusion that the Plaintiffs may not pray within the controlled access area.</u> Defendant disputes the likelihood of the Plaintiffs' success on the RFRA claim on the ground that it will not substantially burden the Plaintiffs to be removed from one location to another. But what the Marshals Service makes out to be nothing of moment is precisely a watershed. True, Virginia Baptist preachers might preach while incarcerated; it was their condition of incarceration that vexed James Madison; but the fact that they could continue preaching while confined did not mean that the jailhouse was an adequate substitute for the Courthouse square. The Marshals Service is inflicting a grievous wound on the public forum and in the process is substantially burdening the religious exercises of the Plaintiffs, as it has done previously by arrests and harassment.

8.    <u>Plaintiffs are likely to prevail on their Fifth Amendment Due Process claim.</u> The Defendant asserts that the Plaintiffs fail to state a Due Process claim because they lack a property interest in holding their demonstration in the specific location adjacent to Rhode Island Avenue. But this misperceives the Due Process claim. Plaintiffs assert that the Defendant is enforcing a constitutionally invalid scheme. That invalidity results from its impermissible vagueness.

As explained in the Plaintiffs' opening brief, this claim rests on the entirely fictitious regulation being enforced here. Without the benefit of a statute, there is no statutory language to

serve to cabin the unfettered discretion of the Marshals Service. Because there is no statute, those who would obey the requirements of law, such as the Plaintiffs, are forced to steer far clear of uncertain shoals and in the process surrendering protected expression to avoid arrest.

If the public sidewalk is no longer a safe haven for free speech, how can a would-be speaker know what conduct violates the unwritten, unenacted strictures of the Brandt security plan? Is it truly lawful to display a sign on one side of a city block and not on another? No arbitrary, ad hoc rationalization can remedy these very practical but hopelessly intractable ambiguities:

> [v]ague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications. Third, but related, where a vague statute abuts upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of those freedoms. Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked.

Grayned v. City of Rockford, 408 U.S. 104, 108-09 (1972) (footnotes and editing marks omitted).

Under the vagueness doctrine, "stricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser." Smith v California, 361 U.S. 147, 149 (1959). The Supreme Court has reiterated this more stringent scrutiny of vague laws that impinge on First Amendment rights. Hynes v. Mayor of Orade11, 425 U.S. 610, 620 (1976) ("[t]he general test of vagueness applies with particular force in review of laws dealing with speech").

Stringent scrutiny, together with specificity in legislation, preclude the chill on free speech that results from vague laws: "[u]ncertain meanings inevitably lead citizens to 'steer far wider of the unlawful zone... than if the boundaries of the forbidden areas were clearly marked.'" Grayned, 408 U.S. at 109 (citation omitted).  The need for specificity is clear:

> [t]hese freedoms are delicate and vulnerable, as well as supremely precious in our society.  The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions.  Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity.

NAACP v. Button, 371 U.S. at 433 (citations omitted).   Because there is no statute or regulation embodying the restrictions that will be imposed under the the Brandt security plan, the plan "impermissibly delegates basic policy matters to policemen, judges and juries for resolution on an ad hoc and subjective basis . . . ." Grayned, 408 U.S. at 108-09.

CONCLUSION

For the foregoing reasons and as argued in the Statement of Points and Authorities Supporting the Motion for a Preliminary Injunction, the Court should grant the motion.

Dated:  September 27, 2005.

Respectfully submitted,

/s/

James Matthew Henderson Sr. # 452639
 *Counsel of Record*
The American Center for Law and Justice
201 Maryland Avenue NE
Washington, DC  20002
Telephone:     (202) 546-8890
Facsimile:     (202) 337-3167

*Attorney for the Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REVEREND PATRICK MAHONEY, *et al.*,)
                                    )
        Plaintiffs,                 )
                                    )
        -vs-                        )        Civil Action No. 05-1786-RCL
                                    )
U. S. MARSHALS SERVICE, *et al.*,   )
                                    )
        Defendants.                 )

## CERTIFICATE OF SERVICE

James M. Henderson, Sr., a member of the bar of this Court, hereby certifies that he caused

a copy of the Plaintiffs' Reply Statement of Points and Authorities Supporting the Motion for a

Preliminary Injunction, a copy of the Plaintiffs' Supplemental Exhibits, and a copy of this Certificate

of Service to be served on all parties required to be served by means of the Court's electronic filing

system.

        Dated:  September 27, 2005.

                            Respectfully submitted,


                            _____/s/_____
                            James Matthew Henderson Sr. # 452639
                              *Counsel of Record*
                            The American Center for Law and Justice
                            201 Maryland Avenue NE
                            Washington, DC  20002
                            Telephone:    (202) 546-8890
                            Facsimile:    (202) 337-3167


                            *Attorney for the Plaintiffs*


Certificate of Service Page -1-