UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REVEREND PATRICK J. MAHONEY, )
 et al. )
 )
  Plaintiffs, )
 )
  v. ) Civil No. 05-1786 RCL
 )
UNITED STATES MARSHALS SERVICE, )
 et al., )
 )
  Defendants. )
―――――――――――――――――――――――)

DEFENDANTS' MOTION TO DISMISS,
OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendants United States Secret Service and United States Marshals Service respectfully move, pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), to dismiss the Amended and Supplemented Complaint on the ground that plaintiffs' claims are moot and there is no concrete controversy for the Court to decide. Additionally, plaintiffs have failed to state a claim regarding certain of the allegations asserted.

In the alternative, defendants submit that this Court should enter summary judgment in their favor, pursuant to Fed. R. Civ. P. 56, because there is no genuine issue as to any material fact and defendants are entitled to judgment as a matter of law. In support of this motion, the Court is respectfully referred to the accompanying statement of material facts not in dispute, memorandum of points and authorities, declarations and exhibits. A proposed order consistent with the relief sought is also

attached.

Respectfully submitted,

_____
KENNETH L. WAINSTEIN, D.C. BAR # 451058
United States Attorney


_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


_____
MARINA UTGOFF BRASWELL, D.C. BAR #416587
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W. - Civil Division
Washington, D.C. 20530
(202) 514-7226

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REVEREND PATRICK J. MAHONEY,          )
  et al.                              )
                             )
        Plaintiffs,                 )
                             )
        v.                          )    Civil No. 05-1786 RCL
                             )
UNITED STATES MARSHALS SERVICE,       )
  et al.,                             )
                             )
        Defendants.                 )
_____)

DEFENDANTS' STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE

     Pursuant to Local Civil Rule 7.1(h), defendants hereby submit their statement of material facts as to which there is no genuine issue:

    A.   The Red Mass in General

    (1)  Since 1952, the Red Mass has been celebrated annually in Washington, D.C., on the Sunday before the first Monday in October, to coincide with the new term of the Supreme Court of the United States.  See Declaration of Susan Gibbs [Gibbs Dec.], copy filed at Docket 6 as Exh. A, ¶ 2.

    (2)  Government officials —- including Supreme Court Justices, White House officials, Cabinet members -- high-level clergy, state and local government officials, foreign dignitaries, judges from the federal, state, and local judiciary, and members of the press, diplomats, and people of all faiths usually attend the mass.  Gibbs Dec., ¶¶ 2, 5.

(3)  The President of the United States also may attend. Id. at ¶ 6.  See Declaration of Robert Brandt [Brandt Dec.], copy filed at Docket No. 6 as Exh. B, ¶ 4.

(4)  When the President decides to attend, the United States Secret Service takes responsibility for all security operations. Id.; 18 U.S.C. § 3056.

(5)  Washington's Red Mass traditionally has been celebrated at the Cathedral of St. Matthew the Apostle, located at 1725 Rhode Island Avenue, N.W.   Gibbs Dec., ¶ 5.

B.  Red Mass in 2003

(6)  In 2003 security precautions for the Red Mass were handled by the United States Marshals Service.  Declaration of James Brooks [Brooks Dec.], copy filed at Docket No. 6 as Exh. D, ¶ 2.

(7)  A controlled-access area was established to ensure in the immediate vicinity of the Cathedral to protect the high level government officials attending the Mass.  Id. at ¶ 3.

(8)  Approximately thirty demonstrators congregated near the controlled-access area, the perimeter of which was marked with a police line.  Demonstrators not attending the Red Mass were informed that they were not allowed to demonstrate within the controlled-access area.  Id. at ¶ 4.

(9)  Certain demonstrators, including plaintiff Mahoney, refused to comply with this directive and repeatedly crossed the

police line into the controlled-access area.  Brooks. Dec., ¶ 5.

(10)  Finally, demonstrators who refused to remain behind the police line, including plaintiff Mahoney, were informed that if they did not move back behind the line voluntarily they would be arrested.  Id. at ¶ 5.

(11) Demonstrators, including plaintiff Mahoney, either sat down, refused to move, or stated that they wanted to be arrested. Id.

(12) The Marshals Service then arrested those demonstrators who refused to voluntarily leave the controlled-access area, including plaintiff Mahoney, and charged them with crossing a police line.  Id.

C.  Red Mass in 2004

(13)  The Marshals Service had responsibility for the Red Mass in 2004 and again created a controlled-access area to protect the persons attending the Mass.  Declaration of Charles F. Roberts [Roberts Dec.], copy filed at Docket No. 6 as Exh. C, ¶¶ 2-3.

(14)  On the day of the 2004 Red Mass, plaintiff Mahoney and his wife began to demonstrate inside the controlled-access area, on the sidewalk abutting Rhode Island Avenue, N.W., directly across from the front door to St. Matthews Cathedral.  Id. at ¶ 4.

(15) Mr. Mahoney was asked to move away from that area and

-3-

refused.  Id. at ¶ 5.

(16)  Additional police officers on motorcycles were called to the scene and placed themselves on the street in front of Mr. Mahoney.  Id. at ¶ 6.

(17)  Mr. Mahoney was not arrested, harassed or prevented from displaying his signs or otherwise demonstrating during the 2004 Red Mass.  Id. at ¶ 7.

D.  Red Mass October 2, 2005

(18)  The President of the United States decided to attend the October 2, 2005 Red Mass.  Declaration of Julia A. Pierson [Pierson Dec.], attached as Exhibit E, ¶ 7.

(19) On October 2, 2005, a secure area was created around St. Matthew's Cathedral, which encompassed the Cathedral itself, as well as a sufficient area around the Cathedral deemed necessary by the Secret Service to protect the Cathedral and its attendees from any possible attack.  Pierson Dec., ¶ 8.

(20)  For one hour before the Red Mass began, and one hour after the Red Mass ended, the Marshals Service and the District of Columbia Metropolitan Police Department [MPD] restricted vehicular traffic near the Cathedral, allowing only authorized vehicles dropping off Mass attendees to drive on Rhode Island Avenue between 17th Street, N.W. and Connecticut Avenue, N.W. Id. at ¶ 9; Declaration of Tracy L. Steed [Steed Dec.], attached as Exhibit F, at ¶ 4.

-4-

(21)   An area for credentialed and screened media was set aside on the south sidewalk of Rhode Island Avenue, across from the center door of the Cathedral.  Pierson Dec., ¶ 9.

(22)   Demonstrators were allowed to stand "on the south sidewalk of M Street, N.W., anywhere between 17th Street, N.W. and Connecticut Avenue, on the 17th Street sidewalks, and on the Connecticut Avenue sidewalks.  Id. at ¶ 11; Steed Dec., ¶ 7.

(23)   These areas were considered "out of weapons range from the motorcade arrival and departure area in the front of the cathedral."  Steed Dec., ¶ 7.

(24) "Outside the restricted area, demonstrators and other members of the public [] [were] free to engage in speech making, to hold prayer vigils or religious services, to display signs or placards, and to engage in any other expressive activities that [] [did] not endanger Secret Service protectees or the public." Pierson Dec., ¶ 17.

