IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| REVEREND PATRICK MAHONEY, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| -vs- | ) | Civil Action No.  1:05-cv-01786-RCL |
| | ) | |
| THE UNITED STATES SECRET SERVICE, | ) | |
| *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

The Plaintiffs, Reverend Patrick Mahoney, Troy Newman, and the Christian Defense

Coalition, respectfully submit this Opposition to Defendants' Motion to Dismiss or in the

Alternative for Summary Judgment.  In compliance with the Local Rules of Court, the Plaintiffs

tender herewith their Counterstatement of Facts Genuinely in Dispute, together with affidavits

supporting the Counterstatement and this Opposition.

STATEMENT REGARDING FACTS

The Plaintiffs adopt by reference, and incorporate herein as though fully set forth the

statement of facts contained in their Statement of Points and Authorities Supporting the Motion

for a Preliminary Injunction, at 1-4, and in their Counterstatement of Facts Genuinely in Dispute.

<u>ARGUMENT</u>

I.    ON THE DEFENDANTS' MOTION TO DISMISS, THIS COURT MUST EXCLUDE
      ALL EXTRANEOUS MATTERS FROM ITS CONSIDERATION

The Court must resolve the question of how to deal with the extraneous matters upon

which the Defendants have relied in their Memorandum supporting the motion to dismiss.  The

provisions of Fed. R. Civ. Pro.12(b)(6) is clear.  The rule requires the Court to make an election:

either the Court must disregard the extraneous matters (both those previously filed on the motion

for a preliminary injunction and those filed with the alternative motion to dismiss or for summary

judgment), and decide the motion to dismiss on the Amended and Verified Complaint alone, or it

must give notice of its intention to treat the motion as one for summary judgment, afford the

parties the opportunity to supplement the record, and then rule on the motion as though made

pursuant to Fed. R. Civ. Pro. 56.  The consideration of extraneous matters rests in the Court's

discretion, while the obligation, if such matters are considered, to give notice of the intent to do

so, is not discretionary.

II.   THE CASE IS NOT SUBJECT TO DISMISSAL AS MOOT.

Defendants contend that this action should be dismissed as moot, and for the purpose state

that the Red Mass is long past, and with it, the opportunity for the Court, were it so inclined, to

afford any relief to the Plaintiffs.  <u>See</u> Memorandum in Support of Defendants' Motion to

Dismiss, or in the Alternative, for Summary Judgment, at 1-2, 9-12.  If this were a case in which

this Court could grant no meaningful relief, then the Defendants would be correct that the case is

due to be dismissed as moot.[1]  The Defendants ignore, however, that the Plaintiffs have sought both injunctive relief and declaratory relief related to the Defendants' closure of the southside Rhode Island Avenue public sidewalk across the street from the Cathedral of Saint Matthew.  See Amended and Supplemented Complaint, ¶¶ 116-119.2.  This Court is authorized by statute and rule of court to grant both declaratory and injunctive relief.  Thus, this Court can grant some or all the relief requested by the Plaintiffs, if it concludes that they are entitled to judgment on one, some or all of their claims.

The Government seeks to make moot a live controversy over which this Court has jurisdiction by asserting that it cannot be known until some future time what security response or plan will be required at that event two and a half months from now.  See Memorandum in Support of Defendants' Motion, at 11.  Curiously absent from the Government's argument is any abdication of the right it arrogates to itself.  The Government simply offers the off-hand defense that it does not yet know what precautions or whether any will be required at future Red Masses.

This litigation is most assuredly not one in which voluntary cessation of wrongful conduct is offered as a ground of mootness.  The Government has not abandoned its right, by administrative ipse dixit, to shut down public sidewalks so that government officials can go to church.  Rather, the Government has only said that it makes assessments about the demands of security in a period of time closer to the event than today.

Rather than voluntary cessation, this is mere voluntary dilatoriness. Contrast Friends of the

---

[1]Of course, such a dismissal would be without prejudice to the rights of the Plaintiffs to seek the aid of this Court in the face of future instances of sidewalk closures pertaining to provision of security at Red Masses.

Earth, Inc. v. Laidlaw Environmental Services, Inc., 528 U.S. 167 (2000). There, the Supreme

Court rejected the mootness claim asserted by Laidlaw, even though it had ceased its wrongful

conduct and had, in fact, closed its offending factory. The Court relied in particular on the fact

that Laidlaw maintained licensing for the factory, and could start up those or similar operations

elsewhere absent the deterrent effect of the fine sought.

Even if the Government were technically correct that the case is moot,[2] this case falls

squarely within one of the exceptions of long standing to the mootness doctrine, for cases that are

capable of repetition yet evade review. See, e.g., Weinstein v. Bradford, 423 U.S. 147 (1975);

Roe v. Wade, 410 U.S. 113, 125 (1973); Moore v. Ogilvie, 394 U.S. 814, 816 (1969); Carroll v.

Princess Anne, 393 U.S. 175, 178-179 (1968).

This Court demonstrated the application of the "capable of repetition yet evading review"

exception in Zearley v. Ackerman, 116 F. Supp. 2d 109, 112 (D.D.C. 2000):

> The issue of mootness arises 'when the issues presented are no longer 'live' or the
> parties lack a cognizable interest in the outcome.' United States Parole
> Commission v. Geraghty, 445 U.S. 388, 395, 63 L. Ed. 2d 479, 100 S. Ct. 1202
> (1980). In such a case, a court has no jurisdiction because Article III of the
> Constitution limits federal judicial power to resolution of cases and controversies.
> The doctrine of 'capable of repetition yet evading review' is an exception to
> mootness for cases where the party can demonstrate that '(1) the challenged action
> [is] in its duration too short to be fully litigated prior to its cessation or expiration,
> and (2) there [is] a reasonable expectation that the same complaining party [will]
> be subjected to the same action again.' United States v. Weston, 338 U.S. App.
> D.C. 355, 194 F.3d 145 (D.C. Cir. 1999).

