IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

REVEREND PATRICK MAHONEY, *et al.*,  )
                                     )
                         Plaintiffs, )
                                     )
-vs-                                 )   Civil Action No. 1:05-cv-01786-RCL
                                     )
THE UNITED STATES SECRET SERVICE,    )
*et al.*,                            )
                                     )
                         Defendants. )

PLAINTIFFS' COUNTERSTATEMENT OF FACTS GENUINELY IN DISPUTE

The Plaintiffs agree that there is no genuine dispute regarding certain facts identified in Defendant's L.Civ.R. 7.1 Statement. In particular, the Plaintiffs agree that there is no dispute regarding the facts stated in paragraphs 1-7, 13-16, 18, 20-23, 25. While agreeing that there is no genuine issue about these facts, the Plaintiffs do not concede that each stated fact is material to the issues in this litigation.

Pursuant to Local Civil Rule 7.1, the Plaintiffs submit this statement of material facts in genuine issue.[1]

---

1. For ease of reference, the following conventions are observed when citing to the exhibits filed by Plaintiffs in this action: Plaintiffs' Exhibits 1 through 4 (filed in support of the Motion for Preliminary Injunction) and Exhibits 7 and 8 (filed in Opposition to the Defendants' Motion for Summary Judgment or Dismissal) are cited thus: "Pls' Ex. __." In the press of time responding to the Defendants' Opposition to the Motion for Preliminary Injunction, counsel for the Plaintiffs erroneously identified the Declaration of Kathleen Mahoney and the Supplemental Declaration of Reverend Patrick Mahoney as Exhibits E and F, respectively. Citations to those exhibits herein will be indicated as "Pls. Ex. 5(E)" and "Pls. Ex. 6(F)." Reference to specific paragraphs of any the Declarations filed by Plaintiffs as exhibits will be indicated as "Pls' Ex. __ ¶ ___."

Counterstatement of Disputed Facts Page 1

I.       GENUINE ISSUES OF FACT REGARDING THE EVENTS OF OCTOBER 5, 2003.

The Plaintiffs directly and specifically dispute Defendants' Undisputed Facts 9-12 to the extent that those stated assertions of fact conflict with the following statement of facts:

1.       When Mahoney, Newman and the CDC arrived at the Cathedral, they found that vehicular traffic in front of the Cathedral was obstructed by crossbucks, and that portions of the sidewalks across from the Cathedral were marked by yellow tape.  Pls' Ex. 1 ¶ 19 (Declaration of Reverend Patrick Mahoney).

2.       Mahoney spoke with an as yet to be identified USMS officer, Deputy Marshal John Doe 1.  Pls' Ex. 1 at ¶ 20; Pls' Ex. 3 at ¶¶ 12-13 (Declaration of Brenna Sullenger).

3.       Deputy Marshal John Doe 1 told Mahoney that he could stand on the public sidewalk directly across from the Cathedral, but that he would not be allowed to display any signs while he did so.  Pls' Ex. 1 at ¶ 21; Pls' Ex. 3 at ¶ 14.

4.       In the area indicated by Deputy Marshal John Doe 1, Mahoney discovered a cadre of press representatives, some with video cameras, others with tape recorders and microphones. Pls' Ex. 1 at ¶ 22; Pls' Ex. 3 at ¶ 20.

5.       Mahoney stood for a brief time in the indicated area without holding any sign.  Pls' Ex. 1 at ¶ 23.

6.       While he stood, Mahoney was left unmolested by the Defendants and other police officials.  Pls' Ex. 1 at ¶ 24.

7.       Mahoney then picked up a sign, approximately 2 feet tall and 3 feet across, on which was displayed the text of the Ten Commandments.  Pls' Ex. 1 at ¶ 25; Pls' Ex. 3 at ¶ 18.

8. Mahoney stood in the area where representatives of the press were standing on the public sidewalk, near where he had just stood without a sign. Pls' Ex. 1 at ¶ 26; Pls' Ex. 3 at ¶ 20.

