UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
REVEREND PATRICK J. MAHONEY,   )
*et al.*,                               )
                               )
        **Plaintiffs,**             )
                               )
        **v.**                      )        **Civil Action No. 05-1786 (RCL)**
                               )
UNITED STATES                  )
MARSHALS SERVICE, *et al.*,     )
                               )
        **Defendants.**             )
_____)

**MEMORANDUM OPINION**

This matter comes before the Court on the defendants' Motion [35] for Summary

Judgment. Upon consideration of the defendants' motion, the opposition thereto, the reply brief,

the applicable law, and the entire record herein, the Court concludes that the defendants' motion

will be granted. Accordingly, summary judgment will be issued in favor of the defendants on all

of the plaintiffs' claims, and those claims will be dismissed with prejudice. The Court's

reasoning is set forth below. As summary judgment requires that the factual record be construed

in the light most favorable to the non-moving party, the factual background recited below is

drawn from the plaintiffs' complaint, the plaintiffs' opposition to the defendants' motion for

summary judgement, and the affidavits and exhibits thereto.

## I.    FACTUAL BACKGROUND

### A.    The Red Mass

The Red Mass is an annual ceremony that marks the start of each new judicial year.  Held on the Sunday before the first Monday in October, the Mass has in recent years taken place at St. Matthew's Cathedral in Northwest Washington, D.C., where it draws many prominent figures to attend.  These have included the last two Presidents of the United States, Supreme Court Justices, judges from various state and federal courts, elected officials, foreign dignitaries, and prominent clergy.  Brandt Decl. ¶ 7.  The Mass is also open to members of the public to the extent the Cathedral, which has a capacity of around 1,000, can seat them.  This year's Red Mass is scheduled to take place at the Cathedral on Sunday, October 1, 2006.

A bit of geography is in order to better understand the allegations in this case.  The Cathedral is located at 1725 Rhode Island Avenue, in the Northwest quadrant of Washington, D.C.  The Cathedral is on the north side of Rhode Island Avenue facing south-southeast.  The block on which it sits is bounded by Connecticut Avenue on the west and 17th Street on the east. In addition to these streets, a person standing on the steps of St. Matthew's would see portions of M Street directly to the south, across the south sidewalk of Rhode Island Avenue.  *See, e.g.*, Mem. in Support of Motion [35] for Summary Judgment, Ex. G, Ex. H.

The United States Marshals Service, which is charged with protecting members of the federal judiciary, *see* 28 U.S.C. § 566(e)(1)(A), is tasked with the primary responsibility of providing security at the Red Mass, in coordination with other local and federal law enforcement agencies.  In years when the President of the United States attends the Mass, such as 2005, all security measures are dictated by the United States Secret Service.  Brandt Decl. ¶ 2.  In

2

providing security for the Mass, the Marshals have weighed a number of factors "to ensure that protective measures will be employed effectively and with a minimum [sic] disruption to the surrounding community."  Brandt Decl. ¶ 5.  The number of dignitaries attending the event "creates a substantial aggregate security threat," such that the Mass is "a reasonably likely target" for violence or other disruption.  *Id.* ¶ 6.

According to the Marshals, the security policies and procedures in place at St. Matthew's Cathedral were substantially similar in 2003, 2004, and 2005, the years at issue in this case. According to the Marshals, they create a "controlled access area" encompassing both sides of Rhode Island Avenue in front of the Cathedral, between Connecticut Avenue and 17th Street. For roughly an hour before and an hour after the Mass, the controlled access area is closed to vehicular traffic, with the exception of authorized vehicles that drop off and pick up certain dignitaries at the Cathedral entrance.  The only members of the public that the Marshals are supposed to allow into the area are those attending the Mass, or credentialed members of the media who have been pre-approved by diocesan press officials.  *See, e.g.*, Brandt Decl.  In addition to this screening, members of the media are subject to having their equipment searched by the Marshals.  The media are confined to a sub-area within the controlled access area, directly across from the Cathedral entrance on the south sidewalk of Rhode Island Avenue.  In 2005, when the Secret Service was in charge of security, a separate area was marked off for demonstrators at the boundary to the controlled access area, on the south sidewalk of M Street. Brandt Decl. ¶ 17.  While this area was reserved for protestors' use and was located directly across from the Cathedral entrance, protestors were allowed to move freely anywhere outside the controlled access area.  *Id.* ¶ 18.

When fixing the boundaries of their controlled access area, the Marshals take into account the physical layout of the area, in conjunction with factors such as "emergency vehicle access, the potential for emergency evacuation of the attendees and other building occupants, and the set-off distances necessary to mitigate the effectiveness of a variety of weapons."  Brandt Decl. ¶ 10.