(25)   The President, members of the United States Supreme

Court, and other dignitaries left the Cathedral through that entrance.  Steed Dec., ¶¶ 5-6.

Respectfully submitted,

_____
KENNETH L. WAINSTEIN, D.C. BAR # 451058
United States Attorney


_____
RUDOLPH CONTRERAS, D.C. BAR # 171538
Assistant United States Attorney


_____
MARINA UTGOFF BRASWELL, D.C. BAR #416587
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W. - Civil Division
Washington, D.C. 20530
(202) 514-7226

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REVEREND PATRICK J. MAHONEY,      )
  et al.                          )
                                  )
          Plaintiffs,             )
                                  )
          v.                      )    Civil No. 05-1786 RCL
                                  )
UNITED STATES MARSHALS SERVICE,   )
  et al.,                         )
                                  )
          Defendants.             )
_____    )

MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS,
OR IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

PRELIMINARY STATEMENT

Plaintiffs filed suit under the First and Fifth Amendments to the United States Constitution, and under the Religious Freedom Restoration Act, challenging the security measures the United States Marshals Service planned to implement at the Red Mass held on October 2, 2005.  When the President of the United States decided to attend the Mass, the United States Secret Service assumed responsibility for the security measures implemented before, during and after the Red Mass.  Plaintiffs' motion for a preliminary injunction concerning those measures was denied by this Court on September 30, 2005.  Plaintiffs subsequently amended their complaint to set forth claims associated with their attendance at the Red Mass on October 2, 2005.  None of plaintiffs' claims, however, has merit.

Indeed, the case should be dismissed as moot.  The Red Mass

is long past, and plaintiffs can point to no concrete injury they are suffering that could be redressed by this Court.  Although plaintiffs allege that they will seek to demonstrate at the Red Mass in October 2006, this Court should not decide in a vacuum issues that may, or may not, arise months from now.

Nonetheless, even if plaintiffs' claims are considered on the merits, dismissal or summary judgment is appropriate for defendants.  Indeed, in denying plaintiffs' motion for a preliminary injunction, this Court concluded that plaintiffs had failed to show a substantial likelihood of success on the merits of their claims.  Nothing has changed since the Court's conclusion that would warrant any different result.

Plaintiffs were given an opportunity to express their First Amendment rights during the 2005 Red Mass.  The fact that they would have preferred a location closer to St. Matthews Cathedral, where the Red Mass took place, simply cannot overcome defendants' legitimate, content neutral, narrowly tailored restrictions on where demonstrators and members of the public could be, such that the security and protection of the President, Supreme Court justices, and other high level officials would not be compromised.

Plaintiffs have failed to state a claim for any violation of their religious rights in connection with the location where they were allowed to demonstrate.  They also cannot show that they

were treated differently than other similarly situated
individuals, or that the restrictions on where they could engage
in their demonstration activities were unconstitutionally vague.

Accordingly, for the reasons set forth below, and in the
declarations referenced and accompanying exhibits, defendants
submit that plaintiffs' claims should be dismissed or, in the
alternative, summary judgment should be granted to defendants on
plaintiffs' claims.

BACKGROUND

A.    The Red Mass in General[1]

Since 1952, the Red Mass has been celebrated annually in
Washington, D.C., on the Sunday before the first Monday in
October, to coincide with the new term of the Supreme Court of
the United States.  Government officials, diplomats, and people
of all faiths attend the mass to invoke God's blessing and
guidance in the administration of justice.  See Declaration of
Susan Gibbs [Gibbs Dec.], copy filed at Docket 6 as Exh. A, ¶ 2.

Washington's Red Mass traditionally has been celebrated at
the Cathedral of St. Matthew the Apostle, located at 1725 Rhode
Island Avenue, N.W.  The mass is attended each year by hundreds
of people -— the Cathedral seats 1000 people —-including Supreme

---

[1]  For the Court's benefit, defendants repeat here part of
the background set forth in defendants' opposition to plaintiffs'
motion for a preliminary injunction, with additions made to
encompass developments that occurred after defendants' motion was
filed.

-3-

Court Justices, White House officials, Cabinet members, high-level clergy, state and local government officials, foreign dignitaries, judges from the federal, state, and local judiciary, and members of the press. Id. at ¶ 5. The President of the United States also may attend. Id. at ¶ 6. See Declaration of Robert Brandt [Brandt Dec.], copy filed at Docket No. 6 as Exh. B, ¶ 4. When the President decides to attend, the United States Secret Service takes responsibility for all security operations. Id.; 18 U.S.C. § 3056.

    B. Red Mass in 2003

In 2003 security precautions for the Red Mass were handled by the United States Marshals Service. Declaration of James Brooks [Brooks Dec.], copy filed at Docket No. 6 as Exh. D, ¶ 2. A controlled-access area was established to ensure that members of the public who were not attending the Mass did not gather in the immediate vicinity of the Cathedral, where they could have created a potential threat for attendees of the Mass had they so desired. Id. at ¶ 3.

Approximately thirty demonstrators congregated near the controlled-access area, the perimeter of which was marked with a police line. Demonstrators who wanted to attend the Mass were allowed to enter the controlled-access area to proceed to the Cathedral. Other demonstrators were informed that they were not allowed to demonstrate within the controlled-access area. Id. at

-4-

¶ 4.

Certain demonstrators, including plaintiff Mahoney, refused to comply with this directive and crossed the police line into the controlled-access area.  He and others were escorted back behind the police line.  This happened again and again.  Finally, demonstrators who refused to remain behind the police line, including plaintiff Mahoney, were informed that if they did not move back behind the line voluntarily they would be arrested. Instead of complying with this lawful order, demonstrators, including plaintiff Mahoney, either sat down, refused to move, or stated that they wanted to be arrested.  The Marshals Service then arrested those demonstrators who refused to voluntarily leave the controlled-access area, including plaintiff Mahoney, and charged them with crossing a police line.  Brooks. Dec., ¶ 5.

C.  Red Mass in 2004

The Marshals Service again had responsibility for the Red Mass in 2004.  Once again a controlled-access area was created to protect the persons attending the Mass.  Declaration of Charles F. Roberts [Roberts Dec.], copy filed at Docket No. 6 as Exh. C, ¶ 3.

On the day of the 2004 Red Mass, plaintiff Mahoney and his wife began to demonstrate inside the controlled-access area, on the sidewalk abutting Rhode Island Avenue, N.W., directly across from the front door to St. Matthews Cathedral.  Mr. Roberts asked

Mr. Mahoney to move away from that area, and Mr. Mahoney refused.
Additional police officers on motorcycles were called to the
scene and placed themselves on the street in front of Mr.
Mahoney. Id. at ¶ 6. This created an undue burden on security,
requiring the presence of additional law enforcement resources,
who were taken away from other locations, solely because Mr.
Mahoney would not respect the controlled-access area created for
security reasons. Id. at ¶ 8. Mr. Mahoney was not arrested,
harassed or prevented from displaying his signs or otherwise
demonstrating during the 2004 Red Mass. Id. at ¶ 7.