_____

[2]We do not concede this point. The Plaintiffs have stated a plan and firm intention to
exercise their constitutional rights by conducting a prayer vigil and demonstration on the sidewalk
opposite from the entrance to the Cathedral of Saint Matthew during the 2006 Red Mass on
October 1. See Plaintiff's Exhibit 7, ¶¶ 55-59; Amended and Supplemented Complaint, ¶¶ 81.42-
82.44.

In Zearley, this Court concluded that claims under the Individuals with Disabilities Education Act were not moot because they squarely fit both prongs of the test it described above. Likewise here, the present case falls squarely within the two prongs: the challenged action is of too brief duration for full litigation prior to expiration and it is completely reasonable to expect that the Plaintiffs will again be subject to the same actions.

First, the challenged action is of too brief duration for full litigation prior to expiration. The Red Mass occurs on the first Sunday in October each year. See Defendants' Exhibit A in Opposition to Preliminary Injunction, Declaration of Susan Gibbs, ¶ 2 (annual celebration of Red Mass since 1952). In addition to the period of time that the Mass itself takes, the Government closes the sidewalks for as much as an hour before the Mass, and for a short period of time afterward. See Defendants' Exhibit B in Opposition to Preliminary Injunction, Declaration of Robert Brandt, ¶ 9 (measures "in effect one hour before the mass begins and continuing until one hour after the mass has ended"); Defendants' Exhibit E in Opposition to Preliminary Injunction, Declaration of Julia A. Pierson, ¶ 9 (same).

All told, the insult to the constitutional rights of the Plaintiffs is, in duration, only some three hours in duration.[3] That period of denial of the constitutional rights of these Plaintiffs is of a duration even more brief than, for example, judicial orders that implicate the freedom of the press in the setting of criminal trials. Yet in cases in which trial courts impose such orders, the Supreme

---

[3]The brevity of the denial of their constitutional rights does not, however, mean that the Plaintiffs have not suffered injury, and are not threatened with future injury. See Elrod v. Burns, 427 U.S. 347, 373-74 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury") (citing New York Times Co. v. United States, 403 U.S. 713 (1971)).

Court has concluded that the "capable of repetition yet evading review standard" is satisfied and has reviewed such orders even after the trials to which they pertain have terminated.  See Richmond Newspapers, Inc. v. Virginia, 448 U.S. 555, 563 (1980); Gannett Co. v. DePasquale, 443 U.S. 368, 377-378 (1979); Nebraska Press Assn. v. Stuart, 427 U.S. 539, 546-547 (1976). Plainly, given the brevity of the time of denial, meaningful review of conditions actually imposed is simply not possible, and any assertion to the contrary by the Government cannot be credited.

Second, there is a reasonable expectation that the same complaining party will be subjected to the same action again.  The Plaintiffs have asserted their plan and intention to engage in prayer vigils and demonstrations at future Red Masses, continuing an established practice going back over many years.  See Plaintiffs' Exhibit 6(F), Supplemental Declaration of Reverend Patrick Mahoney (on the motion for preliminary injunction), ¶ 15.  Moreover, specifically, the Plaintiffs have stated their plan and intention to conduct their prayer vigil and demonstration during the 2006 Red Mass, on October 1, 2006.  See  Plaintiffs' Exhibit 7 in Opposition to Defendants' Alternative Motion, Second Supplemental Declaration of Reverend Patrick Mahoney, ¶¶ 55-59; Amended and Supplemented Complaint, ¶¶ 81.42-82.44.  Taken together with the Government's arguments, both those in opposition to the Preliminary Injunction Motion and those in support of its Alternative Motion, it is clear that the Government has not abandoned its claimed power to shut down the sidewalk at issue, these facts make plain and reasonable the calculation that when the Plaintiffs seek to conduct their prayer vigil and demonstration on October 1, 2006, they will be prevented from doing so, either by the Secret Service, by the Marshals Service, or by both together.

The present case is quite to the contrary of the circumstances in <u>McDonnell Douglas Corp. v. National Aeronautics & Space Administration</u>, 102 F. Supp. 2d 21 (D.D.C. 2000). There, this Court concluded that McDonnell Douglas Corp.'s reverse FOIA suit was rendered moot because the underlying FOIA request to which its litigation responded had been withdrawn and because there was no reasonable prospect that McDonnell Douglas Corp. would be subject to the same action again.  102 F. Supp. 2d at 22-24.  Here, to the contrary, both prongs of the "capable of repetition yet evading review" exception are satisfied, as illustrated above.

Thus, even if the Government is technically correct in asserting that the case between the parties is mooted by the passage of the date of the 2005 Red Mass, this dispute squarely presents the problem of an injury being inflicted by conduct that is "capable of repetition, yet evading review."  For this reason, the Court should deny the Government's motion to dismiss on grounds of mootness.