9. In a few brief minutes, Mahoney was confronted by Deputy Marshal John Doe 2. Pls' Ex. 1 at ¶ 27; Pls' Ex. 3 at ¶ 21.

10. Deputy Marshal John Doe 2 ordered Mahoney to put down his sign. Pls' Ex. 1 at ¶ 28; Pls' Ex. 4, Attachment ("Six arrested for the rule of law") (Declaration of Father Daniel Sparks).

11. Without obstructing anyone's passage, or making offensive physical contact with another, Mahoney continued displaying his sign. Pls' Ex. 1 at ¶ 29; Pls' Ex. 4, Attachment ("Six arrested for the rule of law").

12. Deputy Marshal John Doe 2 physically seized the person of Mahoney, and with the assistance of Deputy Marshal John Doe 3, he dragged Mahoney out of the area of the public sidewalk where the Defendants were interfering with the display of signs. Pls' Ex. 1 at ¶ 30; Pls' Ex. 4, Attachment ("Six arrested for the rule of law").

13. Deputy Marshal John Doe 2 threw Mahoney's sign on the ground outside the area from which he had just ejected Mahoney. Pls' Ex. 1 at ¶ 31; Pls' Ex. 4, Attachment ("Six arrested for the rule of law").

14. Mahoney concluded that this ejection was not an arrest, and that he was free to move about. Pls' Ex. 1 at ¶ 32.

15. Mahoney picked up his sign, and returned to the site of the offensive seizing of his

person by Deputy Marshal John Does 2 and 3. Pls' Ex. 1 at ¶ 33; Pls' Ex. 4, Attachment ("Six arrested for the rule of law").

16. Mahoney was immediately seized, and on this occasion, Deputy Marshal John Doe 2 and John Doe 3 placed Mahoney under arrest. Pls' Ex. 1 at ¶ 34; Pls' Ex. 4, Attachment ("Six arrested for the rule of law").

17. The deputies used plastic zip strip style handcuffs to secure Mahoney's arms behind his back. Pls' Ex. 1 at ¶ 35; Pls' Ex. 4, Attachment ("Six arrested for the rule of law").

18. The Defendants then transferred the custody of Mahoney to representatives of the Washington Metropolitan Police Department, who took him to the local District station. Pls' Ex. 1 at ¶ 36.

19. Mahoney was cited, identifying information was taken from him, and he was released. Pls' Ex. 1 at ¶ 37.

20. While Mahoney was attempting to display his sign, Troy Newman was also at the location for the purpose of supporting the cause of displaying the Ten Commandments in public places. Pls' Ex. 2 at ¶¶ 3-8 (Declaration of Troy Newman).

21. When Newman was told about Mahoney's initial contact with Deputy Marshals, he took his camera and walked over to the vicinity of the activity involving Mahoney. Pls' Ex. 2 at ¶¶ 10-22.

22. Newman took pictures of the contact between Mahoney and certain of the Defendants. Pls' Ex. 2 at ¶¶ 21-23.

23. Newman was observed by Deputy Marshal John Doe 2 to be photographing the

incident. Pls' Ex. 2 at ¶ 38.

24. Deputy Marshal John Doe 2 asked Newman if he was with the press, or who he was with. Pls' Ex. 2 at ¶¶ 39-44.

25. Newman stated that he was with Mahoney. Pls' Ex. 2 at ¶ 45.

26. Deputy Marshal John Doe 2 immediately physically seized Newman and placed him under arrest. Pls' Ex. 2 at ¶¶ 46-63.

27. In October, 2003, when the Plaintiffs were arrested and prevented from carrying out their planned activities, the Defendants had not generally closed the sidewalk to use by the public. Pls' Ex. 7 at ¶ 6.

28. Mahoney numerous instances in which persons passed through the vicinity using the very sidewalk to which Mahoney, Newman and the CDC had been denied access for the purpose of displaying signs depicting the text of the Ten Commandments. Pls' Ex. 7 at ¶ 7.

29. During the time that Mahoney, Newman, and the CDC were conducting their activities, and after Mahoney and Newman were arrested, pedestrians continued to pass up and down the street at the very location where the arrests took place. Pls' Ex. 7 at ¶ 8.