Plaintiffs are Reverend Patrick Mahoney, a Presbyterian minister; Troy Newman, a fellow Christian; and the Christian Defense Coalition, an unincorporated religious association.  Their "religious faith," Mahoney says, "demands of [them] that [they] pursue obedience to the biblical command not to remove the ancient landmarks, including the Ten Commandments," from public places.  Mahoney Decl. ¶¶ 6-11.  In large part because of court cases regarding the public display of depictions of the Ten Commandments, over the last several years both Mahoney and Newman have held public demonstrations and prayer vigils in support of the public display of the Commandments.  Some of these demonstrations have taken place outside the Red Mass, where Rev. Mahoney and his compatriots have sought to convey their message to the many jurists in attendance, by, among other means, carrying signs and praying as a group.

Plaintiffs allege that the restrictions imposed by the Marshals Service at the 2003 and 2004 Masses, and by the Marshals Service and Secret Service at the 2005 Mass, worked a violation of their rights under the First and Fifth Amendments and under the Religious Freedom Restoration Act.  They also contend that, contrary to defendants' assertions, in 2003 and 2004 the "controlled access area," to the extent it existed, was not clearly marked, and that the Rhode Island Avenue sidewalks were not generally closed to members of the public, who were left free to pass through the area or simply mill about.  The Court will consider each Mass in turn.

4

**B.    2003 Mass**

Rev. Mahoney, his wife Kathleen, and several of their acquaintances arrived in the neighborhood of St. Matthew's Cathedral slightly over an hour before the 10 a.m. Mass was to begin.  They had brought signs displaying messages about the Ten Commandments, and planned to display the signs as part of their demonstration.  According to plaintiffs, Rev. Mahoney spoke with a Marshal, who told him that only people going to the Mass could walk down Rhode Island Avenue.  Sullenger Decl. ¶ 14.  When Rev. Mahoney asked how the Marshals could know that *all* the people on Rhode Island Avenue were attending the Mass, the Marshal replied that Rev. Mahoney and his companions could go into the Cathedral, or could stand across the street and watch, but could not stand on the street if they were displaying their signs.  *Id*.

After that, Rev. Mahoney and his companions moved to the south sidewalk of Rhode Island Avenue.  Rev. Mahoney, carrying a sign depicting the Ten Commandments, took up position next to the media, in an area in front of a police line.  Sullenger Decl. ¶ 18.  Marshals tried several times to remove Rev. Mahoney back outside the police line, and each time he crossed the police line and returned with his sign to the Rhode Island Avenue sidewalk. Sullenger Decl. ¶¶ 18-22.  After several rounds of this cycle, the Marshals arrested Rev. Mahoney, on the grounds that he had crossed a police line.  When other individuals attempted to cross that line or remain on the inside of it, they were ordered to return to the other side or face arrest.  *See, e.g.*, Sullenger Decl. ¶ 19.  Several – some of them holding signs – persisted in trying to remain inside the police line, or sat down, or explicitly asked to be arrested.  They were arrested by the Marshals and handcuffed.  *See, e.g.*, Sullenger Decl. ¶¶ 23-24.

Plaintiff Troy Newman was arrested, though he was not carrying a sign.  He had approached the area where the arrests were taking place, from the inside of the police line, to take photos.  A Marshal informed Newman that unless he was with the media, he had to "get out of here."  Newman Decl. ¶ 40.  When the Marshal asked Newman whether he was part of the media, Newman replied that he was acting on behalf of the press by documenting the situation and that he had the same right as the media to take pictures.  Newman Decl. ¶ 42.  The Marshal again asked Newman to identify a media outlet with which he was affiliated, asking, "Who are you with?"  Newman gestured toward Rev. Mahoney and said "I know Rev. Mahoney."  *Id*. ¶¶ 42-45.  Newman was then arrested.  *Id*.  ¶¶ 46-50.

Rev. Mahoney has said that "there were absolutely no access restrictions or controls in place on October 5, 2003, when I arrived on the scene and when I first stood, adjacent to members of the media, on the sidewalk across from St. Matthew's Cathedral,"  Mahoney Supp. Decl. ¶ 3, and that "[t]here were no police lines at that time, or police tape marking off controlled areas."  *Id.* at ¶ 5.  Yet Rev. Mahoney initially said that when he arrived at the Cathedral, "vehicular traffic in front of the Cathedral was obstructed by crossbucks, and . . . portions of the sidewalks across from the Cathedral were marked by yellow tape."  Mahoney Decl. ¶ 19.  Plaintiffs have submitted considerable evidence in support of their allegation that access to Rhode Island Avenue was visibly restricted at the time plaintiffs arrived there.  *See, e.g.*, Amended Complaint ¶ 29; Exhibit to Sparks Decl.; Newman Decl. ¶ 19; Sullenger Decl. ¶ 10.  Indeed, plaintiffs have submitted ample evidence that Rev. Mahoney ducked under a police line several times during the course of his protest.  *See generally* Sullenger Decl.; Newman Decl.; Exhibit to Sparks Decl.  Of course, pictures are sometimes worth a thousand words, such as the

6

pictures showing the police tape, crossbucks, and orange cones that lined Rhode Island Avenue. *See, e.g.*, photos attached to Sullenger Decl., Newman Decl., and Exhibit to Sparks Decl..