     D.   Red Mass October 2, 2005

The President of the United States decided to attend the
October 2, 2005 Red Mass. Declaration of Julia A. Pierson
[Pierson Dec.], attached as Exhibit E, ¶ 7. As mentioned above,
when any event is attended by the President of the United States,
the Secret Service creates a secure area encompassing that event,
in order to ensure that the President is protected from any
threat to his physical safety. Pierson Dec., ¶ 8. For the Red
Mass held on October 2, 2005, a secure area was created around
St. Matthew's Cathedral, which encompassed the Cathedral itself,
as well as a sufficient area around the Cathedral deemed
necessary by the Secret Service to protect the Cathedral and its
attendees from any possible attack. As Ms. Pierson explained:

> In determining the size and scope of the secure area, the
> Secret Service has considered a number of factors including

emergency vehicle access, the potential for the emergency
evacuation of the President and other building occupants,
and the set off distances necessary to mitigate the
effectiveness of a variety of weapons.

Pierson Dec., ¶ 8.

For one hour before the Red Mass began, and one hour after
the Red Mass ended, the Marshals Service and the District of
Columbia Metropolitan Police Department [MPD] restricted
vehicular traffic near the Cathedral, allowing only authorized
vehicles dropping off Mass attendees to drive on Rhode Island
Avenue between 17th Street, N.W. and Connecticut Avenue, N.W.
Id. at ¶ 9; Declaration of Tracy L. Steed [Steed Dec.], attached
as Exhibit F, at ¶ 4.  An area for credentialed and screened
media was set aside on the south sidewalk of Rhode Island Avenue,
across from the center door of the Cathedral.  Pierson Dec., ¶ 9.

Demonstrators were allowed to stand "on the south sidewalk
of M Street, N.W., anywhere between 17th Street, N.W. and
Connecticut Avenue, on the 17th Street sidewalks, and on the
Connecticut Avenue sidewalks.  Id. at ¶ 11; Steed Dec., ¶ 7.
These areas were considered "out of weapons range from the
motorcade arrival and departure area in the front of the
cathedral."  Steed Dec., ¶ 7.

Significantly, "[o]utside the restricted area, demonstrators
and other members of the public [] [were] free to engage in
speech making, to hold prayer vigils or religious services, to
display signs or placards, and to engage in any other expressive

-7-

activities that [] [did] not endanger Secret Service protectees
or the public." Pierson Dec., ¶ 17. As Ms. Pierson pointed out,
"[t]he south sidewalk of M Street has an unobstructed view . . .
of the entrance to the cathedral." Id. at ¶ 12. The President,
members of the United States Supreme Court, and other dignitaries
left the Cathedral through that entrance. Steed Dec., ¶¶ 5-6.

Pursuant to Secret Service policy, demonstrators and members
of the public were treated in the same fashion. Pierson Dec., ¶
16. Outside the restricted area, the Secret Service imposed no
restrictions. Id. at ¶ 15.

In summary, in 2005 the Secret Service carefully balanced
both the security needs of the event and the First Amendment
rights of the press and public in developing the protective
measures described above. The same holds true for the Marshals
Service for 2003 and 2004. The only limitations the
demonstrators encountered were that they had to demonstrate
outside the controlled-access areas during each of those years.
This requirement imposed the least possible burden on the
demonstrators consistent with ensuring the security of the
President, Supreme Court Justices and other high-level officials
who attended the Red Mass events. At the same time, the area
available for the demonstrators allowed them both to be seen and
to be heard by the persons with whom they wish to communicate;
thus, plaintiffs were not prevented from communicating their

message.  Brooks Dec., ¶¶ 4-5; Roberts Dec., ¶ 7; Pierson Dec., ¶ 17; Steed Dec., ¶ 7; Exhs. G-H, attached.

ARGUMENT

I.    Plaintiffs' Claims Raised in the
      Amended Complaint Are Moot.

It is well settled that under Article III of the Constitution, courts have limited jurisdiction and must ensure that they have authority to hear a case before deciding the merits of the claims raised.  Steel Co. v. Citizens for a Better Environment, 523 U.S. 83 (1998); Wyoming Outdoor Council v. United States Forest Service, 165 F.3d 43, 47 (D.C. Cir. 1999). An analysis of the mootness of plaintiffs' claims begins with the familiar proposition that "federal courts are without power to decide questions that cannot affect the rights of litigant in the case before them. " North Carolina v. Rice, 404 U.S. 244, 246 (1971); Southern Co. Services, Inc. v. FERC, 416 F.3d 39, 43 (D.C. Cir. 2005) ("mootness [] is a 'threshold jurisdictional issue.'").  The federal courts' inability to consider moot cases "derives from the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy."  Liner v. Jafco, Inc., 375 U.S. 301, 306 n.3 (1964); Honig v. Doe, 484 U.S. 305, 317 (1988). The Court must be presented with a "definite and concrete" problem that "touch[es] the legal relations of parties having adverse legal interests."  DeFunis v. Odegaard, 416 U.S. 312, 317

(1974) (<u>per curiam</u>), quoting <u>Aetna Life Ins. Co.,</u> v. <u>Haworth</u>, 300 U.S. 227, 240-41 (1937).  A court is not empowered to "'give opinions upon moot questions or abstract propositions, or . . . declare principles or rules of law which cannot affect the matter at issue in the case before it." <u>Beethoven.Com LLC</u> v. <u>Librarian of Congress</u>, 394 F.3d 939, 950 (D.C. Cir. 2005) quoting <u>Mills</u> v. <u>Green</u>, 159 U.S. 651, 653 (1895).

The Court of Appeals for this Circuit has emphasized the requirement that a concrete controversy exist at every stage of the litigation.  As the Court stated:

> Thus, '[e]ven where litigation poses a live controversy when filed, the [mootness] doctrine requires a federal court to refrain from deciding it if "events have so transpired that the decision will neither **presently affect the parties' rights** nor have a more-than-speculative chance of affecting them in the future."'

<u>Columbian Rope Company</u> v. <u>West</u>, 142 F.3d 1313, 1316 (D.C. Cir. 1998) (emphasis added), quoting <u>Clarke</u> v. <u>United States</u>, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc) (quoting <u>Transwestern Pipeline Co.</u> v. <u>FERC</u>, 897 F.2d 570, 575 (D.C. Cir. 1990)).  "If events outrun the controversy such that a court can grant no meaningful relief, the case must be dismissed as moot."  <u>McBride</u> v. <u>Comm. to Review</u>, 264 F.3d 52, 55 (D.C. Cir. 2001).

These decisions compel the conclusion that this action is moot.  Plaintiffs cannot demonstrate that they are currently suffering some actual injury that can be redressed by a favorable judicial decision with respect to the claims raised in the

Amended Complaint, and thus there is no current controversy between plaintiffs and defendants for this Court to adjudicate. See also Valley Forge Christian College v. Americans Untied For Separation of Church and State, Inc., 454 U.S. 464, 472 (1982) (party seeking to invoke Court's jurisdiction must show that it has suffered actual or threatened injury traceable to defendant's conduct which can be redressed by favorable decision).