III.     THE ALTERNATIVE MOTION IS NOT WELL TAKEN AND SHOULD BE DENIED.

**A**.     **The Defendants Have Not Sustained Their Burden on the Motion to Dismiss.**

Rule 12(b)(6) motions weigh whether a claimant has sufficiently and properly stated a claim.  <u>See</u> <u>Swierkiewicz v. Sorema</u>, 534 U.S. 506, 514 (2002).  To resolve such claims, essentially, the Court is required to determine whether the Plaintiff has adduced sufficient facts in the complaint to hold the Defendants liable.  <u>See</u> <u>Byrd v. D.C.</u>, 297 F. Supp. 2d 136, 139 (2003). To measure sufficiency, the rule to be applied is "that a complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).  In making that

determination, this Court must treat the allegations of fact as true and this Court must construe the complaint in favor of the complainant. <u>Schener v. Rhodes</u>, 416 U.S. 232, 236 (1982).

In the present case, the motion to dismiss must be denied because, construing the complaint in favor of the Plaintiffs, it is clear both that they have stated claims upon which relief can be granted and that the Defendants have failed to prove beyond doubt that the Plaintiffs can prove no set of facts supporting their claim that would entitle them to relief.

**B**.    **The Defendants Have Not Sustained Their Burden on the Alternative Motion for Summary Judgment.**

The alternative motion for summary judgment is not favored.  Rule 56 of the Federal Rules of Civil Procedure and decisions of the Supreme Court and of this Court limit summary judgment to those instances in which the moving party shows, based on "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," Fed. R. Civ. P. 56(c), that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c)(3); <u>see</u> <u>also</u> <u>Powell v. Washington Metro. Area Transit Auth.</u>, 238 F. Supp. 2d 160, 164 (D.D.C. 2002). Moreover, the Government, as the moving party, bears the burden to show the absence of a genuine issue regarding the material facts.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

Here, the motion is due to be denied because the material facts are all disputed.

"Material facts are those that 'might affect the outcome of the suit under the governing law . . . .'" <u>Bush v. Engleman</u>, 266 F. Supp. 2d 97, 102 (D.D.C. 2003) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). While a dispute over a material fact is not "genuine" unless the non-moving party produces enough evidence that a "reasonable jury could

return a verdict for the [non-movant]," <u>Anderson</u>, 477 U.S. at 248, here the Plaintiffs have

complied with the requirement of Local Rule 7, providing a Statement of Material Facts

Genuienly in Issue, and citations to supporting evidentiary materials either previously filed with

the Court or filed contemporaneously with this opposition.  The non-movant's evidence "must

consist of more than mere unsupported allegations and must be supported by affidavits or other

competent evidence setting forth specific facts showing that there is a genuine issue for trial."

<u>Powell</u>, 238 F. Supp. 2d. at 164 (citing Fed. R. Civ. P. 56(e); <u>Celotex Corp. v. Catrett</u>, 477 U.S.

317, 323 (1986)).

 In the instant case, as a comparison of the Local Rule 7 Statements of each of the parties

makes clear, the facts are plainly in dispute (contrast the Plaintiffs' and the Defendants' versions

of the events of the October 2004 Red Mass vigil and demonstration).  To the extent any <u>material</u>

facts are undisputed, those facts support the claims of the Plaintiffs and do not form the basis for a

judgment as a matter of law for the Defendants.  Thus, the alternative motion should be denied.

IV. PLAINTIFFS HAVE ADEQUATELY PLED THE VIOLATION OF THEIR FIRST
  AMENDMENT RIGHTS AND THE GOVERNMENT IS NOT ENTITLED TO
  SUMMARY JUDGMENT THEREON.

 A. **Public Forum Doctrine Analysis Governs the Ispe Dixit Closure of the Rhode
   Island Avenue Sidewalks**

 The Supreme Court employs "forum" analysis to resolve claims of access to public

property for purposes of free speech.  <u>Cf.</u>, <u>e.g.</u>, <u>Perry Education Association v. Perry Local</u>

<u>Educators' Association</u>, 460 U.S. 37 (1983) (internal mail system of public school not a

traditional or designated public forum); <u>United States v. Grace</u>, 461 U.S. 171 (1983) (public

sidewalk surrounding U.S. Supreme Court is a traditional public forum); <u>Cornelius v. N.A.A.C.P.</u>

Legal Defense and Education Fund, Inc., 473 U.S. 788, 797 (1985) (Combined Federal Campaign is not a traditional or designated public forum).[4]  Applied here, forum analysis shows that Plaintiffs' First Cause of action states a claim for relief, and that the Defendants are not entitled to judgment thereon as a matter of law.

                1.     Plaintiffs' Prayer Vigil and Peaceful, Public Advocacy on a Sidewalk in Downtown Washington Is Protected Speech

The Plaintiffs conduct prayer vigils and demonstrations.  See, e.g., Amended and Supplemented Complaint, ¶¶ 27-82.44.  Until the incidents giving rise to this litigation they conducted those demonstrations and prayer vigils on the south side public sidewalk adjacent to Rhode Island Avenue NW, directly across the street from the entrance to St. Matthew's Cathedral, on the morning of October 2, 2005, during the time period when the Cathedral hosts the annual Red Mass.  Id.  Their prayer vigil and demonstration consists of the displaying of signs containing the text of the Ten Commandments, as well as prayer and public speaking addressing the role of the Ten Commandments in American law, government and society.  Id.

Religious speech and discussion "are forms of speech protected by the Constitution." Widmar v. Vincent, 454 U.S. 263, 269 (1981); Heffron v. ISKCON, Inc., 452 U.S. 640 (1981). So the signs containing the text of the Ten Commandments, or urging the President and the

---

    [4]As exemplified in Cornelius, the analysis proceeds in three steps.  First, the activity threatened or affected by government action must be identified, and it must be determined whether it is speech protected under the First Amendment. Cornelius, 473 U.S. at 797. (Obviously, in cases not involving expression or expressive activities, the analysis concludes here.) Second, it is essential to "identify the nature of the forum, because the extent to which the Government may limit access depends on whether the forum is public or nonpublic." Id.  Third, where constitutionally protected speech is at stake, the government action must be analyzed according to the standards applicable to the relevant forum. Id.