30. During the time that Mahoney, Newman, and the CDC were conducting their activities, and after Mahoney and Newman were arrested, members of the press continued to stand in the very locations where the arrests took place. Pls' Ex. 7 at ¶ 9.

II. GENUINE ISSUES OF FACT REGARDING THE EVENTS OF OCTOBER 3, 2004.

The Plaintiffs directly and specifically dispute Defendants' Undisputed Facts 17 to the extent that conflicts with the following statement of facts:

31.     Because of their prior arrests at the hands of the Defendants, Mahoney, Newman and the CDC requested their counsel to contact legal counsel for the USMS. Pls' Ex. 1 at ¶¶ 38-39.

32.     The Plaintiffs so instructed their attorney for two purposes: obtaining redress of their prior injury and determining whether the USMS planned to engage in the same conduct during the Red Mass on October 3, 2004. Pls' Ex. 1 at ¶ 40.

33.     The Plaintiffs intended to avoid a repeat of the circumstances in which they were wrongfully arrested in 2003 by obtaining an agreed resolution, and also intended to learn whether judicial intervention would be required to avert such circumstances. Pls' Ex. 1 at ¶ 41.

34.     As a result of those negotiations, counsel for Mahoney, Newman, and the CDC, obtained an oral representation that the USMS would not be responsible for security detail activities outside of St. Matthew's Cathedral and that decisions about security and demonstrations would be made by the Metropolitan Police Department. Pls' Ex. 1 at ¶ 42.

35.     As a consequence of obtaining that representation from the Office of General Counsel for the USMS, Mahoney, Newman, and the CDC, did not seek judicial intervention in advance of the 2004 Red Mass. Pls' Ex. 1 at ¶ 43.

36.     Despite the representations made to their counsel, when Mahoney arrived at St. Matthew's Cathedral on the morning of October 3, 2004, he discovered that the USMS was in charge of security for the exterior of St. Matthew's Cathedral. Pls' Ex. 1 at ¶ 44.

37.     When USMS agents and/or employees discovered that Mahoney and those with him were seeking to pray and to display a placard containing the text of the Decalogue, they

threatened to arrest them for demonstrating in an area of the public sidewalk that they claimed was closed to demonstrations. Pls' Ex. 1 at ¶ 45; Pls' Ex. 5(E) at ¶¶ 2, 11-14 (Declaration of Kathleen Mahoney).

38. The USMS agents and/or employees persisted in the threats and harassment of Mahoney and those with him, making it difficult to carry out their planned prayer vigil and demonstration. Pls' Ex. 1 at ¶ 46; Pls' Ex. 5(E) at ¶¶ 2, 11-14.

39. While no arrests were made during this event, the event was substantially affected by the conduct of the USMS agents and/or employees, and the ability of Reverend Mahoney and his associates to exercise their religious obligations and to express their political and religious views was substantially burdened and hampered. Pls' Ex. 1 at ¶47; Pls' Ex. 5(E) at ¶¶ 2, 11-14.

40. That very area of the sidewalk was not, in fact, "closed" to the public. Pls' Ex. 1 at ¶ 48; Pls' Ex. 5(E) at ¶ 16.

III. <u>GENUINE ISSUES OF FACT REGARDING THE EVENTS OF OCTOBER 2, 2005.</u>

The Plaintiffs directly and specifically dispute Defendants' Undisputed Facts 19 and 24 to the extent that those stated assertions of fact conflict with the following statement of facts:

41. The Plaintiffs' prayer vigil and demonstration activities take place on public sidewalks adjacent to Rhode Island Avenue NW, in Washington, the District of Columbia. Pls' Ex. 1 at ¶¶ 13-17; Ex 7 at ¶ 1 (Second Supplemental Declaration of Reverend Patrick Mahoney).

42. That sidewalk at issue is continuous through the neighborhood and in the City of Washington. Pls' Ex. 1 at ¶¶ 13-17; Ex 7 at ¶ 2.

43. That sidewalk at issue is regularly used by the public for passage through the

neighborhood and in the City of Washington. Pls' Ex. 1 at ¶¶ 13-17; Ex 7 at ¶ 3.