Plaintiffs also allege that "[d]efendants had not generally closed the sidewalk to use by the public." Mahoney 2d Supp. Decl. ¶ 6. They allege that pedestrians transited the sidewalk in front of the Cathedral or simply milled about. Exhibit to Sparks Decl.; Mahoney 2d Supp. Decl. ¶ 7; Newman Decl. ¶ 19. But plaintiffs' evidence is also replete with examples of the Marshals articulating a policy that prohibited members of the non-attending public from entering the controlled access area along Rhode Island Avenue. The only time plaintiffs allege that the Marshals knowingly allowed a member of the non-attending public to enter that area is when a Marshal told Rev. Mahoney that he could stand on the south Rhode Island sidewalk. This was an exception to the policy just articulated by the Marshal, and was quickly corrected by Marshals who instructed Mahoney to leave the area.

There were roughly 30 demonstrators outside the Cathedral that day. Brandt Decl. ¶ 20. Many of them are visible in photographs taken by Newman; several were holding signs identical to the one held by Mahoney, and they stood behind the police line, a few yards from where the arrests took place. Six individuals were arrested.

### C.     2004 Mass

Rev. Mahoney and his wife attempted to demonstrate outside the Red Mass again in 2004. They were the only demonstrators that year. Brandt Decl. ¶ 20. According to Rev. Mahoney, there were no indications that the south sidewalk of Rhode Island Avenue, across from the Cathedral, was closed to the public, and again there were pedestrians passing up and down the sidewalk and even milling about. Mahoney Supp. Decl. ¶ 7. The Mahoneys stood on the

south sidewalk and displayed their signs and otherwise attempted to convey their message.  The

Marshals said that the couple was standing in an area that was closed to protestors, and requested

that they move to an area farther away from the Cathedral entrance.  Mahoney Decl. ¶¶ 45-48;

Mahoney Supp. Decl. ¶¶ 7-10; Roberts Decl. ¶¶ 3-7.  When the couple remained, the Marshals

had the Metropolitan Police Department arrange several police motorcycles between the

Mahoneys and the Cathedral entrance, and the Marshals posted two officers next to Rev.

Mahoney.  Roberts Decl. ¶¶ 3-7.  At some point, Rev. Mahoney asked his wife to step down the

sidewalk, for fear that she might be arrested.  Mahoney Supp. Decl. ¶ 10.  According to Rev.

Mahoney, for the hour or so that he stood on the sidewalk, "virtually constantly I was either

being engaged by various Marshals in confrontations about my right to be present, or being told

that arrest was imminent."  Mahoney Supp. Decl. ¶ 9.  In Rev. Mahoney's view, such

"harassment and threats" violated his First Amendment rights.  Mahoney 2d Supp. Decl. ¶ 56.

Rev. Mahoney was not arrested, and at some point voluntarily left his spot on the sidewalk.

### D.     2005 Mass

Rev. Mahoney and his wife again attempted to demonstrate outside the 2005 Mass, which

was attended by President Bush, and for which security was coordinated by the Secret Service.

Rev. Mahoney does not dispute that Rhode Island Avenue was blocked to vehicular and

pedestrian traffic by barriers and police tape.  He acknowledges that the credentialed media were

allowed inside this controlled access area – specifically, they were allowed to set up their

equipment and work within a confined sub-area, also marked by boundaries and tape.  He asserts

that he and his wife went to the south sidewalk of Rhode Island Avenue, where they were told by

"government officials" that the area would be closed to the public, and that an area on the south

8

sidewalk of M Street had been designated for people carrying signs. Mahoney 2d Supp. Decl. ¶ 26. Rev. Mahoney visited the area on M Street, but found that its distance from the Cathedral entrance, along with various intervening obstructions, "would make communication of our message impossible." *Id*. ¶ 28. Rev. Mahoney then went to hold his sign next to the media area, on the south Rhode Island Avenue sidewalk, but was told by Secret Service agents that the sidewalk would soon be closed to the public, and that he would have to move into a public area or face arrest. *Id*. ¶ 34.

Rev. Mahoney then tried to demonstrate at the corner of Rhode Island and 17th Street, but this "was not an ample alternative channel of communicating," so he returned to the area on M Street that had been set aside for protestors. *Id*. ¶¶ 40, 43. He concluded that from that point, "communicating my message to the President, any attending Justices, or other governmental officials or dignitaries was not possible" because of the distance between the protestors' area and the Cathedral, as well as the trees, traffic, and statues that obstructed the view between the two points. *Id*. ¶¶ 45-46.