The 2003 and 2004 Red Mass events have long since passed. The 2005 Red Mass had been over for two months by the time plaintiffs filed the Amended Complaint; the next Red Mass is months away.  There is no way to know now whether the President will attend the 2006 Red Mass, and thus there is no way to know whether the Marshals Service or the Secret Service will be in charge of security precautions for the 2006 Red Mass.  There also is no way to know now what security precautions may be needed. As the events on September 11, 2001 starkly showed, security precautions that are considered necessary can change overnight and dramatically in nature and scope.  It simply is too speculative to try and predict now how demonstrators will be treated during the 2006 Red Mass.

Plaintiffs' claims against the Marshals Service for the 2005 Red Mass are also moot, because after this case was filed it was learned that the President would be attending the Red Mass. The Secret Service took over responsibility for creating the

controlled-access area about which plaintiffs complain.
Plaintiffs set forth no claims in the Amended Complaint against
the Marshals Service for the 2005 Red Mass that survive this
change in responsibility.

As the Court of Appeals for this Circuit stated in <u>Safe
Energy Coalition</u> v. <u>Nuclear Regulatory Comm'n</u>, 866 F.2d 1473,
1476 (D.C. Cir. 1989), "[a] case is rendered moot when events so
unfold as to preclude the possibility of meaningful relief."
This is now the situation in the instant case with respect to
plaintiffs' claims against both the Marshals service and the
secret Service, concerning the security measures employed on
October 2, 2005.

Accordingly, plaintiffs' claims against defendants should be
dismissed as moot.

II.   <u>Plaintiffs' Damages Claims Must Be Dismissed.</u>

Plaintiffs allege that they are seeking "an award of nominal
damages for the violation of their federal constitutional and
statutory rights." Amended Complaint, ¶ 122. Plaintiffs also
seek to pursue their constitutional claims against the
unidentified individual federal defendants, presumably under
<u>Bivens</u> v. <u>Six Unknown Federal Narcotics Agents</u>, 403 U.S. 388
(1971) [<u>Bivens</u>], although there is no mention of that case.

Plaintiffs' damages claims must be dismissed.

A.    The Constitutional Claims Against Unidentified
<u>Individual Federal Defendants Must Be Dismissed.</u>

The Amended Complaint lists as defendants "Deputy United States Marshal John Does 1 through 5" and claims that John Does 1-3 harassed and arrested plaintiffs Mahoney and Newman in October 2003.  Amended Complaint, ¶¶ 31-56.  No mention is made of actions allegedly taken by John Does 4 & 5.  <u>See</u> Amended Complaint, <u>generally</u>.

Such allegations do not, and cannot state a claim against any unnamed individual federal defendants.  There is no authority for joining fictitious unidentified defendants, and thus they should be dismissed.  <u>See</u>, <u>e.g.</u>, <u>Armstrong</u> v. <u>United States Bureau of Prisons</u>, 976 F. Supp. 17, 23 (D.D.C. 1997).

Moreover, it is well-settled that individual service is required in <u>Bivens</u> action.  <u>See</u> <u>Simpkins</u> v. <u>District of Columbia Government</u>, 108 F.3d 366, 369 (D.C. Cir. 1997) (defendant federal officer in <u>Bivens</u> suit must be served as an individual, pursuant to Fed. R. Civ. P. 4(e)); <u>James</u> v. <u>United States</u>, 709 F. Supp. 257 (D.D.C. 1989)(same).  Accordingly, unless an individual federal employee voluntarily makes an appearance or otherwise waives any personal jurisdiction defense, plaintiffs must begin the process of acquiring personal jurisdiction with proper service of process.  The docket in this case indicates no compliance with these service requirements.

Equally important, with respect to federal employees sued in

-13-

their individual capacities, the defense of qualified immunity may be then asserted as an affirmative defense.  <u>Wilson</u> v. <u>Layne</u>, 523 U.S. 603, 609 (1999); <u>Harlow</u> v. <u>Fitzgerald</u>, 457 U.S. 800, 818 (1982).  Such a defense obviously cannot be raised, however, unless the identity of the individual defendant is known and the actions such a defendant purportedly took alleged.

Plaintiffs are not entitled to use this litigation as a fishing expedition to see if they can find some individual federal defendant who may have violated their rights.  <u>See Laird</u> v. <u>Tatum</u>, 408 U.S. 1, 14 (1972) ("Stripped to its essentials, what respondents appear to be seeking is a broad-scale investigation, conducted by themselves as private parties armed with the subpoena power of a federal district court . . . ."); <u>Ellsberg</u> v. <u>Mitchell</u>, 807 F.2d 204, 207-208 (D.C. Cir. 1986) ("We decline to license any plaintiff to embark on a fishing expedition in government waters on the basis of such speculation."); <u>Dickson</u> v. <u>United States</u>, 831 F. Supp. 893, 900 (D.D.C. 1993) (court rejected plaintiffs' argument that the CIA's tradition of secrecy and bad faith warranted fishing expedition where plaintiffs' allegations were factually vague and legally non-specific).  This is especially true in light of the declarations from the Marshals Service and Secret Service, demonstrating that plaintiffs' rights were not violated.  <u>See</u> <u>supra</u> at 3-8.

Accordingly, to the extent the Amended Complaint can be read to raise Bivens claims against unidentified federal employees, such claims should be dismissed.

> B. The Constitutional Claims Against the
>    Federal Agencies Must Be Dismissed
>    On Sovereign Immunity Grounds.

To the extent that plaintiffs may be seeking damages against federal law enforcement agencies, plaintiffs' claims must be dismissed because there has been no waiver of sovereign immunity for such claims. Sovereign immunity bars all suits against the United States except in accordance with the explicit terms of the statutory waiver of such immunity. Lane v. Pena, 518 U.S. 187, 190-91 (1996); Cox v. Secretary of Labor, 739 F. Supp. 29, 30 (D.D.C. 1990); see also, United States v. Testan, 424 U.S. 392, 399 (1976); United States v. Mitchell, 445 U.S. 535, 538 (1980); Kline v. Republic of El Salvador, 603 F. Supp. 1313, 1316 (D.D.C. 1985).

The Federal Tort Claims Act [FTCA] does not waive the federal government's immunity from suit for any constitutional torts that may be committed by its employees. 28 U.S.C. §§ 2679(b)(1) and (b)(2); Kline v. Republic of El Salvador, 603 F. Supp. at 1317; see also Laswell v. Brown, 683 F.2d 261 (8th Cir. 1982); Birnbaum v. United States, 588 F.2d 319, 327-328 (2nd Cir. 1978). Nor does the Administrative Procedure Act, 5 U.S.C. § 701, et seq., act as a waiver of sovereign immunity in suits

-15-

seeking money damages against the government.  Scanwell

Laboratories, Inc. v. Thomas, 521 F.2d 941, 948 (D.C. Cir. 1975),

cert. denied, 425 U.S. 910 (1976); Cook County Legal Assistance

Foundation v. Pauken, 573 F. Supp. 231, 234 (N.D. Ill. 1983).