Justices of the Supreme Court to "Honor God – Honor the Constitution," <u>see</u> Plaintiffs' Exhibit 8, Declaration of Kathleen Mahoney, Attachment 1 (photograph showing sign), and the prayers and speaking on the related topics, all "far from being a First Amendment orphan, [are] as fully protected under the Free Speech Clause as secular private expression." <u>Capital Square Review and Advisory Board v. Pinette</u>, 515 U.S. 753, 760 (1995) (citing cases). Further, the Plaintiffs' use of signs to draw public attention to what the Plaintiffs perceive as pervasive judicial hostility to the public display of the Ten Commandments is protected expression. Displaying signs and placards addressing public issues is a form of free speech resting "at the core of the First Amendment," <u>Boos v. Barry</u>, 485 U.S. 312, 318 (1988) (and cases cited). <u>Accord</u> <u>United States v. Grace</u>, 461 U.S. 171, 176-77 (1983) (and cases cited); <u>cf.</u> <u>Grayned v. City of Rockford</u>, 408 U.S. 104, 119 (1972) ("classic expressive gesture of the solitary picket").

      2.    <u>The Rhode Island Avenue Sidewalk Is a Traditional Public Forum Property</u>

The sidewalk adjacent to, and on the south side of, Rhode Island Avenue NW in the City of Washington is a downtown city sidewalk, indistinguishable from so many other public sidewalks and ways in the District of Columbia. The specific location in dispute is directly across the street from St. Matthew's Cathedral.

This sidewalk is a traditional public forum property.

It is open. It is continuous through that area of the District of Columbia. It is used for all manner of normal pedestrian and commercial activities. Indeed, at the time of the 2003 and 2004 Red Masses, unrestricted pedestrian access along Rhode Island Avenue was available on that sidewalk. Access to these sidewalks is unrestricted. There are no gates nor guards. There are no

requirements for identification cards or passes.  The layout of this sidewalk encourages the public

to sightsee, to patronize nearby businesses and amenities, and to enjoy the vistas along this

avenue.  Nothing sets these sidewalks apart from any other sidewalk in the City of Washington.

Under the First Amendment, "streets, sidewalks, and parks, are considered, without more,

to be public forums [sic]."  United States v. Grace, 461 U.S. 171, 177 (1983) (and cases cited).

It is well settled that:

> [w]herever the title of streets and parks may rest, they have immemorially been
> held in trust for the use of the public and, time out of mind, have been used for
> purposes of assembly, communicating thoughts between citizens, and discussing
> public questions.  Such use of the streets and public places has, from ancient times,
> been a part of the privileges, immunities, rights, and liberties of citizens.

Hague v. C.I.O., 307 U.S. 496, 515 (1939) (plurality opinion).

Not only are streets, sidewalks, and parks traditional public forum properties, they

represent "quintessential public forums."  Perry Education Association v. Perry Local Educators'

Association, 460 U.S. 37, 45 (1983).  On the range of properties open in varying degrees to

expressive activities, the Rhode Island Avenue sidewalk here lies at the very "end of the

spectrum."  Id.

3.    The Government Has Not Narrowly Tailored its Restriction.

The Defendants cannot justify their past and future closures of the sidewalk, neither the

incomplete closures of 2003 and 2004, nor the entire closure of 2005.  The Government's speech

ban cannot be justified, and nor can the pattern of arrests, harassments and closures be shown to

be narrowly drawn to serve an important public purpose.

In a traditional public fora, "the government's ability to permissibly restrict expressive

conduct is very limited." United States v. Grace, 461 U.S. at 177 (quoting Perry, 460 U.S. at 45) (additional citations omitted).  This conclusion results from the fact that "[o]ne who is rightfully on a street [or a sidewalk] open to the public 'carries with him there as elsewhere the constitutional right to express his views in an orderly fashion.'"  Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 810 (1984) (quoting Jamison v. Texas, 318 U.S. 413, 416 (1943)) (additional citation omitted).  In fact, "[r]egulation of speech activity on governmental property that has been traditionally open to the public for expressive activity, such as public streets and parks, is examined under strict scrutiny."  United States v. Kokinda, 497 U.S. 720, 726 (1990).  In fact, the Supreme Court has held that "[a]dditional restrictions such as an absolute prohibition on a particular type of expression will be upheld only if narrowly drawn to accomplish a compelling governmental interest."  United States v. Grace, 461 U.S. 171, 177 (1983) (citing cases).  See also Capital Square Review and Advisory Board v. Pinette, 515 U.S. 753, 761 (1995) ("the right to limit protected expressive activity is sharply circumscribed").

Several kinds of government actions by the Defendants and those acting in concert with them have either already injured, or presently threaten to injure, the Plaintiffs in the exercise of their First Amendment rights: the arrests for sign displays during the 2003 event, the hectoring and harassment during the 2004 event, and the closure entire of the public forum during the 2005 event.  These actions all fail the relevant standards of scrutiny.