44.     That sidewalk is indistinguishable from others in the City of Washington, including, for example, the sidewalk adjacent to the United States Supreme Court and the sidewalk adjacent to the parade route used for presidential inaugurals along Pennsylvania Avenue. Pls' Ex. 1 at ¶¶ 13-17; Ex 7 at ¶ 4.

45.     St. Matthew's Cathedral is located across a public street from the sidewalk at issue in these circumstances. Pls' Ex. 1 at ¶¶ 13-17; Ex 7 at ¶ 5.

46.     Mahoney, the CDC and Newman filed suit against the USMS and five unnamed United States Deputy Marshals to redress their past constitutional injuries and to obtain injunctive and declaratory relief against future harms. Pls' Ex. 7 at ¶ 10.

47.     The plaintiffs filed a motion for a preliminary injunction, together with supporting declarations, setting out their claim for a preliminary injunction. Pls' Ex. 7 at ¶ 11.

48.     In advance of hearing on the motion for preliminary injunction, the United States Secret Service advised the Office of the United States Attorney for the District of Columbia that the President of the United States planned to attend the 2005 Red Mass. Pls' Ex. 7 at ¶ 12.

49.     As a consequence of the President's planned attendance at the Red Mass, the United States Secret Service assumed lead responsibility for devising the plan for protection of statutorily designated persons attending the Mass. Pls' Ex. 7 at ¶ 13.

50.     The United States Secret Service consented to suit and voluntarily appeared by counsel at the hearing on the motion for preliminary injunction. Pls' Ex. 7 at ¶ 14.

51.     In opposition to the preliminary injunction motion, the United States Secret

Service and the United States Marshals Service offered, by sworn declarations, general information about the security planning for the protection of statutorily protected persons attending the 2005 Red Mass. Pls' Ex. 7 at ¶ 15

52. The United States Secret Service and the United States Marshals Service offered no evidence establishing any credible threat of harm or injury to the President or any other statutorily designated protected person. Pls' Ex. 7 at ¶ 16.

53. The United States Secret Service and the United States Marshals Service offered no evidence establishing that the 2005 Red Mass had been designated as a National Security Special Event, in accordance with the provisions of federal statutes or regulations. Pls' Ex. 7 at ¶ 17

54. On Sunday, October 2, 2005, Reverend Mahoney and his wife, Katie Mahoney, traveled to the vicinity of the Cathedral of St. Matthew for the purpose of fulfilling their religious duties as described herein by displaying a sign containing the text of the Ten Commandments. Pls' Ex. 7 at ¶ 18; Pls' Ex. 8 at ¶ 1 (Supplemental Declaration of Kathleen Mahoney).

55. The Mahoneys arrived at about 8:30 a.m. Pls' Ex. 7 at ¶ 23; Pls' Ex. 8 at ¶ 3.

56. When they arrived on the scene, police tape had already been set up marking various divisions of the public sidewalks and street in the vicinity. Pls' Ex. 7 at ¶ 24; Pls' Ex. 8 at ¶ 8; Pls' Ex. 8, Attachment 1 (photograph).

57. Reverend and Mrs. Mahoney went to the Rhode Island Avenue sidewalk across from the Cathedral, adjacent to an area where media representatives were setting up cameras and other equipment. Pls' Ex. 7 at ¶ 25; Pls' Ex. 8 at ¶ 4; Pls' Ex. 8, Attachment 1 (photograph).

58. While in that location, Reverend and Mrs. Mahoney spoke with government officials who told them that the area where they were standing would be closed to the public, and indicating an area across M Street (on the south sidewalk) that had been designated from people carrying signs. Pls' Ex. 7 ¶ 26; Pls' Ex. 8 ¶¶ 11-12.

59. The Mahoneys went to the south sidewalk adjacent to M Street to check it out. Pls' Ex. 7 ¶ 27; Pls' Ex. 8 ¶ 13.

60. From that location, it was immediately apparent that the distance and obstructions between that location and the front of the Cathedral would make communication of their message impossible. Pls' Ex. 7 ¶ 28; Pls' Ex. 8 ¶¶ 14-22; Ex. 8, Attachment 2-7 (photographs).