Plaintiffs allege that the Marshals violated their rights through the 2003 arrest, the "harassment and threats" of 2004, and the closure of the Rhode Island Avenue sidewalks in 2005. Mahoney 2d Supp. Decl. ¶ 56. Rev. Mahoney asserts that he will continue to attempt to demonstrate and hold prayer vigils on the south sidewalk of Rhode Island Avenue at future Red Masses, including the one scheduled for the morning of October 1, 2006. *Id*.

## II. PROCEDURAL HISTORY

Plaintiffs brought suit against the United States Marshals Service and five unnamed Marshals on September 9, 2005, claiming deprivations of their rights under the First and Fifth

Amendments and the Religious Freedom Restoration Act, 42 U.S.C. §§ 2000bb et seq.  In

addition to seeking damages and injunctive relief, they moved separately for a preliminary

injunction barring the Marshals Service from interfering with their demonstration at the 2005

Red Mass.  That motion was denied by this Court in a September 30, 2005 Order.  On January

13, 2006, plaintiffs amended their Complaint, adding the United States Secret Service as a

defendant.  On May 31, 2006, defendants moved for summary judgment, or, alternatively, to

dismiss the Amended Complaint for failure to state a claim.

### III.    DISCUSSION

#### A.    Mootness

Defendants have argued that the Court should not hear the case because it is moot.  This

argument holds no merit.  Plaintiffs are correct that this case presents a textbook example of

conduct that is capable of repetition yet evades review, and thus is an exception to the general

rule against hearing moot cases.  The conduct at issue is of too short a duration to be successfully

litigated prior to its cessation, yet there is a reasonable expectation that the complaining party

will face the same conduct in the future.  *See, e.g., United States Parole Commission v.

Geraghty*, 445 U.S. 388 (1980); *United States v. Weston*, 194 F.3d 145 (D.C. Cir. 1999).

Defendants do little more than speculate that it cannot be known who will provide security at

future Masses and what security measures will be implicated.  They do not assert the kind of

actual, voluntary cessation of recurring activity that might implicate the mootness doctrine.

#### B.    Summary Judgment Standard

Under Federal Rule of Civil Procedure 56, a court must grant summary judgment when

the pleadings, affidavits, depositions, answers to interrogatories, and admissions of record

demonstrate that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A disputed issue of material fact is genuine and therefore precludes summary judgment where the Court determines that a reasonable jury could conceivably find in favor of the non-moving party on that factual issue. *Anderson*, 477 U.S. at 248. However, even where a genuine issue exists as to some material fact, the movant is entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

As a general rule, when adjudicating a motion for summary judgment, the Court must "assume the truth of all statements proffered by the party opposing summary judgment" and construe all evidence in favor of the non-moving party. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999). *See Anderson*, 477 U.S. at 255; *Carter v. Greenspan*, 304 F. Supp. 2d 13, 21 (D.D.C. 2004). Indeed, the Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). *See also Washington Post Co. v. United States Dep't of Health & Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989). However, "some statements are so conclusory as to come within an exception to" the general rule that the non-movant's statements must be fully credited when adjudicating a motion for summary judgment. *Greene*, 164 F.3d at 675 (citing as examples *Delange v. Dutra Constr. Co.*, 153 F.3d 1055, 1058 (9th Cir. 1998); *Lefkowitz v. Citi-Equity Group, Inc.*, 146 F.3d 233, 240 (5th Cir.

1998)).  Thus "wholly conclusory statements for which no supporting evidence is offered" need not be taken as true for summary judgment purposes.  *Carter*, 304 F. Supp. 2d at 21 (citing *Greene*, 164 F.3d at 674–75).

In order to survive a motion for summary judgment, the non-moving party must establish more than the "mere existence of a scintilla of evidence" in support of its claims.  *Anderson*, 477 U.S. at 252.  In order to prevail, the non-movant's opposition must contain more than "unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial."  *Carter*, 304 F. Supp. 2d at 21.  *See* Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324.  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249–50.  In fact, summary judgment may issue where the movant points to a substantial lack of evidence in the non-movant's case; *see Celotex*, 477 U.S. at 322; or where the movant demonstrates that the non-movant has failed to proffer "evidence on which the jury could reasonably find for" the non-moving party.  *Anderson*, 477 U.S. at 252.

## C.    First Amendment Claims

The First Amendment to the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech . . .."  The kind of "public issue picketing" and demonstration that plaintiffs engaged or attempted to engage in are at the core of First Amendment activity, and courts must "scrutinize carefully any restrictions" on such activity.[1] *Boos v. Barry*, 485 U.S. 312, 343 (1988); *see also United States v. Grace*, 461 U.S. 171, 176

---

[1]The parties do not dispute, and there can be no serious dispute, that speech about religion is entitled to the same protection as public speech on any other topic.  *See, e.g.*, *Heffron v. ISKCON, Inc.*, 452 US. 640 (1981).

(1983). From time immemorial certain public places have been associated with expressive activity, chief among them streets and sidewalks, which are considered, without more, to be "public forums." *See Grace*, 461 U.S. at 176; *Perry Education Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983).