Additionally, to the extent that plaintiffs' Amended

Complaint can be read to seek monetary relief in tort against an

agency of the United States, it is clear that the only possible

basis for jurisdiction in this Court would be under the FTCA.

See Kline v. Republic of El Salvador, 603 F. Supp. at 1316.

Consequently, any damages claims for constitutional torts

raised against federal agencies or employees in their official

capacities must be dismissed.

III. Plaintiffs' First Amendment Claims Fail.

Plaintiffs allege that they sought to engage in First

Amendment activities at the Red Mass and that "[b]y closing the

sidewalk to the Plaintiffs' expressive activities," their First

Amendment rights were violated.  Plaintiffs do not specify which

Red Mass is the subject of this claim; presumably then, the claim

encompasses the Red Mass events held in 2003, 2004 and 2005.

Significantly, plaintiffs do not allege that any action was taken

with respect to their demonstration activities in any of those

years that was based on the content of their speech.  Amended

Complaint, ¶¶ 81.10-81.41.

There is no dispute that the area in question, consisting of

city sidewalks and streets, constitutes a traditional public forum for First Amendment activities. E.g., Perry Educational Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45 (1983). Yet, it is well-established that the right to express ideas is not wholly unfettered. Thus, "the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." Heffron v. ISKCON, 452 U.S. 640, 647 (1981).

In Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293-94 (1983), the Supreme Court reiterated the test of a restriction that impacts speech in a traditional public forum:

> Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions. We have often noted that restrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

Id. at 293-294 (citations omitted). The three-part test in Clark has been widely used and reaffirmed by later decisions of the Supreme Court. See, e.g., Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989). The restrictions imposed by the Secret Service at the 2005 Red Mass, and those imposed by the Marshals Service at the 2003 Red Mass and the 2004 Red Mass, easily satisfy Clark's three-part test for determining the constitutionality of time, place, or manner restrictions.

-17-

A.   <u>The Restrictions Were Content Neutral.</u>

As mentioned above, plaintiffs do not allege that the restrictions imposed on them at any of these three events sought to regulate speech based upon its content or message.  Thus, because the Secret Service's and the Marshals Service's restrictions were not imposed based on the content of the speech, those restrictions are not subject to strict scrutiny.  Rather, an intermediate level of scrutiny is applicable.  <u>See</u>, <u>e.g.</u>, <u>Turner Broadcasting System, Inc.</u> v. <u>FCC</u>, 512 U.S. 622, 642 (1994); <u>American Library Ass'n</u> v. <u>Reno</u>, 33 F.3d 78, 84 (D.C. Cir. 1994), <u>cert</u>. <u>denied</u>, 515 U.S. 1158 (1995).

B.   <u>The Government Interest at Stake Was Significant.</u>

The second prong of the Supreme Court's test in <u>Clark</u> asks whether the regulation is "narrowly tailored to serve a significant government interest."  <u>Id</u>.  Here, the declarations discussed above amply demonstrate the government's legitimate interests at the 2003, 2004 and 2005 Red Mass events was to ensure the security of high level government officials, including the President, while entering, attending and existing the Red Mass events.  <u>See</u> <u>supra</u> at 3-8.  Courts have repeatedly recognized the interest in security, especially of the President of the United States, to be an important one.  <u>See</u>, <u>e.g.</u>, <u>A Quaker Action Group</u> v. <u>Morton</u>, 516 F.2d 717, 727 (D.C. Cir. 1975).

Plaintiffs allege that they have never threatened "the security or peace of the public," nor could any such threat from them be reasonably expected.  Amended Complaint, ¶¶ 95-96. The Supreme Court's decision in Heffron v. ISKCON, 452 U.S. 640, 652-54 (1981), however, makes clear that restrictions on First Amendment activity are valid even when a specific problem does not in fact yet exist.  Rather, the government is entitled to address conduct that, if it were allowed to occur, would negatively impact the government's significant interests.  Id. The government is not obligated to wait until activity actually interferes with its significant interests before it can act, as in some cases that could be too late.  See id.; Clark v. Community for Creative Non-Violence, 468 U.S. at 296-297 (the validity of a regulation is not to be judged solely by reference to the demonstration at hand).

Obviously, this case presents a clear example of this principle.  Neither the Marshals Service nor the Secret Service is obligated to wait until the President or other protectees or high level government officials are in actual danger before taking action to protect them.  In the aftermath of terrorist attacks against this country, both at home and abroad, concerns about security naturally take on a new urgency.  This country learned on September 11, 2001, that the unthinkable can happen, the unimaginable in fact can be imagined by someone, and a

terrible toll for this nation can be exacted by a small number of people.  Surely plaintiffs are not suggesting that the Secret Service or the Marshals Service must wait until an actual attack is made on the President or other protectees at a Red Mass before security around that event can be given its due consideration and approval.  Thus, there can be no question that a significant government interest is at stake at the Red Mass events.

> C.   The Restrictions Were Narrowly Tailored to
>      Serve The Significant Government Interest.

The test for "narrowly tailored" cannot be equated with "the least restrictive means."  Indeed, the Supreme Court has specifically held that "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest, [] the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." Ward, 491 U.S. at 800 (emphasis added).  As the Supreme Court reiterated in Regan v. Time, Inc., 468 U.S. 641, 657 (1984), "[t]he less-restrictive alternative analysis . . . has never been a part of the inquiry into the validity of a time, place, and manner regulation."  See also, e.g., Clark, 468 U.S. at 299; American Library Ass'n v. Reno, 33 F.3d at 88.

Thus, a restriction is "narrowly tailored" to serve substantial government interests if it "target[s] and [eliminates] no more than the exact source of the 'evil' [it

seeks] to remedy." <u>Taxpayers for Vincent</u>, 466 U.S. at 808-10.

As the Court of Appeals for this Circuit stated:

> We conclude that a regulation will meet the Supreme
> Court's 'narrowly tailored' requirement if a
> substantial portion of the burden it imposes furthers
> the Government's interest, even though a less intrusive
> alternative might also exist.

<u>American Library Ass'n</u> v. <u>Reno</u>, 33 F.3d at 88.

Moreover, courts "have been loath to second-guess the

Government's judgment to that effect." <u>Board of Trustees of the</u>

<u>State Univ. of New York</u> v. <u>Fox</u>, 492 U.S. 469, 478 (1989).

Indeed, the Supreme Court in <u>Clark</u> made very plain that a

challenged restriction is not rendered invalid merely "because

there are less speech-restrictive alternatives that could have

satisfied the Government interest in preserving park lands."

<u>Id</u>., 468 U.S. at 299.  Rather, the Supreme Court found that the

Court of Appeals' suggestion that the Park Service reduce the

size, duration or frequency of demonstrators seeking to transmit

their message by camping on park land instead of banning such

activity outright

> represent[s] no more than a disagreement with the Park
> Service over how much protection the core parks require
> or how an acceptable level of preservation is to be
> attained.  We do not believe, however, that either
> <u>United States v. O'Brien</u> or the time, place, or manner
> decisions assign to the judiciary the authority to
> replace the Park Service as the manager of the Nation's
> parks or endow the judiciary with the competence to
> judge how much protection of park lands is wise and how
> that level of conservation is to be attained.