The Government makes much of the statutory duty to insure the safety of protected persons (the President, judges, justices, etc.) and urges that this duty constitutes that compelling government interest that justifies its actions.  The argument proves too much.  The interest in

protecting statutorily designated persons did not justify the Supreme Court sidewalk closure at

stake in United States v. Grace, 461 U.S. 171 (1983) or the ban on sign displays that bring certain

foreign dignitaries into public opprobrium at stake in Boos v. Barry, 485 U.S. 312 (1988).[5]

      In fact, despite its obvious duty to secure the safety of statutorily designated persons, the

Government has failed to provide this Court with the one thing necessary to evaluate the narrow

tailoring of controlled zone: evidence of the threat of harm.  In this regard, the Government's

position is much the same as the school district in Tinker v. Des Moines Independent School

District, 393 U.S. 503, 508-09 (1969).  There, based on an undifferentiated fear or apprehension

that allowing students to continue wearing armbands indicating their disagreement with American

involvement in Vietnam, the school district suspended the Tinker children from school when they

refused to remove the armbands as a condition of continued attendance at school.  Id.  As the

Supreme Court explained,

> But, in our system, undifferentiated fear or apprehension of disturbance is not
> enough to overcome the right to freedom of expression. Any departure from
> absolute regimentation may cause trouble. Any variation from the majority's
> opinion may inspire fear. Any word spoken, in class, in the lunchroom, or on the
> campus, that deviates from the views of another person may start an argument or
> cause a disturbance. But our Constitution says we must take this risk, Terminiello
> v. Chicago, 337 U.S. 1 (1949); and our history says that it is this sort of hazardous
> freedom -- this kind of openness -- that is the basis of our national strength and of
> the independence and vigor of Americans who grow up and live in this relatively
> permissive, often disputatious, society.

Id. at 508-09.  Tinker illustrates well the point that not every imaginable evil, no matter how

_____

    [5]Boos is particularly pertinent since there were clearly vital national interests at stake in
the protection of foreign dignitaries, because such protection is an aspect of the duties of the
federal government under international law.  See Boos, 485 U.S. at 323-24 (discussing this "vital
national interest").

remote, how uncertain, or how unlikely, serves to justify governmental interpositions on constitutional rights.

The controlled zone is just another way of saying, "complete prohibition of a kind of expression." Thus, under <u>Grace</u>, the Government's complete ban can be "upheld only if narrowly drawn to achieve a compelling interest." <u>Grace</u>, 461 U.S. at 177. "In order to qualify as narrowly tailored, a content neutral ordinance must avoid vesting … officials with discretion to grant or deny licenses." <u>Miami Herald Pub. Co. v. City of Hallandale</u>, 734 F.2d 666, 673 (1984), <u>aff'd</u> 742 F.2d 590 (11th Cir. 1984). <u>See</u> <u>Forsyth County. v. Nationalist Movement</u>, 505 U.S. 123, 132-33 (1992). But, as shown on the facts here, the Government defendants did precisely this, exercising unbridled discretion to arrest, threaten to arrest, harass and disrupt demonstrations and similar activities in the traditional public forum.

No government interest justifies this wholly <u>discretionary</u> system threatening free speech on a traditional public forum. The Plaintiffs do not dispute the important purpose of providing security and protection to persons designated by statute. That is not in doubt. Instead, it is the arrogation of power in these circumstances of a type of unbridled discretion that has uniformly declared unconstitutional by the Supreme Court. <u>See</u> <u>Forsyth County</u>, 505 U.S. 123, 131 (1992); <u>see</u> <u>also</u> <u>Shuttlesworth v. City of Birmingham</u>, 394 U.S. 147, 150-51 (1969); <u>Freedman v. Maryland</u>, 380 U.S. 51 (1965).

B.    **The Closure of the Rhode Island Avenue Sidewalk is an Instance of Unbridled Discretion.**

The exercise of raw federal police powers by the Government Defendants to close public sidewalks to demonstrators is an instance of unbridled discretion that restrains speech in advance. It restrains and inhibits expression before it takes place, and gives the Government the right to deny expression altogether.  While such schemes may be treated as time, place, and manner restrictions on expression and can pass constitutional muster if they are free from reliance upon the content of communications for their operation, see Thomas v. Chicago Park District, 534 U.S. 316, 322-23 (2002), by omitting any standards to confine the exercise of discretion to legitimate, constitutionally appropriate standards, the exercise of raw power to suppress expression is an unconstitutional restraint on expression.

As the United States Supreme Court has stated, "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." New York Times Co. v. U.S., 403 U.S. 713, 714 (1971) (quoting Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70 (1963)).  The Government "`thus carries a heavy burden of showing justification for the imposition of such a restrain.'"  New York Times, 403 U.S. at 714 (quoting Organization for a Better Austin v. Keefe, 402 U.S. 415, 419 (1971)).  In this case, it simply cannot sustain the burden of justifying the systematic restraint of speech it has imposed.  The Government's standardless, unbridled discretion provides none of the procedural safeguards that are necessary prerequisites to constitutionality.

Opposition to Dismissal/Summary Judgment Page 16

V.    PLAINTIFFS HAVE ADEQUATELY PLED THE VIOLATION OF THEIR RIGHTS
      UNDER THE RELIGIOUS FREEDOM RESTORATION ACT AND THE FREE
      EXERCISE CLAUSE AND THE GOVERNMENT IS NOT ENTITLED TO
      SUMMARY JUDGMENT THEREON.

The demonstrations and prayer vigils of the Plaintiffs are the product of their deeply held

religious convictions regarding their obligation to speak the truth, to proclaim the standard of

God's law.  See generally Plaintiffs' Exhibit 1 (supporting the Motion for Preliminary Injunction),

Declaration of Reverend Patrick Mahoney; Amended and Supplemented Complaint, ¶¶ 11-25.