61. Katie Mahoney then went to stand in line to enter the Cathedral so that she could attend the Red Mass. Pls' Ex. 7 ¶ 29; Pls' Ex. 8 ¶ 23.

62. As she reached the top of the Cathedral steps to enter the Cathedral, she quickly turned and looked in the direction of the area where demonstrators were permitted to be but was unable to see the location where Reverend Mahoney stood from that position. Pls' Ex. 8 ¶ 24.

63. Reverend Mahoney then proceeded to the sidewalk across from the Cathedral. Pls' Ex. 7 ¶ 30.

64. At that time, the sidewalk across Rhode Island Avenue NW from the Cathedral was open to public passage. Pls' Ex. 7 ¶ 31.

65. Reverend Mahoney stood on that sidewalk, holding his sign, facing the Cathedral. Pls' Ex. 7 ¶ 32.

66. In that location, Reverend Mahoney was standing adjacent to a small cluster of

media representatives, including television, print and radio reporters. Pls' Ex. 7 ¶ 32; Pls' Ex. 8 ¶ 8; Pls' Ex. 8, Attachment 1 (photo).

67. At about 9:00 a.m., Secret Service officers approached Mahoney and advised him of the imminent closing of the sidewalk, directing him to remove himself to one of the areas nearby that remained open to the public, on threat of arrest if he failed to do so. Pls' Ex. 7 ¶ 34.

68. Although Mahoney was ordered to remove himself from that location, the United States Secret Service and the United States Marshals Service allowed the media representatives to remain on the sidewalk adjacent to Rhode Island Avenue, NW, across from the entrance to the Cathedral. Pls' Ex. 7 ¶ 35.

69. Mahoney complied and removed himself to the corner of Rhode Island Avenue and 17th Street NW. Pls' Ex. 7 ¶ 36.

70. Mahoney chose that location for his sign display because representations made in court indicated that the President's limousine and the vehicles bringing other dignitaries to the Cathedral would pass that location. Pls' Ex. 7 ¶ 37.

71. A number of vehicles passed by that location. Pls' Ex. 7 ¶ 38.

72. Because he was prevented from standing on the Rhode Island Avenue sidewalk across from the Cathedral, adjacent to the media, Reverend Mahoney was prevented from displaying his sign and communicating his message to the dignitaries arriving at the Cathedral entirely. Pls' Ex. 7 ¶ 39.

73. Standing at the corner of 17th Street and Rhode Island Avenue was not an ample alternative means of communicating his message. Pls' Ex. 7 ¶ 40.

74. A few minutes after 10:00 a.m., Reverend Mahoney saw the Presidential motorcade pass by, but the President was not in the motorcade. Pls' Ex. 7 ¶ 41.

75. Reverend Mahoney heard Secret Service agents in the vicinity say that the President entered the Cathedral through a back entrance, rather than from Rhode Island Avenue. Pls' Ex. 7 ¶ 42.

76. Reverend Mahoney then immediately proceeded from the corner of Rhode Island Avenue and 17th Street to the sidewalk on the south side of M Street in the 1700 block of the street. Pls' Ex. 7 ¶ 43.

77. The United States Secret Service designated that portion of the M Street sidewalk as a location for protestors. Pls' Ex. 7 ¶ 44.

78. From that location, Reverend Mahoney discovered that communicating his message to the President, any attending Justices, or other governmental officials or dignitaries was not possible. Pls' Ex. 7 ¶ 45.

79. The impossibility of communication resulted from several factors:

a. the great distance from the front of the Cathedral to the designated area made it impossible for those exiting the Cathedral from being able to read the signs or hear the messages of Reverend Mahoney nonexistent;

b. the trees adjacent to Rhode Island Avenue creating visual clutter that screened those exiting the Cathedral from a direct line of sight of the protest zone on the south sidewalk adjacent to M Street;

c. the statuary in the park at the terminal end of the block between Rhode Island

          Avenue and M Street also served to screen those exiting the Cathedral from a direct line of sight of the protest zone on the south sidewalk adjacent to M Street;

    d.    and the vehicular traffic passing on M Street also served to screen those exiting the Cathedral from a direct line of sight of the protest zone on the south sidewalk adjacent to M Street.