The sidewalks along Rhode Island Avenue, in front of St. Matthew's Cathedral, are clearly public forums, a conclusion defendants readily concede. In a public forum, the Government can impose reasonable time, place, and manner regulations as long as the restrictions are content-neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication. *See, e.g., Grace*, 461 U.S. at 176; *Heffron v. ISKCON*, 452 U.S. 640, 647, 654 (1981); *Grayned v. City of Rockford*, 408 U.S. 104, 115 (1972). Further restrictions, such as an absolute prohibition on a particular type of expression, can be upheld only if narrowly drawn to accomplish a compelling governmental interest. *See, e.g., Grace* at 176; *Widmar v. Vincent*, 454 U.S. 263 (1981).

There is no merit to plaintiffs' argument that the defendants must show a compelling governmental interest in this case. First, the restrictions imposed here are content neutral. No members of the public were to be allowed within the controlled access area in front of the Cathedral, unless they were attending the Mass or were part of the credentialed media. Individuals who crossed the boundary to that area were turned back regardless of the content or subject of the message they were conveying.[2] Second, despite plaintiffs' argument, the restrictions here did not amount to a total prohibition on their speech. While plaintiffs may have

---

[2]They were also turned back regardless of whether they were attempting to convey a message at all. In 2003 Troy Newman was arrested for refusing to leave the controlled area, and he does not appear to have held a sign or to have attempted to demonstrate.

13

been denied the ability to demonstrate on the precise part of Rhode Island Avenue that they considered optimal, they were given adequate alternative channels through which to exercise their speech rights.  Defendants need only show a significant interest in this case.

They have done so.  The protection of prominent government figures has been found to be a significant interest.  *See, e.g.*, *Grace v. United States*, 461 U.S. 171, 182 (1983).  Protecting the high-profile government attendees – as well as the general attending public – from the "substantial aggregate security threat" that surrounds the Mass is a significant governmental interest.[3]  Plaintiffs continually fail to appreciate the nature and magnitude of this interest, arguing that there has been no evidence of specific, credible threats to the Mass or specific attendees.  Yet the Marshals have determined that the Mass is fraught with "significant security concerns . . . even without factoring in any threats to specific attendees."  Brandt Decl. ¶ 6.

Common sense dictates that when prominent judges, government officials, foreign dignitaries, Supreme Court Justices, and occasionally the President attend an event in a confined area in downtown Washington, D.C., along with a thousand members of the general public, the risk that there will be violence or other disruption is very real.  Recent years have furnished proof and evidence of the seriousness of this threat: armed gunmen have stormed the Capitol building more than once, judges have been attacked and murdered in their courtrooms and in their homes, and terrorists have targeted American government officials in brutal attacks in the United States and overseas.  The governmental interest in protecting those in attendance at the Red Mass is quite significant and, indeed, it is compelling.  This case involves a governmental response to

---

[3]The restrictions also serve other significant government interests that would justify reasonable time, place, and manner restrictions, such as the interest in maintaining a safe and convenient traffic flow for the many pedestrians attempting to enter the Cathedral.

real threats in the real world, not to "every imaginable evil, no matter how remote, how uncertain, or how unlikely." *Tinker v. Des Moines Independent School District*, 393 U.S. 503 (1969).

The governmental response to that felt necessity, in the form of restrictions on access to the streets and sidewalks in front of the Cathedral, is reasonable, and there is a very close nexus between the restrictions imposed and the government interest that underlies them.  A quick inventory of the restrictions, as they affected plaintiffs, is as follows: (1) in 2003, Rhode Island Avenue was blocked to pedestrians who were not attending the Mass, and pedestrians, such as plaintiffs, who entered the controlled access area of Rhode Island Avenue but did not attempt to attend the Mass were arrested; (2) in 2004, Rev. Mahoney was repeatedly told to remove himself and his sign to a point farther from the Cathedral door than his spot on the south sidewalk of Rhode Island Avenue, and when he remained in that spot was monitored by Marshals and subjected to "harassment and threats"; and (3) in 2005 Rev. Mahoney was ordered off the south sidewalk of Rhode Island Avenue, and thereafter could not get any closer to the Cathedral doors than the south sidewalk of M Street, or the corner of Rhode Island Avenue and 17th Street.

These restrictions were part of the overall policy adopted by defendants to close Rhode Island Avenue to everyone except the credentialed press and the attending public.  They were tailored narrowly, indeed, as narrowly as it seems possible, to the government interests underlying them: isolating space for the safe drop off and pick up of VIPs; isolating unimpeded lanes for ingress and egress for emergency vehicles; keeping all members of the non-attending public outside of the pre-determined weapons range; and providing for safe and orderly passage for members of the attending public.  *See, e.g.,* Brandt Decl.