<u>Clark</u>, 468 U.S. at 288.

-21-

Subsequently, the Court of Appeals for this Circuit summarized the law on this issue as follows:

> The expertise of courts lies in determining whether an agency's decision is within the zone of constitutionality, not in choosing between options within that zone. A court may not require that the agency adopt the 'least restrictive alternative,' thereby substituting its judgment for that of the regulators. In short, if the regulation lies within the zone prescribed by the first amendment it is constitutional and must be affirmed as such by a court before which it is challenged.

White House Vigil, 746 F.2d at 1531-32. See United States v. Kokinda, 497 U.S. 720, 735 (1990) (noting with approval agency judgments affecting First Amendment rights when based on "long" "real-world experience" with conduct being regulated).

The Court of Appeals for this Circuit has upheld restrictions on First Amendment activities that are sought to be held in close proximity to the President. A Quaker Action Group v. Morton, 516 F.2d at 727 (security interests at stake justify prior restraint on public gatherings in White House area). The Secret Service is charged with protecting the President, and the Marshals Service is charged with protecting other high level government officials, and deference should be accorded to these agency's decisions as to what kind of a secure area is necessary to protect the President and other government officials from harm that could flow from the use of certain kinds of weapons. Plainly a significant government interest was at stake in ensuring the President and other high level government officials,

-22-

appearing in public at the Red Mass, remained protected against
any possible harm.

             D.    The Restrictions Left Ample Alternative
                  Channels of Communication Open.

The third prong of the Clark test asks whether the
restriction at issue leaves open ample alternative channels for
communication.  Herein appears to lie the heart of plaintiffs'
complaint, as they allege that they were relegated to a space too
far from St Matthews Cathedral, in their opinion, for them to be
seen or heard, especially in light of the alleged vehicular
traffic on M Street, and certain trees and a statue between them
and the front entrance of the Cathedral.  Amended Complaint,
¶ 81.35.

The First Amendment does not guarantee the right to
demonstrate however and wherever one pleases.  See Friends of the
Vietnam Veterans Memorial v. Kennedy, 116 F.3d 495 (D.C. Cir.
1997);  ISKCON of Potomac, Inc. v. Kennedy, 61 F.3d 949 (D.C.
Cir. 1995).  The law is amply clear that demonstrators are not
guaranteed the most effective means to communicate their
messages.  Heffron, 452 U.S. at 647; Adderly v. Florida, 385 U.S.
at 47-48.

For the 2005 Red Mass, plaintiffs concede that they were
allowed to demonstrate on the south side of M Street near the
Cathedral.  Amended Complaint, ¶¶ 81.32-81.33.  Contrary, to
plaintiffs' allegation, the trees on the sidewalk between M

Street and Rhode Island Avenue do not present a screen that makes it impossible to communicate a message.  See Exhs. G-H.  Rather, as Ms. Pierson explained in her declaration:

> The south sidewalk of M Street has an unobstructed view both of the motorcade drop-off point and of the entrance to the cathedral.  The area set aside for credentialed and screened media on the south sidewalk of Rhode Island Avenue will not obstruct the view from the south sidewalk of M Street.

Exh. E at ¶ 12; Exhs. G-H.  The President departed from the Red Mass through the front entrance of the Cathedral on Rhode Island Avenue.  Steed Dec., ¶ 6.

As to the 2003 and 2004 Red Mass events, plaintiffs do not even allege that they could not be seen.  See Amended Complaint generally.  Thus, with respect two those events, there is no claim by plaintiffs that they did not have amply alternative channels of communication.

The fact that plaintiffs were not as close as they wished to be to the entrance of the Cathedral or to the President or other officials for the Red Mass held in 2005 does not result in a conclusion that their First Amendment rights were violated.  Rather, they were given ample alternative channels of communication to express their messages as the President and other high level officials exited the Cathedral.

IV.  Plaintiffs' Claim Under the Religious Freedom Restoration Act Fails to State a Claim or, Alternatively, Judgement to Defendants is Appropriate.

The Religious Freedom Restoration Act [RFRA] provides that

the government shall not "substantially burden" a person's exercise of religion unless the burden furthers a compelling government interest and is the least restrictive means for furthering that interest.  42 U.S.C. § 2000bb-1(b); Gonzales v. O'Centro Espirita Beneficente Uniao do Vegetal, 126 S. Ct. 1211, 1216 (2006).  This statute was enacted in response to the Supreme Court's decision in Employment Div., Dep't of Human Resources v. Smith, 494 U.S. 872, 886 (1990) [Smith], in which the Court had held that generally applicable laws of neutral intent are no longer subject to challenge under the First Amendment's Free Exercise Clause, even if they incidentally burden the practice of religion.  Gonzales, 126 S. Ct. at 1216-17.  Congress characterized Smith as having "virtually eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion."  42 U.S.C. § 2000bb(a)(4).  RFRA creates a statutory right requiring the government to satisfy the compelling interest test set forth in Sherbert v. Verner, 374 U.S. 398 (1963), and Wisconsin v. Yoder, 406 U.S. 205 (1972), when a government action substantially burdens the free exercise of religion.  42 U.S.C. § 2000bb(b)(1).  Thus, a violation of RFRA requires the same elements that a pre-Smith Free Exercise violation generally required.  Compare Sherbert v. Verner, 374 U.S. at 406 with 42 U.S.C. § 2000bb(b)(1); see Gonzales, 126 S. Ct. at 1220.

RFRA employs an explicit burden-shifting mechanism.  See Gonzales, 126 S. Ct. at 1219; Branch Ministries v. Rissotti, 211 F.3d 137, 142, 144 (D.C. Cir. 2000).  A RFRA claimant must first demonstrate a sincerely held religious belief, and then he must demonstrate that the challenged government regulation has created a "substantial burden" on that belief.  Thiry v. Carlson, 78 F.3d 1491, 1494 (10th Cir.), cert. denied, 519 U.S. 821 (1996).  Only when the plaintiff succeeds on these two points does the burden shift to the defendant to show that the challenged rule furthers a compelling government interest and is the least restrictive means of furthering that interest.  Id.

Defendants will assume for the purposes of this dispositive motion that plaintiffs have a deep and sincerely held belief that they must communicate their religious beliefs that they believe are adversely affected by judicial decisions.  See Complaint, ¶¶ 19-25.  Plaintiffs, however, advance no claim that their religious beliefs require them to communicate at a particular location in the city of Washington, D.C., or that standing on a particular sidewalk in this city has any religious significance whatsoever.[2]  See id. at ¶¶ 19-25, 100-104.  Thus, plaintiffs

_____

[2] Some courts have taken the position that only practices "mandated" by a religion are of sufficient importance to be substantially burdened and thereby eligible for protection under RFRA.  See, e.g., Bryant v. Gomez, 46 F.3d 948 (9th Cir. 1995) (per curiam); Weir v. Nix, 890 F. Supp. 769, 788 (S.D. Iowa 1995), aff'd, 114 F.3d 817 (8th Cir. 1997).  Other courts have

(continued...)

cannot show that being deprived of the ability to stand at a particular location in this city creates a substantial burden on any religious practices.