Two separate sources of rights are at stake here, with respect to the religious liberties of

the Plaintiffs:   the Religious Freedom Restoration Act, Title 42 U.S.C. § 2000bb; and a "hybrid"

right, a confluence of the Freedom of Speech and Free Exercise of Religion Clauses.[6]  To succeed

on a claim under RFRA,[7] the Plaintiffs must show that a substantial burden has been imposed on

their religious exercise, and that the Government's action is not the least restrictive means of

accomplishing a compelling government interest.  See Title 42 U.S.C. § 2000bb-1.[8]

---

[6]The Supreme Court has adopted a linguistic turn of phrase, "hybrid rights," to describe
the category of cases in which religious exercise together with the exercise of some other
constitutional right compels the Judiciary to apply strict scrutiny.  See Employment Div. v. Smith,
494 U.S. 872, 882 (1990).

[7]The analysis applicable to the claims is identical, so that likelihood of success on the one
claim indicates likelihood of success on the other.  For this reason, Plaintiffs set out their
argument on likelihood of success on their RFRA claim in full and adopt, by reference, that
argument with respect to their hybrid rights claim under the First Amendment.

[8]The relevant portion of RFRA states:

(a) In General.--Government shall not substantially burden a person's exercise of
religion even if the burden results from a rule of general applicability, except as
provided in subsection (b).

A.    **Arrests, Hectoring, and Harassment by Marshals Substantially Burdens the Religious Exercises of the Plaintiffs**

It is beyond cavil that seizing a man, taking him into police custody, placing him behind bars, and conditioning his release on a promise to appear at his own future prosecution, all because he displayed a sign bearing the text of the Ten Commandment, adequately proves up the substantiality of the burden on the Plaintiffs' religious exercise.[9] The religious nature of the duty that brought the Plaintiffs to the Rhode Island Avenue sidewalk across the street from the

──────────────────

(b) Exception.--Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person--

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

Title 42 U.S.C. § 2000bb-1.

[9]The question of whether arrests and threats of arrest constitute a substantial burden on religious exercise was assumed to be answered in the affirmative by the Fourth Circuit, in American Life League v. Reno, 47 F.3d 642, 654-55 (4th Cir. 1995):

The threshold inquiry under RFRA concerns burden. If a statute does not substantially burden a religious practice, then the statute does not implicate RFRA.

Plaintiffs' complaint alleges that they do not 'condone . . . nonpeaceable or violent conduct.' Accordingly, a proscription on violence and force cannot substantially burden their religious exercise. However, plaintiffs' complaint also alleges that their opposition to abortion (on religious grounds) requires them to obstruct physically, through peaceful picketing, access to clinics offering abortion services. We will assume that this allegation, coupled with plaintiffs' assertion that the Access Act violates their RFRA rights, satisfies their obligation to plead a substantial burden on their religious exercise.

American Life League v. Reno, 47 F.3d 642 (4th Cir. 1995).

Opposition to Dismissal/Summary Judgment Page 18

Catholic Cathedral of St. Matthew is clear. <u>See</u> Plaintiffs' Exhibit 1, Declaration of Reverend Patrick Mahoney, in support of the Preliminary Injunction, ¶¶ 11-25; Amended and Supplemented Complaint ¶¶ 11-25. The arrests, the focused hectoring and harassment, and the closure of the sidewalks when the Plaintiffs engaged in religious exercises, carried out by federal government officers, unquestionably presents a substantial burden on religious exercise. In fact, the 2003 incident, in which the Defendant Marshals offered to forebear with arrests and threats of arrests, if the Plaintiffs surrendered the right to display their signs depicting the text of the Ten Commandments, evinces the coercive burdening that the Government Defendants have effected. <u>See</u> Plaintiffs' Exhibit 1, ¶¶ 19-34; Amended and Supplemented Complaint ¶¶ 30-44.

      B.      **No Compelling Government Interest Justifies The Arrests, Hectoring, Harassment, or Sidewalk Closures**

The Government has asserted security interests as the justification for its decisions to arrest the Plaintiffs and to close the public sidewalks. The Government Defendants are charged by federal law with protecting, among others, the President and federal judges. As evidenced by the 2005 Red Mass, many dignitaries, including the President and Supreme Court justices attend the annual Red Mass. But the fact that protected persons are present in one location or another does not provide a bootstrap mechanism to justify otherwise invalid restrictions. Otherwise, in <u>United States v. Grace</u> the Court would have concluded that the near location of the Court, with its cadre of protected persons, justified removing placard carriers from the sidewalk on the perimeter of the Supreme Court block. For that matter, the interest in securing the safety of protected persons would have justified an entirely different outcome for the restriction on sign displays in <u>Boos v. Barry</u>.

Opposition to Dismissal/Summary Judgment Page 19

This security argument proves too much.

And in doing so, it omits any explanation of why the streets and sidewalks can be maintained open, not just to others seeking to attend the Red Mass, but to members of the press, and, in years prior to 2005, to passersby, to walkers of dogs, to riders of bicycles. By accommodating the press on the sidewalk near St. Matthews, as was done in 2005, or by leaving the sidewalks open to all manner of persons conducting all manner of ordinary activities of human existence, as was done in 2004 and prior years, while selecting out for special restriction only those who display signs with messages on them, the Government Defendants belie the imperative nature of any claimed interest. Of particular relation in this case is the willingness to allow members of the press and media, with their microphones, video cameras, notebooks, and other reporting paraphernalia to stand in exactly the location where the Plaintiffs were arrested, hectored, harassed and prohibited from praying and demonstrating. That choice alone puts the lie to the nature of the interest at stake here.

C.    **Any Compelling Government Interest Could Have Been Served by Less Restrictive Means**

Assuming a relevant government interest of a sufficiently compelling nature justifies restrictions on pristine religious speech on a public sidewalk, it is certain that arrests, hectoring and harassment were not the least restrictive means to accomplish those purposes.