Pls' Ex. 7 ¶ 46.

80.    Following the end of the Red Mass, Katie Mahoney exited the Cathedral using the main doors facing Rhode Island Avenue. Pls' Ex. 8 ¶ 25.

81.    As she exited the Cathedral she scanned the south sidewalk adjacent to M Street and was not able to see her husband or view his sign. Pls' Ex. 8 ¶ 26-27.

82.    At that time, she also took a photograph of the view from the steps toward the south sidewalk adjacent to M Street. Pls' Ex. 8 ¶ 28; Pls' Ex. 8, Attachment 8 (photograph).

83.    That photograph shows the visual clutter described above and demonstrates that placement of Mahoney and other demonstrators prevented their signs from being read and their messages from being communicated. Pls' Ex. 8 ¶ 31; Pls' Ex. 8, Attachment 8 (photograph).

84.    When Reverend Mahoney found his wife following the end of the Red Mass and after the crowds had cleared, she asked him why he had left the M Street sidewalk location and was stunned to learn that he had stood there the whole time with his sign and that the view from the steps of the Cathedral was too great and the line of sight too cluttered to allow for communication. Pls' Ex. 8 ¶¶ 35-39.

85.    Where he was permitted to stand under the restrictions imposed by the

Government Defendants, it was impossible for the President or Chief Justice Roberts or other attending Justices or dignitaries to see Reverend Mahoney, or his sign, and it was certainly impossible to convey his message to them. Pls' Ex. 7 ¶ 52; Pls' Ex. 8, Attachments 2-8 (photographs).

86. Reverend Mahoney did everything the Government had suggested in court that he would be allowed to do, only to find the information that the Government's counsel put forward in court was neither accurate or factual. Pls' Ex. 7 ¶ 53.

87. At no time did any member of the media that were allowed to stand on Rhode Island Avenue sidewalk display Reverend Mahoney's sign for him or to express his views and opinions on his behalf, although counsel for the Defendants had pressed the argument that Reverend Mahoney's First Amendment rights would be secured by allowing the media to record the events of that morning for reporting and broadcast to the public. Pls' Ex. 7 ¶ 54.

IV. <u>GENUINE ISSUES OF FACT REGARDING FUTURE HARM</u>

88. His prayer vigil and demonstration activity related to the Annual Red Mass is a matter of repeated and long standing activity by Reverend Mahoney and the Christian Defense Coalition. Pls' Ex. 7 ¶ 55.

89. The arrests in 2003, the harassment and threats in 2004, the closure of the public sidewalks unhindered by judicial order in 2005, does not change Reverend Mahoney's fixed intention and plan to continue to conduct prayer vigils and demonstrations during the Red Mass at the Cathedral of St. Matthew, while standing on the public sidewalk adjacent to Rhode Island Avenue. Pls' Ex. 8 ¶ 56.

90.     This year, the Red Mass will take place on October 1st, 2006.  Pls' Ex. 7 ¶ 57.

91.     On October 1st, 2006, Reverend Mahoney plans and intends to conduct a prayer vigil and demonstration on the public sidewalk on the south side of, and adjacent to, Rhode Island Avenue NW, unless, once again, the United States Secret Service and/or the United States Marshal's Service peremptorily destroys the public's right to use those sidewalks for prayer and demonstration purposes.  Pls' Ex. 7 ¶ 58.

92.     If the Defendants continue with their arbitrary and capricious imposition of speech free zones, the recurrence of the events of the previous three years will again result in the denial of Reverend Mahoney's rights protected under the United States Constitution and laws.  Pls' Ex. 7 ¶ 59.

DATED: Saturday, July 15, 2006.

Respectfully submitted,

/s/
James Matthew Henderson Sr. # 452639
*Counsel of Record*
The American Center for Law and Justice
201 Maryland Avenue NE
Washington, DC 20002
(202) 546-8890

*Attorney for the Plaintiffs*