The restrictions in place hew closely to these needs.  There is no allegation that the area exceeded the pre-defined weapons range, that it exceeded the space necessary for emergency vehicles to properly access the Cathedral, or that the Marshals did not need such a buffer zone to allow them space and time to intercept anyone who might try to approach the Cathedral and disrupt the event.  Plaintiffs counter that these boundaries were not reasonable because the general public was allowed to pass through the area and even mill about, while the media was allowed to report from inside the controlled access area.

But it was only the *attending* public that was allowed within that area, according to the Marshals' policy, and according to much of plaintiffs' own evidence.  For instance, plaintiffs have shown repeatedly that at the 2003 Mass, the Marshals told members of the general public – including plaintiffs – that they were not allowed inside the police line if they were not attending the event, and that the Marshals caused the removal of individuals who came inside the line and did not attempt to enter the Cathedral.  Plaintiffs have not pointed to evidence of individuals who could be identified as non-attending members of the public and who were allowed to enter the controlled access area undisturbed.[4]  Indeed, Troy Newman provides an example to the contrary. He did not hold a sign or otherwise engage in the same kinds of activities as Rev. Mahoney.  All he did was signal to the Marshals that he was not attending the Mass and was not a credentialed member of the press.  After being told he could not be in the area and failing to leave, he was

---

[4]Plaintiffs have alleged that a Marshal told Rev. Mahoney he could stand on the public sidewalk across from the Cathedral so long as he did not display his sign.  Mahoney Decl. ¶¶ 20-24; Sullenger Decl. ¶ 14.  Yet they acknowledge that the same Marshal had just finished telling Rev. Mahoney that *no one* was allowed on the Rhode Island Avenue sidewalks unless they were attending the Mass.  And, of course, they acknowledge that other Marshals instructed Rev. Mahoney to leave the restricted area, in keeping with the Marshals' policy, and that the Marshals enforced that policy by effecting arrests.

arrested.

The presence of the media within the controlled access area does not change the calculus. The press had their credentials screened prior to the Mass and had their equipment screened that morning. Given these unique restrictions on the journalists, it was reasonable to impose slightly different restrictions on their proximity to the Cathedral. It is also reasonable for the Marshals to conclude, as they did, that the need for vehicle access to the Cathedral and a buffer zone in front of the Cathedral necessitated placing the setback for the general public, who were not pre-screened or searched, farther back than the setback for the credentialed press.[5]

Plaintiffs claim that certain restrictions would have served the governmental interests at stake in a manner less restrictive to them, such as placing security personnel within and near the location where plaintiffs wanted to demonstrate or deploying metal detectors to the area. But defendants – who do *not* need to show that their restrictions were the least restrictive alternative – have already stated that closure of the south Rhode Island Avenue sidewalk to all but the limited number of pre-screened journalists is necessary to provide the buffer zone, emergency vehicle access, and weapons setoff that they need. Defendants have also set forth that these interests could accommodate allowing the limited number of journalists inside the controlled area, but not the entirety of the general public.

Plaintiffs take great issue with the insinuation that they might pose a threat to anyone's safety, and they point out that it would make little marginal difference if they were allowed to

---

[5]Defendants, in conjunction with representatives of the Archdiocese of Washington, determined that isolating the press in its own area also served the interests of controlling traffic flow and protecting the safety of both press and public. Gibbs Decl. ¶ 9.

stand where they want on the south Rhode Island sidewalk, as Rev. Mahoney did in 2004.[6]  What plaintiffs fail to take into account is that the reasonableness of a time, place, and manner restriction "should not be measured by the disorder that would result from granting an exemption solely to" the complaining party.  *Heffron v. ISKCON*, 452 U.S. 640, 652 (1981).  Rather, courts must look to what would happen if *every* individual to which a restriction applies were freed of its limitations.  *Id.* at 652-54.  If defendants were to allow plaintiffs to demonstrate on the Rhode Island sidewalks, they would have to allow all members of the public to do so, since their speech is just as protected.  *Id.*  The Marshals would lose the emergency access space, the buffer zone, and the weapons setoff that they have determined to be imperative.

Indeed, the facts of this case are quite analogous to those in *Heffron*, where those who wished to distribute or sell literature at a state fair were required to rent booths that were set aside for that purpose and were made available on a first-come, first-serve basis.  A religious group objected to the restriction, which they said limited their ability to roam the fairgrounds to distribute and sell religious literature and to solicit donations for their religion, activities that were part of their religious practice.  The Supreme Court held that this restriction was reasonable in light of the significant government interest in the orderly movement of large crowds at the fair.  *Heffron*, 452 U.S. at 650.

---

[6]Because the Court finds that the overall restrictions imposed by the Marshals, namely the closure of Rhode Island Avenue and its sidewalks to the general public, was a reasonable time, place, and manner restriction, it also finds that the restrictions imposed on Rev. Mahoney in 2004 were reasonable.  In 2004, Rev. Mahoney was allowed to stand where he wished, inside the controlled access area, but was monitored by Marshals to ensure that he did not pose a threat or interfere with their orderly administration of the crowd.  Since it was a reasonable policy to close the sidewalk to the general public, it was certainly reasonable to station officers near a person who persisted in violating that policy.