Although the Supreme Court has admonished that it is not for the courts to decide what constitutes a religious belief or practice based on the Court's perception of the belief or practice at issue, see Thomas v. Review Bd. of Indiana Employment Section, 450 U.S. 707, 714 (1981), plaintiffs nevertheless have the burden of demonstrating that a religious belief or practice was at issue.  This, however, they failed to do.

Nonetheless, even if plaintiffs' Amended Complaint could be read to state that a sincerely held religious belief or practice was implicated by the Secret Service's closure of certain areas around the Cathedral, plaintiffs still would have had to demonstrate that the challenged government action created a "substantial burden" on that belief.  Branch Ministries, Inc. v. Rossotti, 211 F.3d at 142; Thiry v. Carlson, 78 F.3d at 1494.

RFRA does not define what constitutes a "substantial" burden. Yet not all burdens on religion can be considered "substantial."

---

[2](...continued)

taken the position that practices "motivated" by religious beliefs are eligible for protection under RFRA.  E.g., Mack v. O'Leary, 80 F.3d 1175, 1178-79 (7th Cir. 1996); Sasnett v. Sullivan, 908 F. Supp. 1429, 1440-45 (W.D. Wis.), aff'd, 91 F.3d 1018 (7th Cir. 1996), vacated, 117 S. Ct. 2502 (1997).  The government supports the view that religious practices, even if the religion does not deem them mandatory, are eligible for RFRA protection.

42 U.S.C. § 2000bb(b); Werner v. McCotter, 49 F.3d 1476, 1480 (10th Cir.), cert. denied, 515 U.S. 1166 (1995) (not all regulation of religious activity or expression requires showing of compelling state interest); 139 Cong. Rec. S14352 (Daily Ed. Oct. 26, 1993) ("[The Act] does not require the Government to justify every action that has some effect on religious exercise. Only action that places a substantial burden . . . must meet the compelling State interest [test].").

Thus, by its very terms, RFRA does not guarantee the religious adherent the ideal, or the most convenient, circumstance in which to practice each and every aspect of his religion.  Whether a claimed burden is substantial must be viewed in the context in which it is made.  As the Supreme Court stated in Procunier v. Martinez, 416 U.S. 396, 409-10 (1974), "First Amendment guarantees must be 'applied in light of the special characteristics of the . . . environment.'".[3] Goldman v. Weinberger, 475 U.S. 503, 506-07 (1986).

In Branch Ministries, Inc. v. Rossotti, this Court noted that the imposition of a substantial burden relates to the observation of a central religious belief and whether the adherent has been pressured to modify his behavior and violate his beliefs.  Id.,

---

[3] Courts may also consider the importance of the alleged burdened practice.  See, e.g., Small v. Lehman, 98 F.3d 762 (3d Cir. 1996); Mack v. O'Leary, 80 F.3d at 1179-80; Werner, 49 F.3d at 1480; Sasnett, 908 F. Supp. at 1444-45.

211 F.3d at 142, citing <u>Jimmy Swaggart Ministries</u> v. <u>Board of Equalization</u>, 493 U.S. 378, 384-85, 391-92 (1990); <u>Thomas</u> v. <u>Review Board of Indiana Employment Sec. Div.</u>, 450 U.S. at 718.

Applying the "substantial burden" test here, plaintiffs cannot demonstrate a substantial burden on the free exercise of their religious rights.  It is undisputed that plaintiffs had the opportunity to spread their religious messages in the vicinity of the Red Mass in 2003, 2004 and 2005.  As discussed above, it is well established that a would-be demonstrator does **not** have the right to demand the desired location of communication.  <u>See</u> <u>supra</u> at 23.  Here, plaintiffs were not entitled to demonstrate in an area close to St. Matthews Cathedral during the Red Mass in 2003, 2004 and 2005, because the area in close proximity to the Cathedral was closed for security purposes.

Because plaintiffs cannot demonstrate a substantial burden on the free exercise of their religion, this Court need not address whether the government had demonstrated a compelling interest in imposing the burden and whether it did so in the least restrictive means.  Nonetheless, should this Court desire to address the issue, defendants' accompanying declarations amply establish that the government has a compelling interest in ensuring safety of high level government officials seeking to attend the Red Mass.  <u>See</u> <u>supra</u> at 3-8.

Moreover, those engaged in First Amendment activities with

religious messages are certainly not entitled to an outcome that those without religious messages could not achieve.  Accord ISKCON v. Kennedy, 61 F.3d at 958 (under the First Amendment, religious organizations have no greater rights than other organizations regarding disseminating messages on federal property).

The foregoing makes clear that plaintiffs' desire to stand on a particular sidewalk in this city during the Red Mass is not a religious practice, that the prohibition against plaintiffs being allowed to stand in an area closed for security reasons does not substantially burden their free exercise of religion, and that, even if it did, the government has a compelling interest in ensuring the protection of high level government officials. Consequently, plaintiffs' RFRA claims should be denied.

### V.   Plaintiffs' Fifth Amendment Claims Fail On All Counts.

#### A.   Plaintiffs' Claim of a Violation of Due Process is Without Merit.

Plaintiffs allege that the government has an unwritten policy of closing certain sidewalks during the Red Mass at St. Matthews Cathedral and that such a policy is void for vagueness. Amended Complaint, ¶¶ 106-09.  Plaintiffs first allege that the "policy is vague because it is unwritten."  Id. at ¶ 108. Defendants are aware of no authority that holds that a policy, if it exists, is necessarily unconstitutionally vague if it is

unwritten.

Plaintiffs also allege that the policy of closing sidewalks is unconstitutionally vague because it "fails to advise the average person with common intelligence when its requirements are (sic) so they may comport their conduct with such requirements." Amended Complaint, ¶ 109. This claim, however, is at odds with the facts alleged in the Amended Complaint.

For example, plaintiffs allege that during the 2003 Red Mass, when they arrived at the Cathedral "they found that vehicular traffic in front of the Cathedral was obstructed by crossbucks, and that portions of the sidewalks across from the Cathedral were marked by yellow tape." Amended Complaint, ¶ 29. Certainly there is nothing vague about a police line of yellow tape and crossbucks put in the road in front of the Cathedral to prevent vehicular traffic. Any person of ordinary intelligence would view such items as an indication that the areas they encompassed were not available for members of the general public.

Indeed, the "void for vagueness" doctrine in the First Amendment context prohibits restrictions on speech that are so vague that "[t]he lack of precision would give those enforcing this prohibition an impermissibly wide discretionary range in which to determine who is in violation." Community for Creative Non-Violence v. Turner, 893 F.2d 1387, 1394-95 (D.C. Cir. 1990). Here, by contrast, plaintiffs allege that certain sidewalks were

closed to people not entering the Cathedral during the Red Mass.
There is no allegation that government employees were given
discretion as to how to enforce the restricted access to the
areas closed to demonstrators and members of the public not
entering the Cathedral.  See Amended Complaint ¶¶ 106-09.
Accordingly, no impermissibly wide discretion existed with
respect to the government's actions taken to close certain
sidewalks during the Red Mass events.  The "void for vagueness"
doctrine is simply inapplicable here.