Apparently, the Government Defendants fear that sign displays interfere with line of sight for security personnel. It would be baseless calumny to charge that these Plaintiffs are the source of any threat of harm to any protected person. So the Government's claimed interest is in the problem of the hidden weapon, the one that is held by a person unrelated to the Plaintiffs, who

uses the Plaintiffs and their signs to provide sheltering cover. To this interest, less restrictive

approaches abound, including the placement of security personnel within and near the location

where the Plaintiffs engage in their demonstration and prayer vigil, placing such officials behind

the Plaintiffs and those with them, so that anyone attempting to shield their wrongful conduct

from view cannot do so, or, deploy metal detectors to the location and limit access to the area of

concern to those willing to undergo and pass screening.[10]

The Government has greatly overstepped its constitutional bounds, by closing a traditional

public sidewalk to protected activities, by employing the heavy hand of arrest, hectoring, and

harassment, when less restrictive means were available. Because no conceivable interest not

already adequately served by other means justifies this overreach, the substantial burden inflicted

on the Plaintiffs' religious exercise cannot pass scrutiny under RFRA.

VI.    PLAINTIFFS HAVE ADEQUATELY PLED THEIR EQUAL PROTECTION CLAIM
       AND THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT
       THEREON

Plaintiffs' Equal Protection claim is that substantially similarly situated individuals were

treated differently, and in the process, the fundamental rights of the Plaintiffs were violated. A

large crowd was present on the date of the 2003 Red Mass. See Plaintiffs' Exhibit 3, Declaration

of Brenna Sullenger (photos attached thereto). Those present included attendees, onlookers,

passersby, the press, and the Plaintiffs. Persons walking their dog, reading a paper, passing by on

the sidewalk were left entirely unmolested by the Marshals. See Plaintiffs' Exhibit 1, ¶¶ 56-57;

---

[10]This proposal presents its own set of possible constitutional difficulties. But there is no
indication that the Government ever considered such less restrictive mechanisms of insuring
judicial security.

see also "Six Arrested for the Rule of Law," attached to Plaintiffs' Exhibit 4, Declaration of

Father Daniel Sparks ("There were also numerous others who were freely walking the sidewalks,

whether they were simply passing down the sidewalk, coming to join the throng entering the

church, or observing the crowd"). Even the Plaintiffs, until they displayed their Ten

Commandments sign, were not differentially burdened.

Once Reverend Mahoney and then others attempted to communicate to the public on an

issue of paramount – to them – importance by displaying the Ten Commandments sign, a different

standard applied. As Mahoney testified in his Declaration, immediate seizure, followed by

immediate arrest, resulted from his sign display. Plaintiffs' Exhibit 1, ¶¶ 20-34. Such a

consequence was not visited on any member of the press carrying cameras or microphones, any

passersby carrying newspapers, or any other individuals simply passing through the vicinity (other

than these Plaintiffs and those with them). None others, no matter their capacity for innocently

providing a shield to those acting upon nefarious intents, were subjected to arrest, hectoring or

harassment.

This differentiation violates the Equal Protection rights of the Plaintiffs.

VII.    PLAINTIFFS HAVE ADEQUATELY PLED THEIR DUE PROCESS CLAIM AND
        THE GOVERNMENT IS NOT ENTITLED TO SUMMARY JUDGMENT THEREON.

Adequate notice is the sine qua non of due process. Those who would confine their

behavior within the bounds of the law depend on articulable notice of the requirements of the law.

For a Constitution that would confine the law enforcement behaviors of police, marshals, judges,

juries and others, specificity is a necessity. Here, no statute or regulation gives the Government

Defendants authority over permitted uses of the public sidewalks near the Cathedral of St.

Matthew in Washington, the District of Columbia.  No notice is given in advance of arrival at the vicinity that conduct in the vicinity of the Cathedral may appropriately be made subject to the direction and control of the Government Defendants.  Equally troubling, there is no constraint on the administrative judgments, the ad hoc decision-making of the Government Defendants.

The Due Process violation here is the Defendants' creation out of whole cloth and enforcement of a fictional, nonexistent, rule.  The Supreme Court has explained, "[i]t is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).  There is no statute or code section embodying the ban on prayer vigils and demonstrations on the sidewalk adjacent prohibition on hand-held signs imposed by the Defendants on the Plaintiffs.

The Government is not constitutionally endowed with the power the Defendant arrogate in the performance of their protective function, the power to make laws.  This omission is for good reason: the right to freedom of speech is too supremely precious to subject it to the kind of chimerical beast that changes, shifts, mystifies the eyes, and defies those who would, if they could, be obedient.

The fictive ban on demonstrations, on prayer vigils, on sign displays, is unconstitutional because, being imagined and fictional, its terms are so "vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." Connally v. General Constr. Co., 269 U.S. 385, 391 (1926).  The Supreme Court explained the problem of vague enactments in Grayned:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the

person of ordinary intelligence a reasonable opportunity to know what is
prohibited, so that he may act accordingly. Vague laws may trap the innocent by
not providing fair warning. <u>Second</u>, if arbitrary and discriminatory enforcement is
to be prevented, laws must provide explicit standards for those who apply them. A
vague law impermissibly delegates basic policy matters to policemen, judges, and
juries for resolution on an ad hoc and subjective basis, with the attendant dangers
of arbitrary and discriminatory application. <u>Third</u>, but related, where a vague
statute "abut[s] upon sensitive areas of basic First Amendment freedoms," it
"operates to inhibit the exercise of [those] freedoms." Uncertain meanings
inevitably lead citizens to "'steer far wider of the unlawful zone' . . . than if the
boundaries of the forbidden areas were clearly marked."