*Heffron* is directly applicable in this case. Here, as there, Plaintiffs have not been prohibited from directing their speech activity at a specific audience at a specific time and place. They were merely restricted as to where in that area they could engage in that activity, but that did not render the restriction a complete prohibition on speech. In *Heffron* it was reasonable to restrict the plaintiffs to one booth in a 125-acre fairground, whereas plaintiffs in this case are allowed to stand anywhere on the perimeter of the block in question. *Id.* at 650. Indeed, *Heffron* teaches that "consideration of a forum's special attributes is relevant to the constitutionality of a regulation since the significance of the governmental interest must be assessed in light of the characteristic nature and function of the particular forum involved." *Id.* at 650-51.

The special nature and function of the one-block stretch of Rhode Island Avenue at issue in this case are different on the day of the Red Mass than they are on any other day of the year. On that day, the street is more like the state fair in *Heffron* than it is like an ordinary city sidewalk. On that day the street is host to "a temporary event attracting great numbers of visitors who come to the event for a short period." *Id.* at 651. As such, "[t]he flow of the crowd and demands of safety are more pressing in [that] context" than they are for a typical city sidewalk, *id.*, especially when taking into account the prominence of those in attendance and their attractiveness as targets for violence.

Plaintiffs fail to recognize the nature and function of the area in question on the day in question, and this failure leads them to place false reliance on *Grace v. United States*, 461 U.S. 171 (1983) and *Boos v. Barry*, 485 U.S. 312 (1988). Neither case helps plaintiffs, and both demonstrate why the restrictions here are reasonable.

In *Grace* the Supreme Court struck down a prohibition on banners, pickets, and other

demonstrations on the sidewalks surrounding the Supreme Court building.  The Court held that

the restriction was unreasonable and therefore unconstitutional because it had "an insufficient

nexus with any of the public interests that may be thought to undergird" it, which were mainly

the protection of the building and its occupants.  *Id.* at 181-82.  The prohibition could not be

reasonably related or narrowly tailored to the purpose of protecting those in the building because

it applied only to demonstrators and not to the general public, even though there was no reason to

believe that one group posed a greater threat than the other.  Ultimately, the nexus between

restriction and justification was too weak because "[t]here is no suggestion, for example, that

appellees' activities in any way obstructed the sidewalks or access to the building, threatened

injury to any person or property, or in any way interfered with the orderly administration of the

building or other parts of the grounds.  *Id.* at 182.  The total ban was inappropriate because the

sidewalks at question had not been distinguished from any other city sidewalks not subject to the

ban.  *Id.*

     Here, there is a tight nexus between the restrictions – which, unlike *Grace* are temporary

and affect all members of the general public alike – and the interests they serve.  Defendants have

demonstrated that unless they can prohibit the general public, including demonstrators, from

entering this unique sidewalk, there will be a significant risk that someone will "obstruct[] the

sidewalks or access to the building," which need to be clear for those attending the Mass and in

case of emergency evacuation; that someone will "threaten[] injury to any person or property,"

particularly the many high-profile figures who attend the Mass; or will "interfere[] with the

orderly administration of the building or other parts of the grounds."

     Also of no avail to plaintiffs is *Boos v. Barry*, 485 U.S. 312 (1988).  In that case the

Supreme Court held that a District of Columbia Code provision was unconstitutional to the extent it prohibited the display of any sign within 500 feet of a foreign embassy if that sign tended to bring that foreign government into "public disrepute."  Among other reasons, the prohibition was unconstitutional because it was not content neutral, and thus stricter scrutiny was applied than in this case.  While the *Boos* Court assumed, without deciding, that America's international law obligation to protect the dignity of foreign diplomats was a compelling governmental interest, it held that the restriction at issue was not narrowly tailored to that purpose.  For example, less restrictive means of achieving that objective had already been codified in federal law.  Here the restriction is content-neutral and hews closely to the very important interest it serves.

Finally, the restrictions here leave open ample alternative channels of communication, despite plaintiffs' protestations to the contrary.  From the plaintiffs' own photographs of the scene, it is obvious that the entrance to the Cathedral is visible from the south M Street sidewalk, which was open to protestors during each year in question.  While there may be some obstructions between the Cathedral entrance and the spots outside the controlled access area, these are naturally occurring and were not imposed by defendants.  Defendants have taken pains to ensure that demonstrators and other members of the public are able to exercise their First Amendment rights in the area.  But this does not mean that they must allow plaintiffs, and everyone else who so wishes, to demonstrate in whatever place they consider to be optimal.  Plaintiffs have not been prohibited from demonstrating and conveying their message, and, considering the physical reality of the location in question, they have been left with ample alternatives.