### B.    Plaintiffs' Claim of Alleged Unequal Treatment is Without Merit.[4]

The Equal Protection component of the Fifth Amendment's Due
Process Clause places the same limits on the exercise of federal
power that the Equal Protection Clause of the Fourteenth
Amendment places on the exercise of state power.  Bolling v.
Sharpe, 347 U.S. 497 (1954).  In essence, the equal protection
guarantee requires that similarly situated persons be treated
similarly.  City of Cleburne v. Cleburne Living Center, Inc., 473
U.S. 432 (1985).  Thus, the Equal Protection Clause protects from
"disparity in treatment . . . between classes of individuals
whose situations are arguably indistinguishable."  Ross v.
Moffitt, 417 U.S. 606, 600 (1979).  To bring an action under the

---

[4] Plaintiffs appear to raise Equal Protection claims only
with respect to the 2003 red Mass.  See Amended Complaint,
¶¶ 77-80, 111-15.

Equal Protection Clause, a plaintiff must show that the government has failed to "afford similar treatment to similarly situated persons." <u>News America Pub., Inc.</u> v. <u>FCC</u>, 844 F.2d 800, 809 (D.C. Cir. 1988). To the extent that there are meaningful differences between individuals, they are not similarly situated for equal protection purposes. <u>City of Cleburne</u> v. <u>Cleburne Living Center, Inc.</u>, 473 U.S. at 441. Thus, "[t]he threshold inquiry in evaluating an equal protection claim is, therefore, 'to determine whether a person is similarly situated to those persons who allegedly received favorable treatment.'" <u>Women Prisoners of the District of Columbia Department of Corrections</u> v. <u>District of Columbia</u>, 93 F.3d 910, 924 (D.C. Cir. 1996), quoting <u>United States</u> v. <u>Whiton</u>, 48 F.3d 356, 358 (8th Cir. 1995). The failure to point to a similarly situated individual or group treated differently than the plaintiff is fatal to the claim of a denial of equal protection. <u>Women Prisoners of the District of Columbia Department of Corrections</u>, 93 F.3d at 924.

Plaintiffs allege in their Fourth Cause of Action in the Amended Complaint that defendants asserted "a right to close the relevant public sidewalk to public demonstrations using picket signs" but "did not close the sidewalk to public passage generally." Amended Complaint, ¶ 111. Plaintiffs then assert that by allowing the general public to use the public sidewalk, "despite the claim that the sidewalk must be closed to insure

public safety, the defendants have deprived Mahoney, Newman and the CDC of the equal protection of the laws." <u>Id</u>. at ¶ 112.

Although trying to divine the exact nature of plaintiffs' claims here is difficult at best, it appears that plaintiffs are claiming that when plaintiffs Mahoney and Newman were arrested in October of 2003, they were arrested at a location where members of the public and the press were allowed to walk and stand. <u>See</u> Amended Complaint, ¶¶ 77-80. Plaintiffs, of course, are not similarly situated to members of the press, who carry credentials and are screened, Pierson Dec., ¶ 9, and thus no equal protection claim can lie with respect to the type of access accorded to the press at the 2003 Red Mass.[5]

With respect to members of the public, the Brooks Declaration explains the circumstances of the 2003 arrests of plaintiffs and demonstrates that plaintiffs were not treated differently than other similarly situated individuals. As Inspector Brooks explains, during the 2003 Red Mass the Marshals Service created a controlled-access area in the area in the immediate vicinity of the Cathedral. Brooks. Dec., ¶ 3. "The purpose of the controlled-access area was to ensure that non-attending members of the public did not loiter in the immediate vicinity of the Cathedral, thereby creating a potential threat to

---

[5]  The fact that plaintiff Newman at some point allegedly used a camera to record certain incidents does not transform him into a member of the press. <u>See</u> Amended Complaint, ¶ 115.

the attendees." Id.  A police line was established to mark the controlled-access area.  Id. at 4.  Individuals, including demonstrators, who intended to attend the mass were allowed to cross the police line into the controlled-access area.  Id.

     During the event several demonstrators, including plaintiff Mahoney, crossed the police line to engage in demonstration activities instead of to attend the mass.[6]  They were escorted back behind the police line but repeatedly returned to the controlled-access area.  Finally the demonstrators improperly entering the controlled-access area, including plaintiff Mahoney, were informed that if they did not move back behind the police line voluntarily they would be arrested.  Certain demonstrators, including plaintiff Mahoney, "either sat down and refused to move or stated explicitly that they wanted to be arrested."  Id. at ¶ 5.  The Marshals Service then arrested the demonstrators in the controlled-access area for crossing a police line.  Id.

     Thus, contrary to plaintiffs' claim, members of the general public were not allowed to linger in the area where plaintiffs Mahoney and Newman were arrested.  Rather, to the extent that

_____

     [6] According to the Complaint, plaintiff Newman was also in the controlled-access area.  Id at ¶¶ 113-115.

members of the public were allowed to enter the controlled-access area, it was because they were proceeding to the Cathedral to attend the Red Mass and needed to cross this area to enter the Cathedral.

Accordingly, plaintiffs' Equal Protection claim fails because they were not treated differently than similarly situated individuals.

<u>CONCLUSION</u>

For the foregoing reasons, defendants respectfully submit that their motion to dismiss or, in the alternative, for summary judgment be granted.

Respectfully submitted,

_____
KENNETH L. WAINSTEIN, D.C. BAR # 451058
United States Attorney


_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


_____
MARINA UTGOFF BRASWELL, D.C. BAR #416587
Assistant United States Attorney
U.S. Attorney's Office
555 4th Street, N.W. - Civil Division
Washington, D.C. 20530
(202) 514-7226

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
REVEREND PATRICK J. MAHONEY,        )
  et al.                            )
                                    )
          Plaintiffs,               )
                                    )
          v.                        )    Civil No. 05-1786 RCL
                                    )
UNITED STATES MARSHALS SERVICE,     )
  et al.,                           )
                                    )
          Defendants.               )
_____)
```

ORDER

Upon consideration of defendants' motion to dismiss or, in the alternative, for summary judgment, plaintiffs' opposition, and the entire record, and it appearing to the Court that the grant of defendants' motion would be just and proper, it is hereby

ORDERED that defendants' motion to dismiss or, in the alternative, for summary judgment be, and it is, granted; and it is further

ORDERED that this case be, and it is, dismissed with prejudice.

_____
UNITED STATES DISTRICT JUDGE

MARINA UTGOFF BRASWELL
Assistant United States Attorney
U.S. Attorney's Office
Judiciary Center Building
555 4th Street, N.W.
Washington, D.C. 20530


James Matthew Henderson
The American Center for Law and Justice
201 Maryland Avenue, NE
Washington, D.C. 20002