<u>Grayned</u>, 408 U.S. at 108-09.

The law deployed by the Government Defendants here fails the test: it does not "give the
person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he
may act accordingly." <u>Grayned,</u> 408 U.S. at 108.   While all laws must be reasonably clear, laws
which regulate or restrict free speech, such as the twenty foot zone, must satisfy "a more stringent
vagueness test," <u>Village of Hoffman Estates v. Flipside, Hoffman-Estates,</u> 455 U.S. 489, 499
(1982) (footnote omitted).  "Precision of regulation must be the touchstone in an area so closely
touching our most precious freedoms." <u>Riley v. Nat'l Federation of the Blind,</u> 487 U.S. 781, 801
(1988) (internal quotation marks and citations omitted).  When a law imposes such vague criminal
prohibitions,  speakers are forced to proceed at their own peril -- or to censor their speech out of
fear of prosecution.  The Due Process Clause forbids such government-imposed guessing games.
<u>Grayned,</u> 408 U.S. at 108-09.

Under the vagueness doctrine, "stricter standards of permissible statutory vagueness may
be applied to a statute having a potentially inhibiting effect on speech; a man may the less be
required to act at his peril here, because the free dissemination of ideas may be the loser." <u>Smith v</u>

California, 361 U.S. 147, 149 (1959).  The Supreme Court has reiterated this more stringent

scrutiny of vague laws that impinge on first amendment rights.  Hynes v. Mayor of Orade11, 425

U.S. 610, 620 (1976) ("[t]he general test of vagueness applies with particular force in review of

laws dealing with speech").  Stringent scrutiny, together with specificity in legislation, preclude

the chill on free speech that results from vague laws: "[u]ncertain meanings inevitably lead citizens

to 'steer far wider of the unlawful zone... than if the boundaries of the forbidden areas were

clearly marked.'" Grayned, 408 U.S. at 109 (quoting Baggett v. Bullitt, 377 U.S. 360, 372

(1964)). The need for specificity is clear:

> [t]hese freedoms are delicate and vulnerable, as well as supremely precious in our
> society.  The threat of sanctions may deter their exercise almost as potently as the
> actual application of sanctions.  Because First Amendment freedoms need
> breathing space to survive, government may regulate in the area only with narrow
> specificity.

NAACP v. Button, 371 U.S. 415, 433 (1963) (citations omitted).  The Government's fictional

ban on demonstrations, prayer vigils, and sign displays fails to establish a definite standard of

conduct, because it is fictional; thus, it violates due process because "everyone is entitled to know

what a statute requires or forbids."  Hynes, 425 U.S. at 620 (striking an ordinance permitting

solicitation only for "recognized charitable causes" as unconstitutionally vague).  The Due

Process Clause of the Fifth Amendment is offended by the enforcement of, or the threat of

enforcement of, an imaginary law restricting rights of freedom of speech.

VIII.    THE CLAIM FOR DAMAGES AGAINST AGENCIES OF THE UNITED STATES,
ARISES, IF AT ALL, UNDER THE RELIGIOUS FREEDOM RESTORATION ACT,
AND IS DUE TO BE DENIED, IF AT ALL, BECAUSE CONGRESS DID NOT
EXPRESSLY WAIVE SOVEREIGN IMMUNITY BY ITS ENACTMENT OF RFRA

Pursuant to Fed. R. Civ. Pro. 11, counsel for the Plaintiffs gives notice to the Court that

the argument contained in this section seeks a reversal or modification of existing law.  In

particular, the attention of the Court is drawn to the decision of the United States Court of

Appeals for the District of Columbia Circuit in Webman v. Federal Bureau of Prisons, 441 F.3d

1022, reh'g and reh'g en banc denied, 2006 U.S. App. LEXIS 16915 (D.C. Cir. 2006).  In

Webman, the D. C. Circuit expressly concluded that Congress had not waived the sovereign

immunity of the United States to suits for money damages under the Religious Freedom

Restoration Act, Title 42 U.S.C. § 2000bb.  441 F.3d at 1025-26.

Here, the claims for damages against the agencies stand, or fall, on the determination of

the question whether Congress abrogated sovereign immunity to suits for damages against

agencies of the federal government when it enacted the broadly sweeping statute.  This Court is

bound to the construction of RFRA given authoritatively by the Circuit Court in Webman and

must, therefore, deny the claim for damages on that ground.  For that reason, Plaintiffs

respectfully request that the Court expressly deny the claim for damages against the United States

Marshals Service and the United States Secret Service on the ground of sovereign immunity

having not been abrogated under RFRA, so that Plaintiffs may, in due course, exercise their right

to seek review of that decision, ultimately, in the Supreme Court of the United States.[11]

---

[11]Of course, that the claims for money damages are subject to dismissal because of the
ground of sovereign immunity does not mean that the claims for injunctive and declaratory relief

<u>CONCLUSION</u>

For all the foregoing reasons, the motion to dismiss and the alternative motion for summary judgment should be denied.

DATED: Saturday, July 15, 2006.

Respectfully submitted,

_____
/s/

James Matthew Henderson Sr. # 452639
*Counsel of Record*
The American Center for Law and Justice
201 Maryland Avenue NE
Washington, DC 20002
(202) 546-8890

*Attorney for the Plaintiffs*

_____

are likewise subject to dismissal. <u>See</u> <u>Webman</u>, 441 F.3d at 1025 (noting that federal agencies subject to suit under RFRA for nonmonetary damages).