The Court does not take lightly the sincere beliefs of plaintiffs, nor does it find any evidence on the record that they themselves pose any risk of violence.  But the governmental interest in ensuring the safety of those at the Red Mass is acute.  That interest justifies taking certain common sense protective measures, which is exactly what defendants have done.  Those measures are reasonable and very narrowly tailored.  Plaintiffs' First Amendment claims must therefore fail.

### D.     Fifth Amendment Claims

Plaintiffs advance claims under the Due Process and Equal Protection Clauses of the Fifth Amendment.  Plaintiffs appear to argue that the restrictions imposed at the Red Mass violate the Due Process Clause because they are unwritten, issued without authority, and are vague and indecipherable.  Plaintiffs cite to no authority, and the Court is aware of none, that stands for the proposition that a policy must be written in order to be constitutional.  As noted previously, the Marshals Service and Secret Service were acting within their statutory authority relative to their designated protectees, and when the Metropolitan Police closed the public sidewalks, they acted within their own statutory authority.  *See* 24 DCMR §§ 2100 et seq.; Hedgepeth Decl. ¶ 2. Finally, there is nothing unconstitutionally vague about the restrictions at issue.  The restricted area of Rhode Island Avenue was marked with tape and barriers, and Marshals repeatedly articulated their policy to plaintiffs.

As for the Equal Protection argument, plaintiffs assert that they were treated differently than others who were similarly situated.  To establish an Equal Protection violation, plaintiffs must establish as a threshold matter that Defendants failed to "afford similar treatment to similarly situated persons."  *News America Pub., Inc. v. FCC*, 844 F.2d 800, 809 (Dec. Cir.

1988).  Plaintiffs have failed to identify anyone who was similarly situated to them and was not similarly treated.  As such, plaintiffs' Equal Protection claims, like their Due Process claims, must fail.

### D.    RFRA Claims

Plaintiffs also assert claims under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. §§ 2000bb - 2000bb-4, which states that "government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability" unless the burden is applied "in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling government interest."  42 U.S.C. § 2000bb-1(a), (b).  As plaintiffs acknowledge, their claims for damages under RFRA must be dismissed because RFRA did not effect a waiver of the federal government's sovereign immunity to damages claims.  *Webman v. Fed. Bur. of Prisons*, 441 F.3d 1022 (D.C. Cir.), *reh'g and reh'g en banc denied* (June 20, 2006).

Judgment for defendants is also in order on plaintiffs' other RFRA claims.  Plaintiffs have not properly alleged that their religious exercise has been substantially burdened.[7]  It is not the case that every activity which could be cast as "religiously motivated" is the kind of exercise of religion protected by RFRA.  *Henderson v. Kennedy*, 253 F.3d 12, 16-17 (D.C. Cir. 2001).  Plaintiffs have alleged that they wish to engage in speech about religion and that this desire is motivated by their religious beliefs, but they have not alleged that this is part of the exercise of their religion.  Most importantly, they do not allege that their religion compels them to engage in

---

[7]Judgment for defendants is also warranted on any RFRA claims advanced by the Christian Defense Coalition, an "unincorporated religious association," because that entity is not a "person" and thus does not have rights under RFRA.  42 U.S.C. § 2000bb-1(a).

this speech at the time and place and in the manner at issue here.  They certainly do not allege that their religion compels them to demonstrate in favor of the public display of the Ten Commandments at all times and in all places, and they offer no evidence that their religion requires them to demonstrate at this particular time and place as compared to all others.

Instead, their evidence confirms the notion that plaintiffs wish to demonstrate at the Red Mass because it provides a target-rich audience of prominent government officials, at whom plaintiffs wish to direct their political message.  This is a classic case of speech on an issue of public interest, not a case of religious exercise.  Finally, even if the Court were to assume that plaintiffs were exercising their religion by demonstrating in front of the Mass, there would still be no substantial burden on this exercise, for the same reasons the Court has held that the time, place, and manner restrictions in this case were reasonable.[8]

## **CONCLUSION**

For the foregoing reasons, the Court concludes that defendants are entitled to judgment on plaintiffs' claims under the First and Fifth Amendments, that plaintiffs' damages claim under RFRA is barred by sovereign immunity, and that defendants are entitled to judgment on plaintiffs' claims for other relief under RFRA.  The Court will therefore grant defendants' motion for summary judgment as to all of the plaintiffs' causes of action, and will enter judgment in favor of defendants and dismiss this case with prejudice.

A corresponding Order setting forth the Court's Judgment in this case shall issue this date.

---

[8]Plaintiffs have also alleged that they wish to pray and hold prayer vigils in front of the Mass, and prayer seems to be a clear aspect of the exercise of their religion.  But they have not alleged that their religion compels them to pray once a year at specific points on the 1700 block of Rhode Island Avenue.

24

Signed by Royce C. Lamberth, United States District Judge, September 27, 2006.